UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------x
STEPHEN GRAY, individually and on        :
behalf of all others similarly situated, :
                                         :
            Plaintiff,                   :      Civil Action No: 07 Civ. 9790 (SHS)
v.                                       :
                                         :
CITIGROUP INC., CHARLES PRINCE,          :
THE PLANS ADMINISTRATIVE                 :
COMMITTEE OF CITIGROUP INC.,             :
THE 401(k) INVESTMENT                    :
COMMITTEE, and JOHN DOES 1 - 20,         :
                                         :
            Defendants.                  :
-----------------------------------------------------x
SHAUN ROSE, Individually and On          :
Behalf of All Others Similarly Situated, :
                                         :
            Plaintiff,                   :      Civil Action No: 07 Civ. 10294 (DC)
v.                                       :
                                         :
CITIGROUP INC., CHARLES PRINCE,          :
THE PLANS ADMINISTRATIVE                 :
COMMITTEE OF CITIGROUP INC.,             :
THE 401(k) INVESTMENT                    :
COMMITTEE, and JOHN DOES 1 - 10,         :
                                         :
            Defendants.                  :
-----------------------------------------------------x
MEREDITH TRANBERG, individually          :
and on behalf of all others similarly situated :
                                         :
            Plaintiff,                   :      Civil Action No: 07 Civ. 10341 (UA)
v.                                       :
                                         :
CITIGROUP INC., CHARLES PRINCE,          :
THE PLANS ADMINISTRATIVE                 :
COMMITTEE OF CITIGROUP INC.,             :
THE 401(k) INVESTMENT                    :
COMMITTEE, and JOHN DOES 1 - 20,         :
                                         :
            Defendants.                  :
-----------------------------------------------------x
```

```
-------------------------------------------------------x
ANTON RAPPOLD, individually and on      :
behalf of all others similarly situated,     :
                                             :
              Plaintiff,                      :      Civil Action No: 07 Civ. 10396 (UA)
v.                                            :
                                             :
CITIGROUP INC., CITIBANK, N.A.,             :
CHARLES PRINCE, THE PLANS                   :
ADMINISTRATIVE COMMITTEE OF                 :
CITIGROUP INC., THE 401(k)                  :
INVESTMENT COMMITTEE, and JOHN             :
and JANE DOES 1 - 10,                        :
                                             :
              Defendants.                     :
-------------------------------------------------------x
SAMIER TADROS, on Behalf of All             :
Others Similarly Situated,                   :
                                             :
              Plaintiff,                      :      Civil Action No: 07 Civ. 10442 (UA)
v.                                            :
                                             :
CITIGROUP INC., CHARLES O.                  :
PRINCE, C. MICHAEL ARMSTRONG,              :
ALAIN J.P. BELDA, GEORGE DAVID,            :
KENNETH T. DERR, JOHN M. DEUTCH,           :
 ROBERTO HERNANDEZ RAMIREZ,                :
ANN DIBBLE JORDAN, KLAUS                    :
KLEINFELD, ANDREW N. LIVERIS,              :
ANNE MULCAHY, RICHARD D.                   :
PARSONS, JUDITH RODIN, ROBERT E.          :
RUBIN, ROBERT E. RUBIN, FRANKLIN          :
A. THOMAS, JOHN DOES 1-20 (BEING          :
CURRENT AND FORMER MEMBERS                 :
OF THE PLANS ADMINISTRATIVE                :
COMMITTEE OF CITIGROUP INC.)               :
and JOHN DOES 21-40 (BEING                  :
CURRENT AND FORMER MEMBERS                 :
OF THE INVESTMENT COMMITTEE                :
OF THE CITIGROUP INC. 401(K) PLAN),:
                                             :
              Defendants.                     :
-------------------------------------------------------x
```

```
--------------------------------------------------------x
STEPHAN FIORINO, individually and on     :
behalf of all others similarly situated,  :
                                          :
            Plaintiff,                    :       Civil Action No: 07 Civ. 10458 (UA)
v.                                        :
                                          :
CITIGROUP INC., CITIBANK N.A.,            :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF               :
CITIGROUP INC., THE 401(k)                :
INVESTMENT COMMITTEE, and                 :
JOHN DOES 1 - 20,                         :
                                          :
            Defendants.                   :
--------------------------------------------------------x
JAMES BOLLA, individually and on behalf :
 of all others similarly situated,        :
                                          :
            Plaintiff,                    :       Civil Action No: 07 Civ. 10461 (UA)
v.                                        :
                                          :
CITIGROUP INC., CITIBANK N.A.,            :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF               :
CITIGROUP INC., THE 401(k)                :
INVESTMENT COMMITTEE, and                 :
JOHN DOES 1 - 20,                         :
                                          :
            Defendants.                   :
--------------------------------------------------------x
```

```
-------------------------------------------------------x
MARK GEROULO, individually, on behalf  :
of the CITIGROUP 401(k) Plan, the      :
CITIBUILDER 401 (K) PLAN FOR           :
PUERTO RICO, and all others similarly, :
                                       :
            Plaintiff,                 :        Civil Action No: 07 Civ. 10472 (UA)
                                       :
v.                                     :
                                       :
CITIGROUP, INC., CITIBANK, N.A.,       :
THE PLAN ADMINISTRATIVE                :
COMMITTEE OF CITIGROUP, INC.,          :
MICHAEL E. SCHLEIN, JOHN DOES          :
1-10, THE CITIGROUP 401(k) PLAN        :
INVESTMENT COMMITTEE and JOHN          :
DOES 10-20, C. MICHAEL                 :
ARMSTRONG, ALAN J.P. BELDA,            :
GEORGE DAVID, KENNETH T. DERR,         :
JOHN M. DEUTCH, ROBERTO                :
HERNANDEZ, ANN DIBBLE JORDAN,          :
ANDREW N. LIVERIS, DUDLEY C.           :
MECUM, ANNE M. MULCAHY,                :
RICHARD D. PARSONS, ANDRALL E.         :
PEARSON, CHARLES PRINCE, JUDITH        :
RODIN, ROBERT E. RUBIN, FRANKLIN       :
A. THOMAS, SANFORD I. WEILL,           :
                                       :
            Defendants.                :
-------------------------------------------------------x
```

```
------------------------------------------------------x
ALAN STEVENS, on Behalf of Himself      :
and All Others Similarly Situated,      :
                                        :
              Plaintiff,                :      Civil Action No: 07 Civ. 11156 (UA)
v.                                      :
                                        :
CITIGROUP INC., CITIBANK, N.A,          :
CHARLES PRINCE, C. MICHAEL              :
ARMSTRONG, ALAIN J.P. BELDA,            :
GEORGE DAVID, KENNETH T. DERR,          :
JOHN M. DEUTCH, PETER JOHNSON,          :
ROBERTO HERNANDEZ RAMIREZ,              :
ANDREW N. LIVERIS, ANNE                 :
MULCAHEY, RICHARD D. PARSONS,           :
JUDITH RODIN, ROBERT E. RUBIN,          :
ROBERT L. RYAN, FRANKLIN A.             :
THOMAS, THE PLANS                       :
ADMINISTRATION COMMITTEE OF             :
CITIGROUP, INC., THE INVESTMENT         :
COMMITTEE and JOHN DOES 1-30,           :
                                        :
              Defendants.               :
------------------------------------------------------x
STEPHEN GOLDSTEIN, on Behalf of         :
Himself and a Class of Persons Similarly :
Situated,                               :
                                        :
              Plaintiff,                :      Civil Action No: 07 Civ. 11158 (UA)
v.                                      :
                                        :
CITIGROUP INC., THE PLANS               :
ADMINISTRATION COMMITTEE OF             :
CITIGROUP, INC., MICHAEL E.             :
SCHLEIN, CHARLES PRINCE, C.             :
MICHAEL ARMSTRONG, ALAIN J.P.           :
BELDA, GEORGE DAVID, KENNETH T.         :
DERR, JOHN M. DEUTCH, ROBERTO           :
HERNANDEZ RAMIREZ, ANDREW N.            :
LIVERIS, ANNE MULCAHEY,                 :
RICHARD D. PARSONS, JUDITH              :
RODIN, ROBERT E. RUBIN, ROBERT L.       :
RYAN, AND FRANKLIN A. THOMAS,           :
And JOHN DOES 1-30,                     :
                                        :
              Defendants.               :
```

```
------------------------------------------------------x
CHRIS SOUTHARD, on Behalf of All       :
Others Similarly Situated,             :
                                       :
              Plaintiff,               :      Civil Action No: 07 Civ. 11164 (UA)
v.                                     :
                                       :
CITIGROUP INC., CHARLES O.             :
PRINCE, C. MICHAEL ARMSTRONG,          :
ALAIN J.P. BELDA, GEORGE DAVID,        :
KENNETH T. DERR, JOHN M. DEUTCH,       :
ROBERTO HERNANDEZ RAMIREZ,             :
ANN DIBBLE JORDAN, KLAUS               :
KLEINFELD, ANDREW N. LIVERIS,          :
ANNE MULCAHY, RICHARD D.               :
PARSONS, JUDITH RODIN, ROBERT E.       :
RUBIN, ROBERT E. RUBIN, FRANKLIN       :
A. THOMAS, JOHN DOES 1-20 (BEING       :
CURRENT AND FORMER MEMBERS             :
OF THE PLANS ADMINISTRATIVE            :
COMMITTEE OF CITIGROUP INC.)           :
and JOHN DOES 21-40 (BEING             :
CURRENT AND FORMER MEMBERS             :
OF THE INVESTMENT COMMITTEE            :
OF THE CITIGROUP INC. 401(K) PLAN),    :
                                       :
              Defendants.              :
------------------------------------------------------
FRANCIA BRICK, individually and on     :
Behalf of all others similarly situated,      :
                                       :
              Plaintiff,               :      Civil Action No: 07 Civ. 11369 (UA)
v.                                     :
                                       :
CITIGROUP INC., CHARLES PRINCE,        :
THE PLAN'S ADMINISTRATIVE              :
COMMITTEE OF CITIGROUP, INC.,          :
THE 401(k) INVESTMENT COMMITTEE,:
And JOHN DOES 1-10,                    :
                                       :
              Defendants.              :
------------------------------------------------------
```

## <u>DECLARATION OF ROBERT A. IZARD</u>

I, Robert A. Izard, declare as follows:

1.      I am a Shareholder in the law firm Schatz Nobel Izard, P.C.

2.      Attached hereto as Exhibit A is a true and correct copy of a Special Master's Report and Recommendation issued in *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02-1500 (S.D.N.Y), dated August 7, 2007.

3.      Attached hereto as Exhibit B is a true and correct copy of an Order issued in *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02-1500 (S.D.N.Y), dated October 26, 2007.

4.      Attached hereto as Exhibit C is a true and correct copy of a transcript of proceedings in *In re Merck Sec., ERISA and Deriv. Litig.*, No. 05-1157 (D.N.J.), on  April 18, 2005.

5.      Attached hereto as Exhibit D is a true and correct copy of a Case Management Order issued in *In re Tyco International, Ltd. Sec. Litig.*, Case No. 02-1335 (D.N.H.), on December 20, 2002.

6.      Attached hereto as Exhibit E is a true and correct copy of an Order issued *in In re Sprint Corp. ERISA Litig.*, No. 03-2202 (D. Kan.), issued on August 3, 2006.

7.      Attached hereto as Exhibit F is the firm resume of Schatz Nobel Izard, P.C.

8.      Attached hereto as Exhibit G is a true and correct copy of a Citigroup 401(k) Plan Summary Plan Description.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of December, 2007.

_____/s/_____
Robert A. Izard

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------

IN RE AOL TIME WARNER, INC.                    02 Civ. 8853 (SWK)
SECURITIES AND "ERISA" LITIGATION

                                               **REPORT & RECOMMENDATION**
                                               **OF THE SPECIAL MASTER**
------------------------------------

**TO: HON. SHIRLEY WOHL KRAM, U.S.D.J.:**

By orders entered October 25 and November 15, 2006, I was appointed Special Master of the Court for the purpose of reviewing and making recommendations to the Court upon various applications for fees and expenses filed by attorneys and law firms representing individual claimants or the class in this action. Class counsel requested that the Court enter an award of 20 percent of the total recovery, or $20 million, plus reimbursement of costs and disbursements. Although counsel seek an award based upon the percentage method, they report accrued fees, based upon their customary hourly billing rates, in the amount of $9,145,282.10. I respectfully recommend that the applications be granted to the extent of awarding $17,865,395 in fees and $267,552.64 in expenses.

### Background of the Action

This is the second in a trilogy of class actions following in the wake of the merger between two corporate behemoths. Plaintiffs are members of various retirement plans sponsored by America Online Inc. ("AOL"), Time Warner, Inc. ("Time Warner") or their merger-born amalgamation. They sue under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§1001 *et seq.* Linking the various defendants' accounting irregularities with the over-concentration of plan assets in AOL Time Warner securities, plaintiffs sought to hold them liable for massive losses in the plans' values between 1999 and 2003. Plaintiffs contend that the sponsors and those who directed the plan investments in the relevant time period invested too heavily in the sponsors' own securities, failing to diversify the portfolio and leaving the plans especially vulnerable to loss when an AOL Time Warner accounting scandal became public. According to the Amended Complaint, AOL Time Warner engaged in sham transactions and other artifices designed to create the appearance that they were generating revenue, when in fact they provided only illusory benefits to the company.

Three plan members, Barbara Grant, Rita Roberts and Steven Winfield, commenced the original actions. Those actions were consolidated into a single Amended Complaint, in which three separate law firms acted as co-lead counsel: Stull, Stull & Brody of New York, New York; Schatz & Nobel, P.C. of Hartford, Connecticut; and Schiffrin & Barroway, LLP of Radnor, Pennsylvania.

As is often the case, the Amended Complaint was met with motions to dismiss, filed by two large law firms well experienced in ERISA and class action defense. Defendants were primarily represented by the defense powerhouse of Cravath Swaine & Moore. Counsel thus faced a tough fight, which they no doubt anticipated and were willing to risk from the start.

2

Most of the Amended Complaint survived the motions to dismiss. The majority of the remaining legal work in the case consisted of the review and coding of documents - some 15 million pages in all according to counsel - and settlement negotiations under the auspices of an earlier Special Master, Paul D. Wachter. Although a class certification motion was filed and summary judgment motions were pending, less time was devoted to those activities than to the discovery-related work.

The mediation conducted by Special Master Wachter was unusually sophisticated. Counsel for each side were challenged to prove their respective positions through evidence, written presentations and oral arguments that spanned multiple days and required elaborate preparation.

The pivotal issues that permeated the litigation were the focal point of the mediation as well. Included among them was the dispute over loss causation, accentuated by the recession and the shattering of the so-called "technology bubble" which coincided with the misdeeds chronicled in the Amended Complaint. The liability of plan fiduciaries and others for concentrating plan assets in company stock was also an unsettled question, as was the standing of holders, rather than sellers, of securities. The morass of documents and complexity of these issues make it hardly surprising that the daily time records reflect more than 28,000 lawyer and paralegal hours.

The case was finally settled at the end of a mediation session with Special Master Wachter on February 22, 2006. The

3

settlement provides for a $100 million payment to the plans, to be distributed ultimately to plan beneficiaries. This settlement followed a $2.5 billion accord, also mediated by Mr. Wachter, in the companion AOL Time Warner securities case nearly a year earlier. (Plan beneficiaries will also share pro rata in the former settlement.) As part of the current settlement, the proposed terms were reviewed and approved by an independent fiduciary, acting pursuant to Department of Labor ERISA settlement regulations.

Counsel sent notice to approximately 65,000 potential beneficiaries. Only four plan members came forward with objections, all through the same attorney in a consolidated filing. In essence, the objectors contend that the settlement arrived on the coattails of the earlier securities settlement, and that the percentage sought by counsel exceeds the "average range of percentage fees." Objection to Class Action Settlement & Request for Attorney's Fees at 5.

On September 27, 2006, the Court approved the settlement in a Memorandum Opinion. In endorsing the settlement, the Court described class counsel as "experienced," "well-informed" and willing to face the many risks associated with this litigation.

I have reviewed the voluminous case file, including the papers prepared and filed by class counsel. Those papers reflect proficient legal advocacy, accurate identification of the issues, timely filings and proper analysis. At the same time, many of the arguments were not new, but were common to many contemporary ERISA

cases, and some emulated the analyses and other work performed in the AOL Time Warner securities case.

In their settlement notice, counsel informed the class of their intention to seek fees up to 25 percent of the recovery amount, plus expenses. Counsel now crystallize their request with an application for 20 percent of the recovery, or $20 million, plus $267,552.64 in "out-of-pocket costs and expenses." The cost and expense request, however, was commendably reduced from the original amount of $327,359.29 after my conference with counsel on May 30, 2007, based on certain issues I raised.

Counsel have submitted their daily time records and summaries of their expenses, broken down by firm. The documents reflect the services performed by each timekeeper, with corresponding dates and duration. These records are intended for use as a potential "cross-check" against their percentage-based fee request.

They distinguish other cases in which the stock price decline was preceded by the issuer's own restatement of financial results. Counsel not only echo the risks present in the prior securities action, such as proving the abstruse web of different artifices used to inflate the company's accounting for advertising revenues, loss causation and a basis for class certification, but additional unsettled issues peculiar to ERISA, such as fiduciary liability, standing to recover as holders of securities and over-concentration of plan assets in company stock. Counsel also cite the absence of a head start from governmental investigations that often spur these private claims.

Counsel heavily emphasize the endorsement of their fee application by an independent fiduciary, Fiduciary Counselors Inc., which also opined favorably upon the settlement. Because federal law prohibits certain settlements of ERISA claims, such independent review is required by an exception for such purpose contained in federal regulations. *See* Prohibited Transaction Exemption 2003-39, 68 Fed. Reg. 75632-01 (Dec. 31, 2003).

In addition to reviewing voluminous applications from counsel and a response from counsel for the objectors, I met with counsel on May 30, 2007 to discuss certain tentative findings, to raise a number of questions and to solicit comment upon the Second Circuit's recent decision in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 484 F.3d 162 (2d Cir. 2007).[1] Counsel also presented certain information not readily apparent from their fee submissions. I also invited counsel for the sole objectors, Stephen Tsai, Esq. Mr. Tsai did not attend.

Counsel argued that the ERISA case was riskier than the securities case and that their negotiating position was weakened, rather than bolstered, by the securities settlement. According to counsel, the securities settlement enabled defendants to turn their full attention to the ERISA defense, and the comparatively limited exposure in the ERISA case dampened defendants' incentive to settle.

---

[1] This opinion was amended on July 12, 2007 but not in the respects cited here. *See* 2007 WL 2004106. The official citation from the original decision is utilized for convenience.

Counsel also elaborated on the anatomy of the $100 million settlement, details of which they were previously reluctant to supply on paper because of the confidential and candid nature of the settlement negotiations and the prospect that these same adversaries would be squaring off in future cases. Keeping this in mind, I will limit my finding to one which notes that, when the mediated negotiations reached the vicinity of $70 million, a number which the independent fiduciary found to be at the upper range of expectations, counsel pressed on, in the face of stiff resistance from defendants and the pessimism of the Special Master.

Counsel subsequently made further submissions addressing various matters covered at the conference. To their credit, counsel reduced their expense applications by $59,806.65, in line with certain issues I raised and suggestions I made.

## Discussion

### The Approved Methodologies

This case presents an early opportunity for a district court to apply *Arbor Hill* to an award of attorneys' fees from a common fund. Although *Arbor Hill's* evolutionary holding arose in the context of a statutory fee shifting determination under the Voting Rights Act of 1965, 42 U.S.C. §1973, its principles resonate throughout the sphere of judicial fee determinations generally. Indeed, its market orientation echoes the Court of Appeals' pronouncement seven years earlier in its reigning common fund guidepost that "market rates, where available, are the ideal proxy

for [class counsel's] compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). Counsel acknowledge the relevance of this recent decision and urge that the opinion is consistent with their current application.

*Arbor Hill* is the latest milestone in a cycle of judicial fee jurisprudence that dates back as far as the 19th century. *See Trustees v. Greenough*, 105 U.S. 527 (1881).[2] The so-called "common fund doctrine," coupled with Fed. R. Civ. P. 23(e), authorizes the Court to award fees and expenses to class counsel and certain other claimants in a duly certified class action. *See In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 222 (2d Cir. 1987), *cert. denied sub nom. Schwartz v. Dean*, 484 U.S. 926 (1987). Based on the notion that incentives and rewards are necessary for those who would take on a legal risk and challenge for the benefit of a wide class, the doctrine awards the successful champions reasonable compensation from the resultant fund.

As the Court of Appeals acknowledged in *Arbor Hill*, the journey from the early days of class actions to the current year has not always been smooth, consistent or, in some cases, clear. The federal courts have shifted back-and-forth between the percentage-of-recovery method and the so-called "lodestar" method, a term now banished by the Court of Appeals to the lexical dustbin

---

[2] Interestingly enough, two of the major dictates of *Goldberger*, a preference for "moderation and a jealous regard to the rights of those who are interested in the fund," can be traced back to the Supreme Court's seminal verbiage in *Greenough.* 105 U.S. at 537.

in favor of the "presumptively reasonable fee." *Compare, e.g.,* *Winkelman v. General Motors Corp.,* 48 F. Supp. 504 (S.D.N.Y. 1942), *aff'd sub nom. Singer v. General Motors Corp.,* 136 F.2d 905 (2d Cir. 1943) *with City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2d Cir. 1974) *and with Goldberger,* 209 F.3d at 47.

The percentage-of-recovery method popular since the earliest days of common fund litigation evolved in the 1970s into the rate-based lodestar method, *see Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir. 1973), as the courts perceived that percentage recoveries were too frequently overcompensating counsel at the expense of their class constituents. Under the lodestar procedure, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate. Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Goldberger,* 209 F.3d at 47 (citations omitted); *see also "Agent Orange" Product Liability Litigation,* 818 F.2d at 222 ("the court may, in its discretion, increase or decrease [the hourly fees] by examining such factors as the quality of counsel's work, the risk of the litigation and the complexity of the issues").

As the broadening scope and complexity of litigation compounded legal hours over the ensuing decades, the lodestar

began drawing fire.   Critics have contended that the lodestar created a temptation for lawyers to run up the number of hours for which they could be paid, created an unanticipated disincentive to early settlements and compelled district courts "to engage in a gimlet-eyed review of line-item fee audits." *Goldberger,* 209 F.3d at 48-49; *see also Court Awarded Attorney Fees*, Report of the 3d Cir. Task Force, 108 F.R.D. 237 (Oct. 8, 1985); *Kirschoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986).   To this day, the lodestar method continues to spark criticism for generating avoidable hours, discouraging early settlement and burdening district judges with tedious audits of time records.   *Goldberger*, 209 F.3d at 48-49; Alan Hirsch & Diane Sheehey, *Awarding Attorneys Fees & Managing Fee Litigation* at 73-74 (Fed. Jud. Ctr. 2d ed. 2005).

It did not take long for the percentage method to regain its place in fee jurisprudence.   Some circuits began mandating its use, *e.g.*, *Swedish Hospital v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993), while others, including the Second Circuit, retained the lodestar as an alternative.   *See Goldberger,* 209 F.3d at 50; *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291 (9th Cir. 1990); *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513 (6th Cir. 1993).

Regardless of the method used, the fee determination process represents a departure from the norms of the justice system.   In typical party-against-party litigation, each side pays its own fees.   *See Alyeska Pipeline Servs. Co. v. Wilderness* Soc'y, 421 U.S. 240, 247 (1975).   In statutory fee-shifting cases, such as

10

*Arbor Hill*, defendants have every incentive to minimize their fee exposure. Even in this case, aside from the frequency with which class actions end in settlement, *see* Decl. of Michael J. Klein, Jul. 18, 2006, Ex. B; Janet Cooper Alexander*, Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stanford L. Rev. 497, 578 (1991), neither side could rule out an eventual award through statutory fee-shifting until the settlement was reached. *See* 29 U.S.C. §1132(g) (ERISA fee-shifting statute).

By contrast, in a common fund case, the defendants, having settled by creating a finite monetary pool in exchange for a release, have little interest in the division of the spoils. Individual class members, whose numbers are scattered and who often lack a singular interest sufficient to prompt intervention, rarely object. *See* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts* at 76 (Fed. Jud. Ctr. 1996). While the absence of dissent is a factor that the courts must consider, it is far from decisive. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 280-81 (3d Cir. 2001) ("acquiescence [which is the most that a failure to object shows] is not the same thing as 'prior approval'")(ellipse in original).

Thus, the Court must enter the fray as a guardian of the class interests and to harmonize the tension between the remunerative demands of counsel and maximizing the recoveries of individual claimants. *See Goldberger,* 209 F.3d at 52; *see*

11

*generally Court Awarded Attorney Fees*, 108 F.R.D. 237.  Regardless of the method used, "a fee award should be assessed based on scrutiny of the unique circumstances of each case and 'a jealous regard to the rights of those who are interested in the fund.'" *Goldberger,* 209 F.3d at 53, *quoting Grinnell*, 495 F.2d at 469. Regardless of whether the court in a case of this nature would ultimately engage in statutory fee shifting, hourly fee analysis or a percentage approach, it is as true for the plaintiffs in this case as it was in *Arbor Hill* that they had "little incentive to negotiate a rate structure with [their] attorney prior to the litigation; the district court must act later to ensure that the attorney does not recoup fees that the market would not otherwise bear."  484 F.2d at 164.

**The Two Approaches**

The Second Circuit has provided detailed guidance on the implementation of the two permissible methods, onto which it has superimposed the requirements expressed in *Arbor Hill*.  There is no reason to abjure *Arbor Hill's* market focus simply because this is a common fund case.  If nothing else, it informs the hourly rate "cross-check," and, as counsel have argued, a percentage recovery may well be the market model in ERISA class actions.

The Court of Appeals has left broad discretion to the district courts in the choice between the lodestar and percentage processes.  *Goldberger*, 209 F.3d at 50; *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores,*

*Inc.*, 544 U.S. 1044 (2005).

Despite having this option, every significant Southern District opinion facing the issue since *Goldberger* has embraced the percentage approach, without much case-specific analysis of the choice. *Banyai v. Mazur*, 00 Civ. 9806 (SHS) (S.D.N.Y. Mar. 30, 2007) (8.45 percent fee award for $40 million settlement); *In re AOL Time Warner, Inc. Securities & "ERISA" Litig.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006); *Ling v. Cantley & Sedacca, L.L.P.*, 2006 WL 290477 (S.D.N.Y. Feb. 8, 2006); *In re Worldcom, Inc. ERISA Litigation*, 2005 WL 3116188 (S.D.N.Y. Nov. 22, 2005); *Hicks v. Stanley*, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005); *In re WorldCom, Inc. Securities Litigation*, 388 F. Supp.2d 319 (S.D.N.Y. 2005); *FTR ex rel. Cel-Sci Co v. Adv. Fund II Ltd.*, 2005 WL 2234039 (S.D.N.Y. Sep. 14, 2005); *Spann v. AOL Time Warner Inc.*, 2005 WL 1330937 (S.D.N.Y. Jun. 7, 2005); *In re Elan Securities Litig.*, 385 F. Supp.2d 363 (S.D.N.Y. 2005); *In re Bristol-Myers Squibb Sec. Litigation*, 361 F. Supp.2d 229 (S.D.N.Y. 2005); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317 (S.D.N.Y. 2005), *aff'd in part, rev'd in part on other grounds*, 443 F.3d 253 (2d Cir. 2006); *In re Alloy, Inc. Securities Litigation*, 2004 WL 2750089, *2 (S.D.N.Y. Dec. 2, 2004); *In re Global Crossing Securities & ERISA Litigation*, 225 F.R.D. 436 (S.D.N.Y. 2004); *In re Interpublic Sec. Litig.*, 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004); *In re AMF Bowling*, 334 F. Supp.2d 462 (S.D.N.Y. 2004); *Klein ex rel. SICOR, Inc. v. Salvi*, 2004 WL 596109 (S.D.N.Y. Mar. 30, 2004); *In re Independent Energy*

*Holdings PLC*, 2003 WL 22244676 (S.D.N.Y. Sep. 29, 2003); *In re Lloyd's American Trust Fund Litigation*, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002); *Baffa v. Donaldson Lufkin & Jenrette Sec. Co.*, 2002 WL 1315603 (S.D.N.Y. Jun. 17, 2002); *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2001 WL 709262 (S.D.N.Y. Jun. 22, 2001); *In re American Bank Note Holographics, Inc.*, 127 F. Supp.2d 418 (S.D.N.Y. Jan. 2, 2001); *Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000). Each of these decisions seems to have been guided mainly by the generic simplicity of a percentage selection, in contrast to the agonizing calculation of the lodestar.

Similarly, a review of ERISA class action monetary settlements both inside and outside this district shows a uniform application of the percentage method. *See* Decl. of Michael J. Klein, Jul. 18, 2006, Ex. B.

It would be an understatement to say that the lodestar has become the exception, as opposed to the rule, in large class action recoveries. There is little reason to deviate from the rule in this case. Although I have cross-checked the result against counsel's hourly time records, that process required less mathematical precision when used for that purpose, rather than as the basic meter for fee determination. The percentage method has therefore saved time and left less room for subjective challenges over usefulness and efficiency of any particular hour.

To be sure, some justification could be found for use of the presumptively reasonable fee method here. Though its application

entails time, precision and no shortage of tedium, the hourly fee method is arguably a more objective measure. *See Grinnell*, 495 F.2d at 470-71 (only the lodestar method can "claim objectivity"); *see also In re Bolar Pharmaceutical Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (fee computed under lodestar method is "strongly presumed to be reasonable"). That advantage is partially lost, however, when, as here, adjustments are or should be made to the hours claimed or the hourly fee requested.

And if a major goal of the percentage method is to avoid an unnecessary run-up of lawyer hours or a roadblock to early settlement, the percentage method is not necessarily a panacea in a regime where the court uses its discretion *at the end of the case* to determine not only the amount of fees, but the method used to calculate them. Counsel do not usually know until the case is over which method of compensation will obtain. Probability, not certainty, of a percentage recovery is arguably enough to accomplish the objectives of deterring unnecessary hours and fostering early settlement.

The most significant reason for pause in this case is its underlying nature and clientele. This is an ERISA case. The beneficiaries are not shareholders, but, rather, an estimated 65,000 individual current or former employees of AOL Time Warner or related entities. They undoubtedly worked at many diverse levels, from the mail room to the executive suite.

Unlike the more common shareholder cases, the landscape was

not dominated by sophisticated institutional investors whose decisions were fully volitional, unshackled from employee loyalty or the influence of sponsor steering. As class counsel argued in the underlying action, the class members here were constrained to some degree in their abilities to opt out of these employer-sponsored investment vehicles or to influence the choice of plan holdings.

Unsurprisingly, there is no evidence of a fee agreement between counsel and the lead plaintiffs. Even if there were, it is doubtful that these plaintiffs would have the sophistication or the clout of the large institutional holders in securities actions which engage in hard bargaining with lead counsel over retainer terms. Under the current circumstances, a court works off of a cleaner slate and must lend especial scrutiny to counsel's fee requests.

In addition, ERISA has its own statutory fee-shifting authority. 29 U.S.C. §1132(g). It is well established that, under this provision, fees would be assessed against the defendant on the basis of an hourly rate, rather than a percentage. *See McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91 (2d Cir. 2006).

The existence of Section 1132(g) does not, however, preclude the use of the common fund doctrine to award fees from the recovered fund under the percentage method. Various courts have addressed this precise issue, upholding the use of the percentage method in common fund ERISA cases. *See, e.g., Florin v.*

16

*Nationsbank of Georgia, N.A.,* 34 F.3d 560 (7th Cir. 1994); *In re Global Crossing Securities and ERISA Litig.,* 225 F.R.D. 436 (S.D.N.Y. 2004). Nevertheless, the class characteristics here – a multitude of individuals with limited choice and bargaining power – conjoin with the hourly rate regime of Section 1132(g) to warrant, at a minimum, a more thorough cross-check against a percentage award than might ordinarily be the case.

### Application of These Principles

Ultimately, as *Goldberger* instructs us, the objective is a reasonable fee, which may be established by either the hourly fee or percentage method. *Arbor Hill* reinforces the market driven approach toward assessment of legal fees. The confluence of these principles commends use of the percentage approach under the circumstances of this case.

As in virtually any case, this method offers simplicity. The percentage method reduces, though it does not eliminate, an expensive and mind-numbing line-by-line review of counsel's bills, thereby freeing judicial resources and allowing class and claimants to be paid, and the case to be closed, more quickly. It also mimics the contingent fee system that has developed in this country for cases of significant risk or of plaintiffs who are unwilling or unable to afford the cost prior to conclusion.

The class here consisted of individual employees or retirees, none of whom likely could have afforded counsel's total hourly price tag of over $9 million during the course of the litigation. Paying an hourly rate was not a realistic option.

On the other hand, ERISA's fee-shifting provision, 29 U.S.C. §1132(g), could have enabled counsel to seek fees from the offending defendants.  Fee-shifting statutes such as Section 1132 serve the same vindicatory function as the common fund doctrine, without invading the fund recovered for the plaintiff class.[3] The question remains whether top caliber counsel would be lured by such an arrangement, for which little precedent is found in these stock-concentration cases.  In this particular marketplace, such an arrangement would be uncommon, if not unprecedented.

And although this action was filed under ERISA, rather than the securities laws, the markets for legal services are sufficiently alike that guidance can be drawn from the more mature securities litigation arena.   There, as noted, recent cases show an overwhelming preference for the percentage award. In a growing number of such cases, sophisticated lead plaintiffs, such as investment funds, have entered into retainer agreements based on percentages.

As the Court of Appeals begrudgingly but realistically acknowledged, the courts themselves have become factors in this marketplace. *Arbor Hill*, 484 F.3d at 164 ("the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case

---

[3] As a practical matter, counsel fees could nevertheless enter into the settlement negotiations, as defendants would likely factor such fees into their aggregate cost of settlement, even if the fees were paid to the lawyers directly rather than the client class.

effectively"). The near uniformity with which the courts in this district and elsewhere of late have applied the percentage method is testament to its dominance.

This settlement also consisted entirely of monetary compensation. It did not include coupons, injunctive relief or other non-monetary elements of ambiguous valuation, which could undermine the reliability of a percentage analysis. *Compare, e.g., Shaw v. Toshiba America Information Systems*, 91 F. Supp.2d 942 (E.D. Tex. 2000).

In addition, the presumptively reasonable fee method works most efficiently where only minimal adjustment is required for the time spent and the hourly billing rates. Here, a number of adjustments have been made to the hourly time charges computed by counsel. The risks associated with the case at its outset further support a percentage determination. Even if an hourly-based fee were awarded, it would warrant some measure of enhancement to account for the risk and quality of the service. Hence, the selection of a presumptively reasonable fee would involve only modestly more precision than choosing a percentage.

This becomes the decisive factor in support of the percentage method here. A "presumptively reasonable fee" analysis would itself in this case require some enhancement to compensate counsel for the risks they undertook and the manner in which they achieved their sizable recovery. The injection of this element of subjectivity into the fee process weakens the rationale for eschewing a percentage award for lack of

objectivity.

As this Circuit's law requires, I have cross-checked my tentative percentage calculation against the "presumptively reasonable fee." *See Wal-Mart*, 396 F.3d at 123; *Goldberger*, 209 F.3d at 50.    Indeed, given the nature of the beneficiaries in this case, I have applied a more thorough cross-check than might otherwise be the case.

**The Percentage of the Recovery**

This Circuit has rejected a "benchmark" recovery percentage for class action counsel.    Unlike some other circuits, which have embraced generically applicable percentages, often as high as 25 percent, *see, e.g., Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990), the Second Circuit requires a searching analysis based upon the circumstances of each case.  *Goldberger,* 209 F.3d at 53.

The traditional factors for computing common fund attorneys' fees thus remain relevant.    In *Goldberger*, the Court defined those elements as (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  *Wal-Mart*, 396 F.3d at 121 (*citing Goldberger*, 209 F.3d at 50); *see also Matter of Freeman*, 34 N.Y.2d 1, 9, 355 N.Y.S.2d 336 (1974) (adopting similar analyses under state law).

*Goldberger* emphasizes two other important points, namely that "moderation" is the touchstone and that the district courts

should strive to replicate market compensation. 209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation"). At the same time, the Second Circuit recognizes that, in this type of case, where the fee is set retrospectively without the challenge of a traditional adversary, we "cannot know precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." *Id*. Accordingly, the Court of Appeals requires that a "searching assessment" be performed by the district court in each case based upon the circumstances of that case. *Goldberger*, 209 F.3d at 52.

*Arbor Hill* now adds, at least for the purpose of determining the presumptively reasonable fee, a set of additional considerations. In addition to assessing the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), the court

> should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.

484 F.2d at 169.

*Arbor Hill* weaves into the assessment the reality that the courts play an important role in establishing market compensation in class action cases. This does not necessarily represent a

21

move toward a "benchmark," but does commend some comparison with other cases in which the courts, sometimes with help from sophisticated lead plaintiffs, have influenced this market.

The court can best do justice to the market here by fusing the *ex ante* approaches taken in retainer agreements and a number of judicial innovations, with more traditional *ex post* class action fee awards. In their struggle to introduce market competition into the selection and compensation of class counsel, the courts have experimented with concepts ranging from competitive bidding to sealed outcome predictions. *See, e.g., In Re HPL Technologies, Inc. Securities Litig.*, 366 F. Supp. 2d 912 (N.D. Cal. 2005). Data are available from studies of cases in which "auctions" were conducted for the selection of class counsel. *See* Laural L. Looper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study* (Fed. Jud. Ctr. 2001), *reprinted at* 209 F.R.D. 519 (2002).[4] The study concluded that, in such cases, the fee percentages tended to be lower than those awarded retrospectively by the courts:

> Attorneys' fees were generally less than the reported percentages in other class actions in the respective circuits. The majority of fee awards was less than 9% (may or may not include expenses) of the total recovery and ranged from a low of approximately 5% in *In*

---

[4] Although the auction approach has fallen into disfavor, *e.g., In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001), *cert. denied sub nom. Mark v. Calif. Pub. Employees' Retirement System*, 535 U.S. 929 (2002), there is no reason to doubt the data generated in those cases. While it is true that fee auctions drew theoretical criticism for downplaying the quality element in counsel selection, counsel ultimately selected in various cases, including *Cendant*, were renowned practitioners in the field.

> re *Auction Houses* to a high of 22.5% in *In re Oracle.*

Class counsel herein, by contrast, cite a "benchmark range" of 20 percent to 33 $^1/_3$ percent, a spread considerably higher than that found in the auction study.   Mem. of Law in Support of Class Counsel's Motion at 1.

One popular innovation, which has garnered a following in lead plaintiff retainer agreements, is the use of tiered percentage structures, which depend upon the size of the recovery and the stage at which it was achieved.  One such arrangement was made by lead counsel and adopted by the court in *WorldCom*.[5]  The potentials ranged on a decreasing basis from 4 to 12 percent. Judge Cote ultimately approved counsel's request for fees totaling $336.1 million, or 5.5 percent of the total recovery. On the grid, a figure of 12 percent would apply to a settlement in the range here.

A negotiated retainer arrangement also existed in *Cendant Corp. Litig.*, 264 F.3d 201.[6]  There, two leading class action firms agreed to a fee scale, for settlement during discovery, of 17.5 percent for a recovery up to $100 million; 10 percent between $100 and $300 million; 7.5 percent between $300 and $500 million; and 5 percent above $500 million.

---

[5] The complete retainer agreement was filed with the *WorldCom* court as part of counsel's fee application and is available at http://www.worldcomlitigation.com/courtdox/retainer.pdf.
[6] The case was remanded because, *inter alia*, counsel had not obtained lead plaintiff's prior review of their fee application, as required by the retainer letter.  But this does not affect the letter's vitality as a heuristic example of market-based bargaining.

Although two samples are no talismans, and the Second Circuit has rejected the benchmark approach in any event, the *WorldCom* and *Cendant* retainer letters furnish informative market-based guidance. And they do so not only with actual bargained-for percentages, but also with sliding scales based on both the magnitude and juncture of the recovery.

Finding a common thread in judicial fee determinations is a less scrutable undertaking. Some judicial decisions have followed the trend in retainer letters, tapering the fee percentages as the amounts of recovery increase. *See, e.g., Prudential*, 148 F.3d at 340. The agreements also incorporated negotiated percentages noticeably lower than those which class counsel herein cite as prevailing in megafund cases. These agreements, and the Federal Judicial Center study, provide evidence that the percentages awarded retrospectively by various courts tend to exceed those that would be generated through give-and-take bargaining in the commercial marketplace. *See also In re Cabletron Systems Inc. Sec. Litig.*, 239 F.R.D. 30 (D.N.H. 2006) (surveying various cases and commentaries awarding percentages and concluding that bargaining and bidding generally lead to lower awards).

A lesser number of tiered cases have *increased* the percentages as the recovery climbed, on a theory of diminishing returns which assumes counsel's efforts will slacken once they have reached a point of marginal satisfaction. *See* John C. Coffee, Jr., *Litigation Governance: A Gentle Critique of the*

*Third Circuit Task Force Rept.*, 74 Temple L. Rev. 805, 809 n. 16 (2001)(citing two cases in which fee percentages increased with the size of the award); *see also In re AT&T Corp.,* 455 F.3d 160 (3d Cir. 2006); *In re AOL Time Warner, Inc. Securities & "ERISA" Litig.,* 2006 WL 3057232.

Even the source cited by counsel here, a compendium of 76 ERISA cases compiled by Fiduciary Counselors Inc., the independent fiduciary in this case, shows no common thread from which to derive a percentage. The percentages range from a low of 2.8 to a high of 43.5, and the variances cannot always be explained by the size of the settlement or the nature or duration of the case. *See* Decl. of Michael J. Klein, Jul. 18, 2006, Ex. B. Recently awarded fee percentages in large ERISA settlements in this district have ranged from 18 percent in *WorldCom*, 59 Fed. R. Serv.3d 1170 (2004), to 15 percent in *Global Crossing,* 225 F.R.D. at 469, to 8.45 percent in *Banyai*. No single precedent provides a template from which the fee here can be determined.

## The *Goldberger* Factors

### (1) The Time And Labor Expended By Counsel.

Counsel report spending in the aggregate 28,354 hours on this litigation, including paralegal time. This equated to fees of $9,145,282.10. Of that amount, attorney time comprised 28,078 hours, with corresponding fees of $9,068,740.85.

This case required enormous manpower. Most of the hours were dominated by associates and paralegals, who reviewed millions of documents to extract evidence. This is a necessary undertaking in

a case of this genre. Partner hours, in significant part, were devoted to preparation of the consolidated complaint, negotiations, mediation with the Special Master, settlement implementation and supervision.

Motions were filed for dismissal and for summary judgment. Some of the issues were familiar ones, such as the standards for alleging securities fraud and accounting irregularities. Others were less common, including the ERISA issues of concentration in the sponsor's securities and holder standing. Loss causation was a challenging and partially unsettled issue.

Though over 28,000 hours were expended overall, the aggregate is well within bounds for a massive case of this nature. The case was handled with relative efficiency. Although the hourly cross-check suggests a reduction of 1,483 hours and a corresponding $481,795.50 in the hourly fees submitted, these adjustments, representing 5.2 percent of the hours, are modest in comparison with similarly sized cases. In the securities case, for example, the Court adopted a recommendation cross-checked against an hourly reduction of 14.7 percent. The relatively small adjustment here is notable considering that large cases inherently tend to produce at least some inefficiencies, and that it is easier to manage a complex case in hindsight than in the midst of high-pressure litigation.

**(2) The Magnitude and Complexities of the Litigation.**

This litigation was large and complex. The labyrinthian regulatory scheme of ERISA intersected with alleged securities

infractions to sculpt a legal and accounting maze. Changes in the legal landscape occurred during the pendency of the action, including a Supreme Court ruling on loss causation that threw the outcome into still further doubt. *See Dura Pharmaecuticals, Inc. v. Broudo,* 125 S. Ct. 1627 (2005); *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005), *cert. denied,* 126 S. Ct. 421 (2005).

Counsel and paraprofessionals reviewed and analyzed millions of documents, employing such innovative tools as an electronic data repository. They defended or conducted several depositions, although most of the deposition work was obviated by the settlement.

The recovery was substantial. The $100 million payable by defendants represents one of the highest ERISA recoveries in history. But size alone is not the determinant. "[A] large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel." *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir. 1977). The magnitude of this settlement is in significant part attributable to the size of the class and the ERISA-regulated fund at issue.

Other than some additional cost of identifying and notifying class members, it is difficult to discern much additional complexity of the work or risk stemming from the class size. By the same token, the size of the class and the attendant risk to the defendants gave the defendants inherent incentive to settle

27

the action.

**(3) The Risk of the Litigation.**

Risk has been described by some authorities as the preeminent factor in determining either a percentage or a lodestar multiplier. *See Agent Orange,* 818 F.2d at 236.

Counsel argue that this case "entail[ed] a greater financial risk than most." Mem. of Law in Support of Class Counsel's Motion at 23. They point in particular to "a high risk that they would be unable to establish liability, certify the class and establish damages at trial." They further cite anticipated "millions of dollars in costs just to complete thorough discovery, with significant additional outlays should it be necessary to go to trial." *Id.* Finally, counsel point to the number of unsettled factual and legal issues that confronted them.

Many of these risks are inherent in any class action. Thus, the risks existed but for the most part were hardly unique. Plaintiffs also cite a number of cases for the proposition that the "state of the law in ERISA company stock cases is not mature." *Id.* While there has been considerable development of the learning curve with ERISA cases, particularly over the past few years, counsel's statement is accurate as of the date this action was filed. Even so, no ERISA case of this type has ever gone to trial. As with most large class actions, ERISA stock concentration cases tend to settle. Neither side in a large ERISA case seems inclined to take the risk, or incur or accrue

the burden or expense, of a trial. *See* Report of the Independent Fiduciary for the Proposed Settlement in the AOL Time Warner ERISA Litigation (Jun. 29, 2006) at 17.

Given this consideration, and the high likelihood that any judgment against the particular defendants here would be collectible, the risk in this case, though undeniably present, should not be overstated. There is no suggestion that the company or any of the individual defendants, a virtual *Who's Who* of civic and financial leaders, were impecunious. During the pendency of this litigation, the defendants in the parallel securities case withstood a $2.5 billion settlement, with no impact on the company's viability.

Risks also run both ways. The absence of any trials of these ERISA cases reflects the uncertainties faced by defendants as well as plaintiffs, creating powerful incentives to settle on both sides. Cases of this magnitude frequently end in settlement because neither side wants to assume the ultimate risk of a jury verdict or summary judgment. *See* Janet Cooper Alexander, 43 Stanford L. Rev. at 578. This risk is an issue not only for the immediate defendants, but globally for director and officer insurers, for whom a losing precedent could have cataclysmic impact.

The settlement of the AOL Time Warner securities case cuts both ways in evaluating the risk here. Counsel argued at our conference that the settlement undercut their position, to the degree that defendants were prepared to turn their formidable

29

defensive firepower against this case alone.  On the other hand, the reality that the likely stakes in this case were lower, and the same Special Master was engaged in similar settlement procedures, decreased the risk that the class and counsel would leave empty-handed.  Leading ERISA cases have tended to settle soon after compromise of parallel securities litigation.  The Global Crossing, Enron and Bristol-Myers Squibb ERISA cases, for example, each settled soon after settlement of the securities actions.  Overall, class counsel here faced higher-than-average risk on the merits, lower-than-average risk of facing trial and substantially lower-than-average risk of non-collection.

### (4) The Quality of Representation.

Counsel take justifiable pride in their accomplishments.  The quality of their filings was impressive.  Counsel defeated well developed motions to dismiss, filed by skilled and renowned defense lawyers.  Even more importantly, they used the mediation process to persuade reluctant and determined defendants to part with settlement dollars well above those expected.

The service was praiseworthy in all respects.  That being said, quality performance does not always justify an outlying fee. Counsel were selected herein on the basis of their quality, formidability and track record of superior results.  Their hourly billing rates, which stand well above the median, reflect an inherent and anticipated quality factor.  See Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* §14:6 (Thomson-West, 4th ed. 2002)("market rate for legal fees depends in part on the

risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case").

Counsel also benefited to a degree from work performed by others.    Though counsel parlayed information into successful advocacy, the transactions giving rise to the suit were first exposed by reports in the media, and the ensuing accounting analysis was in significant part developed in the securities case and by expert consultants.    The time records reflect regular consultation with the attorneys prosecuting the more advanced securities case.[7]

Parallel government investigations were also undertaken.    AOL was cited by the SEC for limited violations in 2000 and entered into a deferred prosecution agreement with the United States Attorney for the Eastern District of Virginia on December 14, 2004.    Several peripheral figures were indicted, various AOL executives implicated in the class action lost their jobs and the company restated its accounting during the pendency of the action.

**(5) The Requested Fee in Relation to the Settlement.**

As noted, these blockbuster cases generally entail lower fee percentages than those seen in smaller cases, to avoid delivering a windfall to the attorneys because of the size of the class or the recovery. *See Prudential,* 148 F.3d at 340.

---

[7] Although the time records reveal that most of the relationship among the plaintiffs' lawyers in the two cases was marked by cooperation, there was friction at the time of the securities settlement over the scope of the releases, which counsel here viewed as a risk to their case.

This factor is inherently considered in the selection of the appropriate percentage.  Here, the percentage falls well within the range of similar cases.  An important consideration is the extra mile traveled by counsel to obtain a $100 million settlement for the class, an amount substantially above what experts considered fair and what seemed achievable under the circumstances.

**(6) Public Policy Considerations.**

In evaluating the public policy ramifications of a fee award, the need to encourage counsel to accept worthy engagements must be reconciled with capping compensation at reasonable levels. *See In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart,* 396 F.3d 96.  A large award here does not offend public policy.  The result was superlative.  Unlike other cases where the class award consisted significantly of injunctive relief, stock, price rollbacks or hard-to-value coupons, the class will receive its entire $100 million award in cash replenishment of the plans.

The award here harmonizes the goals of encouraging the bar to accept future assignments, deterring errant plan sponsors and advisors and avoiding inequitable dilution of the class members' recovery.  An award in the vicinity of that here would fall just barely outside the prevailing range cited by the objectors.  *See* Objection to Class Settlement & Request for Attorney's Fees at 4 (contending that "[p]ercentage fees post-*Goldberger* have ranged from 4% to 16%").

### The *Arbor Hill* Factors

Although *Arbor Hill's* place in the selection of common fund fee percentages is not yet clear, this recent Court of Appeals opinion is relevant, at the very least in connection with the cross-check.    Its reinforcement of the market-based approach commended in *Goldberger* is also instructional, regardless of the method used to fix the fee.

Arbor Hill directs the district courts to consider the twelve factors enumerated in *Johnson v. Georgia Highway Express*, 488 F.2d at 717-19.    Most of those criteria literally or conceptually overlap the six factors set forth in *Goldberger*. The *Johnson* elements include:

(1) the time and labor required;

(2) the novelty and difficulty of the questions involved;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and the length of the professional relationship with the client;

(12) awards in similar cases.

Of those elements, only factors 4, 7, 10 and 11 are not subsumed within the preceding *Goldberger* analysis. Item 11, however, is irrelevant to this situation.

Item 4 is not covered in counsel's submission, understandably because *Arbor Hill* was not issued until after their filings. A review of various class action cases around the country, however, indicates that all three firms were engaged in other, substantial matters. *See also* Mem. of Law in Support of Class Counsel's Motion at 33-35. While the hours devoted to this case were extensive, it does not appear that a majority of any firm's time was devoted to this case at the expense of others. And the burden was shared among three firms.

As to factor 7, this case was not marked by nominal or absentee clients. The lead plaintiffs in this case contributed their own time and effort and were involved in certain phases of the work. They did not, however, impose any particular time limitations that are reflected in counsel's submissions. The only time constraints were those fixed by court scheduling. Such limitations were no more severe than those attending typical cases of this nature and the Special Master accommodated counsel's schedules in his performance of the mediation.

This case was not "undesirable," the tenth factor enumerated in *Johnson.* True enough, the competition for the lead counsel role was not as intense as in the companion securities case, *Cendant* or a number of others. Nevertheless, three prominent class action firms eagerly sought the engagement and ultimately

34

worked together to achieve this recovery.

Finally, *Arbor Hill* encourages the reviewing court to evaluate non-monetary benefits accruing to counsel, such as reputational interests. In this case and others, counsel vying for class action appointments regularly cite their accomplishments in similar matters. There is little doubt that the $100 million recovered here, and the commendations flowing from the Court's approval of the settlement and this Report, will be highlighted by counsel in their future applications and bolster their opportunities for new engagements.

### Fee Recommendation

Although the comparative data supplied by counsel are helpful in performing the "searching assessment" of the fee application, the fee must ultimately be based upon a thorough evaluation of the circumstances of this case:

> In reviewing an attorneys' fees award in a class action settlement, a district court should consider all factors that are useful and relevant with respect to the particular facts of the case. The factors should not be applied formulaically; in cases involving extremely large settlement awards, district courts may give some factors less weight than others in evaluating a fee award. It is important in all cases that the district court robustly engages in assessments of the fee award reasonableness factors with close scrutiny of fee arrangements in class action settlements.

*Current Decisions Survey*, 27 Class Action Rep. 34 (2006).

To inject a measure of science into the fee-setting process here, I have focused on three discernible phases present in this litigation. These segments are derived from a review of the

court filings, counsel's time records, the conference we conducted and the conclusions of the independent fiduciary.

The first phase consisted of the pre-mediation period, in which counsel absorbed the greatest risk: a shutout. The second phase emerged during the mediation process, when offers appeared on the table and counsel were better assured of a settlement at some level that would provide them with a reasonable return on their efforts. The third phase consisted of the period, during the mediation, in which counsel tenaciously spurned a settlement that was reasonable and potentially approvable, holding out for the standout recovery that was ultimately attained.

Economic rationality suggests that counsel's risk began to subside when settlement offers materialized that would have permitted counsel to recover a fee in the vicinity of their regular hourly rates. *Cf.* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 681, n. 35 (1986). That is because such rates are presumptively set at a level at or above a threshold of profitability.

To recover their hourly fees at their requested allowance of 20 percent of the total recovery, counsel would have required a recovery of $43,317,433. This calculation results from dividing the adjusted hourly claim of $8,663,486.60 by the figure of 20 percent. Because 20 percent falls within the range awarded in eight-figure ERISA recoveries, *see* Decl. of Michael J. Klein,

Jul. 18, 2006, Ex. B, this is a fair percentage to award for this tranche.

The second tier is tied to the recovery between $43,317,433 and an expectable result of $70,000,000. Counsel themselves pointed to their recovery above $70 million as their most difficult and noteworthy feat. Thus, the intermediate tier of $26,682,567 reflects both the recovery of counsel's base profit – as measured by their own hourly rates – and a plateau at which neither extraordinary skills nor results resounded. Although this result should not be gainsaid, there is little reason for a premium on a result that was within the realm of expectation from well credentialed lawyers. A lower percentage is also consistent with the majority of fee agreements and auction awards, and a number of decisions, that taper percentages downward as the recovery amounts increase. And it follows a nascent downward trend in percentages generally. *See* Wayne Schneider, *Courts Don't Have to Award Excessive Fees to Incentivize Class Counsel in Federal Securities Class Actions*, 20 NAPPA Report 8, 8-9 (May 2006). Accordingly, I am recommending a 12 percent award for this second layer of recovery, or $3,201,908.

The third and final tier of $30 million, on the other hand, stands out as some of the hardest work and most outstanding results. Here is where counsel exceeded the expectations of the independent fiduciary and stretched the defendants' settlement tolerances beyond their limits. I confirmed this conclusion with Nell Hennessy, President and CEO of the independent fiduciary.

*See also* Fiduciary Counselors Inc., Report of the Independent Fiduciary.  Awarding 20 percent for this tranche ($6 million) will compensate counsel for their tenacity and provide incentives for future counsel to continue to press class recoveries, even past the point of diminishing returns.  *See* John C. Coffee, Jr., 74 Temple L. Rev. at 809 n. 16; *see also In re Auction Houses Antitrust Litig.,* 197 F.R.D. 71, 80 (S.D.N.Y. 2000).

Accordingly, the total amount of this fee recommendation is $17,865,395, or approximately 17.9 percent of the total recovery. The proposed fee percentage is applied to the gross recovery amount, not the net after disbursements.  *See Newberg,* §14:6 ("most courts seem to apply the percentage of recovery methodology to the gross settlement fund").

While there is an element of arbitrariness in any percentage fee award, this recommendation measures the accomplishments of counsel in distinct phases.  It harmonizes diverse and sometimes conflicting considerations:  compensation for risk and quality, avoidance of overcompensation for expected performance, incentives to maximize the class recovery, and consistency with awards in similar cases.

It also honors the market.  *See Arbor Hill,* 484 F.3d at 171. A lawyer choosing between a risky contingent fee assignment and one that guarantees a return of his or her hourly rate would negotiate for a higher premium for the riskiest phase.  By the same token, the thrifty client postulated in *Arbor Hill* would no doubt resist a bonus for an expectable result.  "By asking what a

reasonable, paying client would do, a district court best approximates the workings of today's market for legal services." *Id*. And, further, a success fee for a particularly good result is recognized as a legitimate marketplace incentive. *See Arkin Kaplan LLP v. Jones*, ___ A.D.3d ___, ___ N.Y.S.2d ___, 2007 WL 2050946 (1st Dept. Jul. 19, 2007).

In addition, this fee results in an average hourly billing rate for all timekeepers - attorneys and paralegals - of $630.08, yielding a multiplier of 2.06 over regular hourly rates. This multiplier would peg the hourly rates at $1,380 for the highest billing partner[8] and $433 for the lowest billing associate. Given that some top lawyers already command regular hourly rates in excess of $1,000, *see Hourly Billing Rates Continue to Rise*, National L. J. (Dec. 12, 2005), the rates, with a multiplier for risk and quality, though high, are within bounds. *See* Altman Weil, *Survey of Law Firm Economics* (Altman Weil Publications Inc. 2005) at 85. There is no out-of district rate issue here, as the prevailing rates in counsel's three locations, Hartford, Philadelphia and New York, are not materially dissimilar. *Id*. at 89, 91 (indicating average partner rates in Pennsylvania only $5 per hour lower than in New York and in Connecticut actually higher per hour than in New York). The 2.06 multiplier is nearly identical to the 2.19 multiplier that counsel touted as appropriate for this case.

As a further and related matter, the recommendation comports

---

[8] This disregards 15 minutes billed by one partner at $745 per hour.

with an hourly fee cross-check.    See pp. 42-50, *infra*.    The
award, based on counsel's unadjusted recordings, yields a 1.95
multiple.      Based upon the adjustment for excess time, the
multiple becomes, as noted, 2.06.

The award is modestly less than the amount requested by
class counsel, an amount with which the independent fiduciary was
satisfied.      However, the award applies counsel's requested
percentage to the phases of the case where it is most applicable,
namely the initial stages where there was heightened risk of non-
recovery, and the final stages in which counsel deserve a special
reward for their tenacity.

The award steers clear of a benchmark, *Goldberger*, 209 F.3d
at 51, but still falls within the overall contemporary range.    It
gives recognition to an emerging trend toward smaller class
action fee percentages, *see* Wayne Schneider, 20 NAPPA Report at
8-9, and to consideration of *Arbor Hill's* hypothesized thrifty
client.    In addition, because this case falls under ERISA with
its unique class of beneficiaries, and at least some possibility
at the outset that counsel would be compensated on an hourly
basis under Section 1132(g), it is not unfair to temper counsel's
fee proposal.

This award considers, but is not dictated by, fees
authorized in other cases.    Indeed, the wide variance among class
action awards highlights the impracticality of basing awards on
predecessor cases.

Counsel underscore the size of their recovery, in seeking a

very large fee and in citing several comparably sized cases as precedent.   Size of the recovery is not necessarily, however, a reliable measure of the risk undertaken, the quality of the legal work or the effort involved.   The average settlement has increased markedly over the years and records are continuously broken.   Mushrooming awards may be more attributable to external factors than to the work of counsel in a particular case.   *Cf. PricewaterhouseCoopers Securities Litig. Study* (2005) at 3 (suggesting that the clout of lead plaintiffs under the PLSRA, steep declines in the stock prices of multibillion dollar corporations and growing third-party liability have converged to generate larger settlements).

And "it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." *Goldberger* at 52, *quoting Union Carbide Consumer Prod. Bus. Securities Litig.,* 724 F. Supp. 160, 167-68 (S.D.N.Y. 1989).   "The huge fees in a huge case might be less a function of the amount or quality of the attorneys' work, or even of the risk undertaken, and more simply a function of the fact that the lawyers managed to find and bring a case with huge damages." Task Force on Contingent Fees, Tort Trial & Insurance Practice Section of the American Bar Association, *Report on Contingent Fees in Class Action Litigation,* 25 Rev. Litig. 459, 470 (2006). This was, to a degree, true in this case.   The size of the settlement was a function not only of counsel's labors but also the sheer size of this 65,000 member class.   While counsel

41

proudly and appropriately deserve their share of the credit, the recovery's magnitude is also the product of the underlying circumstances.

The size of the settlement further undercuts the usefulness of the "benchmark" cases cited by counsel, all but one of which involved smaller recoveries.  There is an emerging consensus in favor of lower, sometimes tapered, percentages for awards in large cases, prompted by record-breaking recoveries carrying the potential for windfall fees.  *See, e.g., Wal-Mart*, 396 F.3d at 123 ("the sheer size of the instant fund makes a smaller percentage appropriate"); *Prudential Insurance Co. of America Sales Practices Litig.*, 148 F.3d at 340; *In re Smithkline Beckman Securities Litig.,* 751 F. Supp. 525, 534 (E.D. Pa. 1990); *but see In re Linerboard Antitrust Litigation,* No. MDL 1261, 2004 WL 1221350 (E.D. Pa. Jun. 2, 2004).  One study which analyzed over 1,100 common fund cases found that the average fee award for class action cases whose settlements were valued at or over $100 million was 15.1 percent.  Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003).  The hourglass-shaped award here melds the declining percentage regime appropriate in a $100 million case with the extraordinary effort lodged by counsel in obtaining the 30 million final dollars thought potentially unattainable.

This modest adjustment to counsel's fee request should not dilute recognition of their commendable work and their fidelity

to the class in the face of risks.  Counsel in this case deserve sizable compensation and it is the intention of this Report & Recommendation to provide it, within the bounds of moderation and the guidelines of *Goldberger* and *Arbor Hill.*

### The Hourly Based Cross-Check

The hourly fee analysis has two fundamental components: examining the attorney time records for reasonableness and necessity, and establishing appropriate hourly billing rates. *Goldberger,* 209 F.3d at 47.

### The Time and Services Billed

In evaluating the hourly fees, I have reviewed the summaries provided by all counsel of their time and expenses; performed a moderately detailed examination of counsel's actual time records; reviewed the case file at the courthouse; and focused on certain tasks which consumed significant hours.  I then reduced counsel's fee calculation by $481,795.50.

These reductions fell into several broad categories: services that belong more appropriately in overhead, such as training; vague service descriptions; repetitive entries over multiple days; lack of corresponding entries between two timekeepers for an interactive service; full billing of travel time charges; excessive rounding of time charges; work on the fee application; and work inappropriately charged after the settlement was reached.  Specifically, fees were reduced by $228,142.75 for rounded or imprecise billing; $6,008.75 for lack of corresponding entries; $145,612.00 for unnecessary post-

settlement activity; $11,480.00 for repetitive descriptions; $8,500.25 for charges properly attributable to overhead; $14,140.00 for overly vague descriptions; $6,143.75 for excessive time on task; $44,228.00 for half of out-of-town travel time; $1,890.00 for non-compensable services; $1,487.50 for work on fee applications; and $14,162.50 for training.

For example, certain disallowances consisted of conferences between or among lawyers where one participant's time was recorded but not another's, or where excessive numbers of personnel were assigned to a particular task. If the former problem stems from inadequate recordkeeping, the remedy of disallowing the recorded time may seem harsh. But the law on this subject is settled: a lawyer applying for a fee bears the burden of recording all corresponding entries. *See, e.g., Carrero v. New York City Housing Authority*, 750 F. Supp. 660 (S.D.N.Y. 1990).

Travel time is another consideration. A lawyer's reasonable travel time for client business purposes should be recoverable, as the practice in this jurisdiction is to charge at a unitary hourly rate and a lawyer not engaged in travel for a client's business could presumably otherwise be representing another client at his or her hourly billing rate. Once again, however, as with any attorney's time, the key is "reasonableness."

Applying this standard to the present case, long distance travel should not be viewed identically with local travel to Foley Square or opposing counsel's office in Manhattan. This is not to suggest that long distance travel should not be reimbursed at all.

A long distance trip, however, affords opportunities to perform work for the present or other clients, especially with advances in technology such as laptop computers and cellular phones. Travel time not productively spent should be adjusted.

For long-distance travel in which the time records contain no evidence of other work performed *en route*, I applied a reduction of 50 percent for billable hours, consistent with the methodology adopted by the district court and affirmed by the Court of Appeals in *Agent Orange*, 818 F.2d at 230.

Certain other time entries bear telltale signs of rounding and estimation, rather than precise recording. A noticeable illustration is a pattern of some timekeepers of recording much of their daily time in even-hour increments, rather than a random mixture of daily hours ending in .00, .25, .50 and .75. Those hours were reduced by 10 percent. *See Welch v. Metropolitan Life Ins. Co.,* 480 F.3d 942 (9th Cir. 2007); *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146-47 (2d Cir. 1983) (upholding percentage reductions and placing the burden on fee applicants to keep and produce "accurate records" of work done and time spent). It bears emphasis that this reduction is recommended due to imprecision, not evidence of fabrication.

The reductions finally include several miscellaneous items, such as excessive time on task, work on a complaint in another action, preparation of an engagement letter and multiple attendees defending a deposition. The 4.25 hours recorded for preparation of counsel's fee application are not compensable. *See City of*

*Detroit v. Grinnell Corp.*, 560 F.2d 1093.

Once again, there is no evidence of purposeful inflation of time spent by any counsel. These are, however, charges that would draw objection from a scrutinizing client in the marketplace.

**Billing Rates**

A proper analysis also requires the establishment of appropriate hourly billing rates. In this regard, I have consulted authoritative sources, *see* Altman Weil, *Survey of Law Firm Economics; Hourly Billing Rates Continue to Rise*, National L. J. (Dec. 12, 2005); considered the submissions of class counsel; and drawn upon my own experience as a practitioner. *See Goldberger*, 209 F.3d at 56.

The attorney billing rates range from $210 for the lowest billing associate to $670 for the highest billing partner performing meaningful work. No adjustment is recommended for the base hourly rates here for several reasons. First, counsel have not increased their hourly rate requests to their current levels to compensate for delay in payment, as is a common practice approved by authorities as high as the United States Supreme Court. *Missouri v. Jenkins*, 491 U.S. 274 (1989); *see also Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998). Instead, counsel's fees are based on rates in force between 2003 and 2006.

Second, all three firms are situated in major Northeastern metropolitan areas, where billing rates tend to be among the highest in the country. Altman Weil at 85. While these hourly

rates are high, they are within the bounds charged by top lawyers in the region.    In addition, *Arbor Hill* holds that the "community" for rate-setting purposes may, where appropriate, be based on practice area rather than geography.    In this regard, the rates charged by counsel here are commensurate with those recorded in other cases by leading members of the class action bar.    Logan, Moshman & Moore, 24 Class Action Rep. at 195; *see also Goldberger,* 209 F.3d at 46 (citing $550 hourly rate charged by leading class action practitioner in 2000).

Finally, the hourly charges here, with an appropriate multiplier, yield a result consistent with other awards and a fee reasonable under the circumstances.    Because the computation here is used as a cross-check, rather than the primary determinant, dissection of the hourly rates would be unproductive and unnecessary to "prevent windfalls."    *Compare Agent Orange,* 818 F.2d at 232-33.

The raw product of hours and rates is subject to an upward or downward multiplier to account for particular circumstances of the case.    A multiplier is not, however, presumed.    To the contrary, the unadjusted lodestar is "strongly presumed to be reasonable . . ." *Bolar Pharmaceutical,* 966 F.2d at 732.    A multiplier bestows excessive compensation if the lodestar fee already reflects the fair value of the lawyers' services.    *See Agent Orange*, 818 F.2d at 237.

Stated somewhat differently, an hourly rate inherently reflects risk, quality and other factors associated with an

attorney's competitiveness, skills and overhead.    Adding a
multiplier to a base rate that already accounts for these factors
could result in windfall compensation to lawyers at the expense
of their class clients.    *See In re Bolar Pharmaceutical Co.*
*Securities Litigation*, 800 F. Supp. 1091, 1096 (E.D.N.Y. 1992).

Counsel's request of $20,000,000 reflects a multiplier of
2.16 (against the unadjusted time charges), which they contend is
reasonable.    They assert that a "routine" multiplier sits between
3 and 5.  Mem. in Supp. of Class Counsel's Motion at 43.

A    consensus    on    multipliers    has    eluded    courts    and
commentators.    One district judge computed an average multiplier
of 1.44, after conducting an analysis of 49 federal securities
law actions litigated within the Second Circuit.    *See In re*
*McDonnell Douglas Equipment Leasing Securities Litig.*, 842 F.
Supp. 733 (S.D.N.Y. 1994); *compare* William J. Lynk, *The Courts*
*and the Plaintiff's Bar:    Awarding the Attorney's Fee in Class-*
*Action Litigation*," 23 J. Legal Studies 185, 196 (1994)(reporting
an average multiplier of 1.69 for class actions studied between
1973 and 1990); Wayne Schneider, *Courts Don't Have to Award*
*Excessive Fees*, 20 NAPPA Report at 10 (range of multipliers
between 1.37 and 3.1 in seven representative class action
settlements in 2004 and 2005); *In re Cendant Corp. PRIDES Litig.*,
243 F.3d 722, 742 (3d Cir. 2001), *cert. denied sub nom. Kirby*
*McInerney & Squire, LLP v. Joanne A. Aboff Family Trust*, 534 U.S.
889 (2001) (in surveying cases with common funds over $100
million, court found multiplier of 1.35 to 2.99 common); *In re*

*NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (multipliers between 3 and 4.5 are common); *Newberg*, §14:6 ("[m]ultiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied"); *see also Wal-Mart*, 396 F.2d at 123 (3.5 multiplier); *WorldCom*, 388 F. Supp.2d at 354 (4.0 multiplier); *In re Avon Products, Inc. Securities Litig.*, Fed. Sec. L. Rep. (CCH) ¶97061, 1992 WL 349768 (S.D.N.Y. 1992) (decision used percentage method, but stated that under the lodestar approach a risk multiplier of 2 to 3 would have been appropriate). Some courts have frowned upon multipliers in excess of two. *See Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998).

The multiplier generated through the presumptively reasonable fee here is 2.06. This number falls comfortably within the prevailing range, is barely distinguishable from counsel's original request of 2.19 and bolsters the reasonableness of the percentage award that this Report recommends.

### Objections

In arriving at the recommended percentages, I have considered the objections filed by putative class members to counsel's application. Indeed, the very fact that only four objections – all conveyed through the same attorney – were received from a class potentially comprising tens of thousands, informs my recommendation. *See Wal-Mart*, 396 F.2d at 118-19.

Objections were filed collectively by Douglas Powell,

Gregory Finn, Trina Hosmer and James E. Pentz. *See* Objection to Class Action Settlement & Request for Attorney's Fees. The objections were filed as part of a broader attack on the settlement, at a time when counsel had merely noticed their intention to file a future application no higher than 25 percent.

The objectors chiefly argued that the case involved very little discovery, no trial preparation, and little risk that it "would not settle for a substantial sum, especially after the settlement in the securities action." *Id.* at 4-5. Contending that "fees post-*Goldberger* have ranged from 4% to 16%," these class members also suggested that "[i]n prior settlements that combined securities and ERISA actions, the ERISA fee awards have been slightly less than the fees awarded in the main securities action." *Id.*

Although relatively few depositions were conducted, counsel dedicated enormous amounts of time to the review of millions of pages of documents. This not only falls within the realm of discovery, but can also be considered an indirect part of trial preparation. Moreover, the groundwork for the sophisticated mediation undertaken here resembled many elements of trial preparation. Extreme persuasion was needed to bring the case to its final objective of $100 million.

The opponents are more on target with their assertions that the fee percentages warrant moderation and that ERISA settlements have often followed compromises of parallel securities claims. These factors have influenced my recommendation. Indeed, for the

middle tier of this award, I have emulated the 12 percent figure utilized in two cases cited by the objectors, *see In re Elan Securities,* 385 F. Supp.2d 363; *In re Interpublic Sec. Litig.,* 2004 WL 2397190, and I have adopted an overall percentage only slightly higher than the 15 percent they cite in *Global Crossing.*

### Disbursements

Counsel sought reimbursement of their out-of-pocket disbursements in 12 categories: court filing fees, couriers, out-of-town travel, process service, document retrieval, experts and consultants, in-house reproduction; outside reproduction; court stenographers; postage; faxes; and telephone. After our conference, counsel voluntarily reduced their disbursement application. The ultimate request totaled $267,552.64, or approximately three percent of the adjusted lodestar. Copies of the expense breakdowns for each firm are annexed to this Report as Appendix A.

The charges in each of those categories appear reasonable and commensurate with the types of services performed. At my suggestion, counsel have limited their in-house copying charges to 20 cents per page, consistent with Second Circuit Rule 39, restricted meal expense requests to those incurred out-of-town, eliminated basic subscription charges from their computer-based legal research requests and made other adjustments. I recommend that counsel's amended request of $267,552.64 be allowed in full.

### Conclusion

The fee award of $17,865,395 synthesizes the particular

51

circumstances and distinct phases of this case, the tempering impact of a hypothetical client negotiating in the legal marketplace and a check against an hourly rate. The hourglass-shaped percentage structure used to arrive at this fee provides the incentives and rewards at the junctures where they are most needed and deserved, and is consistent with the trend toward lower percentages in large cases.

Dated:  New York, New York
        August 7, 2007

                              Respectfully submitted,

                              _____
                              DAVID H. PIKUS
                              Special Master

# APPENDIX A

## EXHIBIT 7

IN RE AOL TIME WARNER, INC. SECURITIES AND "ERISA" LITIGATION

SCHATZ NOBEL IZARD P.C.

EXPENSE REPORT

From Inception Through May 31, 2006

| Expense Description | Cumulative Total |
|---|---|
| Court Reporters/Filing Fees | $320.00 |
| Transcripts | $3,995.66 |
| Document Reproductions | $28,673.40 |
| Postage/Delivery | $1108.91 |
| Telephone/Telecopier | $54.37 |
| Travel/Food/Lodging | $8,824.02 |
| Computer Consulting for Discovery/ Document Production | $47,017.36 |
| Expert Accountant | $23,505.31 |
| Pacer Service Center | $106.32 |
| Notice of Filing of Class Action | $646.00 |
| **TOTALS:** | 114,251.35 |

IN RE AOL TIME WARNER, INC. ERISA LITIGATION

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

**Expense Report**

**Case Inception – May 2006**

| EXPENSE | TOTAL AMOUNT |
|---|---|
| Meals, Hotels & Transportation | 3,422.53 |
| Photocopying | 1,381.60 |
| Telephone & Fax | 339.84 |
| Messenger, Courier & Federal Express | 166.87 |
| Postage | .37 |
| The Michel-Shaked Group | 26,802.09 |
| Inseyet LLC | 34,867.05 |
| TOTALS | 66,980.35 |

# IN RE AOL TIME WARNER ERISA LITIGATION

## STULL, STULL & BRODY EXPENSE CHART (EXHIBIT B)

**Period: Inception to May 25, 2006**          **As Revised and Refiled on June 4, 2007**

| Category | Amount |
|---|---|
| Court Filing Fees | $300.00 |
| Federal Express, Messenger Service | $2,561.81 |
| Airfares, Hotels, Trainfares, Car Rentals, Taxis & Meals (only out-of-town meals; all in-town meals excluded) | $6,979.95 |
| Attorney Process Service | $120.00 |
| Document & Courthouse Retrieval | $889.18 |
| Inseyet (Database Hosting & Consultancy) | $34,867.05 |
| Out-of-Office Copying | $2,561.53 |
| The Michel Shaked Group (Finance Experts) | $9,401.84 |
| Cravath, Swain & Moore (Hard Drive Documents) | $8,372.00 |
| Court Reporters | $7,822.10 |
| In-Office Copying (at a rate of .20 cents per page) | $1,638.00 |
| Postage Meter | $61.39 |
| Faxes (at a rate of $1.00 per page) | $1,302.00 |
| Telephone Conference Calls | $219.09 |
| Rosenwald & Bildstein, CPAs | $9,225.00 |
| **Total:** | **$86,320.94** |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
IN RE AOL TIME WARNER ERISA          x
LITIGATION                           x        02 Cv. 8853 (SWK)
                                     x
                                     x        **MEMORANDUM OPINION**
------------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**

On September 27, 2006, the Court issued an opinion approving a $100 million class action settlement (the "Settlement") reached in litigation brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") by participants in AOL Time Warner, Inc's ("AOLTW")[1] 401(k) defined contribution plans (the "Plans"). See In re AOL Time Warner ERISA Litig., 02 Cv. 8853 (SWK), 2006 WL 2789862 (S.D.N.Y. Sept. 27, 2006). The Court reserved decision on counsel's application for attorney's fees, and on the three Named Plaintiffs' requests for "case contribution"--or incentive--awards. See id. at *10. On August 9, 2007, David Pikus, the Special Master for attorney's fees, submitted his final report and recommendation ("R&R") to this Court and served it on all relevant parties. Following the passage of a comment period that yielded only positive feedback, the Court now adopts the R&R. Additionally, the Court awards Named Plaintiffs Rita Roberts Hill and Barbara

---

[1] Although Defendant AOLTW has changed its name to Time Warner, Inc., for clarity, the Court will continue to refer to the merged entity as AOLTW.

Grant incentive awards of $1,000 each, and Named Plaintiff Steven Winfield an award of $500.

## I.   THE SPECIAL MASTER'S CALCULATION OF ATTORNEY'S FEES AND COSTS

Special Master Pikus recommends an award of $17,865,395 in fees and $267,552.64 in expenses.[2] He reached this recommendation by employing a three-tiered percentage structure, which averages out to approximately 17.9% of the common fund. This tiered percentage structure reflects the varying degrees of risk and complexity inherent in different stages of the litigation, rewards class counsel for negotiating a settlement that was previously thought unattainable, and reflects the fact that the instant ERISA litigation followed the settlement of a parallel securities claim.

Special Master Pikus rightly recommends an award that avoids recourse to a mere benchmark. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 51-52 (2d Cir. 2000). Although the percentage of attorney's fees awarded in connection with ERISA settlements varies widely (R&R 25; see also Independent Fiduciary's Review of the Motion of Plaintiffs for

---

[2] Special Master Pikus's fee recommendation is lower than class counsel's original request for 20 percent of the recovery ($20 million), plus $327,359.29 in expenses. Class counsel agreed to the reduction in expenses following a conference with the Special Master, in which the attendees resolved several issues surrounding class counsel's expense calculations. (See R&R 43-44 (listing reductions).)

an Award of Attorneys' Fees, for Reimbursement of Expenses and for Case Contribution Compensation to the Named Plaintiffs, July 18, 2006 ("Independent Fiduciary's July 18 Review")), in this case, the averaged 17.9% award is within the range of percentage awards that have been recently approved by courts of this circuit in connection with large ERISA settlements. See, e.g., In re WorldCom, Inc. ERISA Litig., 02 Cv. 4816 (DLC), 2004 WL 2338151, at *11 (S.D.N.Y. Oct. 18, 2004) (approving an 18% award); In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 469-70 (S.D.N.Y. 1994) (approving a 15% award); but see Banyai v. Mazur, 00 Cv. 9806 (SHS), 2007 U.S. Dist. LEXIS 25272, at *23 (S.D.N.Y. Mar. 30, 2007) (awarding 8.45%). Additionally, an independent fiduciary has already considered and approved class counsel's original fee application, which would have resulted in a fee and expense award higher than the one generated by the Special Master and adopted today. After considering the factors set forth in Goldberger and Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110 (2d Cir. 2007),[3] which Special Master Pikus thoroughly

---

[3] Subsequent to the drafting of the R&R, the Court of Appeals amended the Arbor Hill opinion. See Arbor Hill, 493 F.3d at 111 n.1. The portions of the opinion relied upon by the Special Master, however, remain unchanged. For ease of reference, the Court cites the amended version of the Arbor Hill opinion.

The impact of the Arbor Hill decision on common fund cases such as this one is unclear, as Arbor Hill involved a statutory fee shifting determination. (See R&R 7.) At least one court in

analyzes in the R&R,[4] as well as a cross-check against an hourly

rate calculation,[5] the Court finds the recommendation to be fair

---

this circuit has applied <u>Arbor Hill</u> when assessing an application for attorney's fees and costs in an ERISA case. See <u>Finkel v. E. End Elec. Assocs., Ltd.</u>, 06 Cv. 2169 (FB) (RLM), 2007 WL 2572167, at *4 (E.D.N.Y. Aug. 31, 2007) (adopting Magistrate Judge's calculation of attorney's fees and costs); 06 Cv. 2169 (FB), 2007 WL 2572169, at *6-*7 (E.D.N.Y. July 10, 2007) (applying <u>Arbor Hill</u> when calculating attorney's fees and costs). Because there have been no objections to Special Master Pikus's application of <u>Arbor Hill</u> in the case at hand, the Court merely notes the Special Master's consideration of that decision where relevant without deciding whether the case applies to all common fund cases.

Special Master Pikus incorporated the <u>Arbor Hill</u> decision into his analysis when generating a "presumptively reasonable fee" against which he could cross-check his calculated percentage award. In calculating the presumptively reasonable fee, Special Master Pikus was cognizant that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and that "such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." <u>Arbor Hill</u>, 493 F.3d at 118. The Special Master concluded that class counsel will likely derive a significant reputational benefit from this case. (See R&R 35; see also R&R 38-40 (concluding that three-tiered percentage structure reflects market considerations).) Additionally, Special Master Pikus considered the twelve factors identified by the <u>Arbor Hill</u> Court (and originally enumerated in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714, 717-19 (5th Cir. 1974)), eight of which are subsumed within the factors discussed in <u>Goldberger</u>. (See R&R 33-34.) The Court concurs with the Special Master's recognition of class counsel's likely reputational benefit, and with his conclusion that the recommended award comports with the additional, relevant <u>Arbor Hill</u> factors.

[4] Indeed, the Special Master presumed that class members in an ERISA case, unlike those in typical securities litigation, are not "sophisticated institutional investors whose decisions were fully volitional, unshackled from employee loyalty or the influence of sponsor steering" (R&R 16), and he therefore performed an especially thorough cross-check of the reasonableness of the percentage award.

and reasonable and adopts the R&R's recommended award.[6] The administration of the award is to be carried out under the terms set forth in the accompanying order approving the R&R and awarding attorney's fees and reimbursement of costs.

II.    INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS

In addition to the fees and expenses sought by class counsel, the three Named Plaintiffs also request an incentive award of $20,000 each. Because the R&R does not address this request, the Court has conducted its own analysis. "Incentive awards are not uncommon in class action cases and are within the discretion of the court." Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (quoting Roberts v. Texaco, Inc., 979 F. Supp. 185, 200 (S.D.N.Y. 1997)). Courts look for the

---

[5] The Special Master performed this cross-check because, under ERISA's fee-shifting provision, fees would be assessed against the defendant on the basis of an hourly rate. See McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006).

[6] In adopting the R&R, the Court also adopts the Special Master's response to the lone objection that the Settlement has received. (See R&R 49-51 (addressing collective objection filed on behalf of four class members).) Additionally, the objectors also contend that the Notice of Class Action Settlement fails to provide the information required by Federal Rule of Civil Procedure 23(h). (See Objection to Class Action Settlement and Request for Attorney's Fees and Case Contribution Awards 1-4.) In approving the Settlement, the Court reviewed the form and method of notice and concluded that "the notice procedures and the content of the notice were adequate," In re AOL Time Warner ERISA Litig., 2006 WL 2789862, at *10, so it need not address this point further. The Court addresses the objectors' arguments concerning the requested incentive awards in Part II. See infra note 10.

existence of "special circumstances" when determining whether an award is justified and, if so, in what amount. Id. Because the focus is on "special circumstances," "[n]o meaningful guidelines of broad applicability are discernible from the reported decisions as to the appropriate measure for an award . . . ." Roberts, 979 F. Supp. at 201-02. Incentive awards have thus varied in both the methodology underlying their calculation, see, e.g., In re Stock Exchs. Options Trading Antitrust Litig., MDL No. 1283, 99 Cv. 0962 (RCC), 2006 WL 3498590, at *13 (S.D.N.Y. Dec. 4, 2006) (computing incentive award by using hourly rate for time spent in deposition), and their size, see Sheppard v. Consol. Edison Co. of New York, Inc., 94 Cv. 403 (JG), 2002 WL 2003206, at *6 (E.D.N.Y. Aug. 1, 2002) (citing cases with range of incentive awards from $336 to $303,000).

Nevertheless, the case law reveals several factors often cited by courts in adjudicating named plaintiffs' requests for incentive awards in class actions, including:

> the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.

Roberts, 979 F. Supp. at 200. Additionally, when deciding requests for such awards, courts often look to the sums awarded

6

in similar cases, see, e.g., Gross v. Wash. Mut. Bank, F.A., 02 Cv. 4135 (RML), 2006 WL 318814, at *6 (E.D.N.Y. Feb. 9, 2006); In re Remeron Direct Purchaser Antitrust Litig., 03 Cv. 0085, 2005 WL 3008808, at *18 (D.N.J. Nov. 9, 2005); In re Linerboard Antitrust Litig., MDL No. 1261, Civ. A. 98-5055, Civ. A. 99-1000, Civ. A. 99-1341, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004); Dornberger v. Metro. Life Ins. Co., 203 F.R.D. 118, 124-25 (S.D.N.Y. 2001), and compare the named plaintiff's requested award to each class member's estimated pro rata share of the monetary judgment or settlement, see, e.g., In re Sprint Corp. ERISA Litig., 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006); Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 355 & n.249 (S.D.N.Y. 2005), vacated in part on other grounds by Denney v. BDO Seidman, L.L.P., 412 F.3d 58 (2d Cir. 2005); Sheppard, 2002 WL 2003206, at *6-*7.

In this case, the Named Plaintiffs contributed to an ultimately successful class action suit. The Named Plaintiffs' counsel aver that, in filing suit, the Named Plaintiffs "risked that their current or future employers would flag them as potential problem employees because of their willingness to pursue litigation against an employer" (Pls.' Mot. 47), although they do not provide specific evidence of the purported risk's magnitude. Throughout several years of litigation, the Named Plaintiffs consulted with counsel, reviewed litigation

documents, produced documents for discovery, and responded to interrogatories. (See generally Pls.' Mot., Declaration of Rita Roberts Hill ("Hill Decl."); Declaration of Barbara Grant ("Grant Decl."); Declaration of Steven Winfield ("Winfield Decl.").) Two of the three Named Plaintiffs were deposed. (Named Pls.' Letter Correcting Mot., Oct. 3, 2007; Pls.' Mot., Supplemental Declaration of Rita Roberts Hill ("Hill Supp. Decl.") ¶ 2; Supplemental Declaration of Barbara Grant ("Grant Supp. Decl.") ¶ 6.)[7] Named Plaintiff Grant attended and spoke at the July 19, 2006 hearing on final approval of the Settlement. (See Tr. 17-18, July 19, 2006.) In short, the record demonstrates that all three Named Plaintiffs made sustained contributions to this litigation,[8] which ultimately resulted in one of the largest ERISA settlements ever recorded. (See Report

---

[7] The defendants originally intended to depose all three Named Plaintiffs. Once the parties reached a settlement, however, the defendants canceled Named Plaintiff Winfield's deposition. (See Winfield Decl. ¶ 5.) At the time of the cancellation, Named Plaintiff Winfield had already engaged in preparation for the deposition. (Pls.' Mot., Supplemental Declaration of Steven Winfield ("Winfield Supp. Decl.") ¶ 3-4; Winfield Decl. ¶ 5.)

[8] Named Plaintiff Hill asserts that she dedicated 50-75 hours to the prosecution of her case (see Hill Decl. ¶ 6), and Named Plaintiff Winfield affirms that he spent approximately 30 hours on similar tasks (see Winfield Decl. ¶ 6), while Named Plaintiff Grant estimates that she put in 700 hours of labor (see Grant Decl. ¶ 4). Clearly, Named Plaintiff Grant's estimate is by far the largest. The Court notes, however, that not all of the activities mentioned in her itemized list are contributions that past courts have found compensable. (See, e.g., Grant Decl. ¶ 5.a-5.g.) In any event, the time commitment for all three Named Plaintiffs was substantial.

of the Independent Fiduciary for the Proposed Settlement in the AOL Time Warner ERISA Litigation, June 29, 2006, at 2 ("Other than the Enron settlement, the pool of funds available for distribution . . . is the largest ever awarded in an ERISA employer stock case.").) An incentive award of some kind is thus warranted.

Nevertheless, the Court concludes that the requested $20,000 per-plaintiff fee would be excessive, especially in light of the indirect, and much smaller, monetary relief accruing to the more than 65,000 absent class members. See In re Sprint Corp. ERISA Litig., 443 F. Supp. 2d at 1271 (reducing requested incentive award from $15,000 to $5,000, despite multimillion-dollar settlement amount, in light of fact that no individual class member stood to recover more than $1,000 from settlement). Although it is true that, without the efforts of the Named Plaintiffs, this litigation may never have occurred, it is equally true that, without the tens of thousands of absent class members, the defendant may never have been induced to settle. An incentive award that compensates the Named Plaintiffs for the time they spent sitting for depositions, plus reasonable deposition preparation time, creates less of a disparity among class members while still rewarding the Named Plaintiffs for their efforts. Cf. In re Stock Options Trading Antitrust Litig., 2006 WL 3498590, at *13.

In this case, Named Plaintiff Hill was deposed for 4.5 hours (Hill Supp. Decl. ¶ 2), and Named Plaintiff Grant was deposed for no more than 6.5 hours (see Grant Supp. Decl. ¶ 6). The deposed Named Plaintiffs should also be rewarded for reasonable preparation time.[9] Additionally, given that his deposition was canceled at the eleventh hour, Named Plaintiff Winfield also should be rewarded for time reasonably spent in preparation. Accordingly, the Court concludes that awards of

---

[9] Again, the Named Plaintiffs vary in the amount of time that they reportedly dedicated to deposition preparation: Named Plaintiff Hill submitted an estimate of 30 hours (see Hill Supp. Decl. ¶ 3); Named Plaintiff Winfield "expended approximately 12-14 hours preparing for [his] deposition and adjusting [his] schedule" (Winfield Supp. Decl. ¶ 4); and Named Plaintiff Grant reports that she dedicated 67 hours preparing for, traveling to, and sitting for her deposition (see Grant Supp. Decl. ¶ 4-7). Although the Court questions neither the Named Plaintiffs' accuracy, nor their veracity, it concludes that it would not be fair and reasonable for the award to cover all of the claimed "preparation time." For example, though there may be no "bright-line formula of preparation time versus deposition time to be used in all cases," Monsour's Inc. v. Menu Maker Foods, Inc., 05 Cv. 1204 (MLB), 2007 WL 437780, at *2 (D. Kan. Feb. 6, 2007); see also Am. Ref-Fuel Co. of Niagara, LP v. Caremeuse N.A., 02 Cv. 814C(F), 2007 WL 2283768, at *2 (W.D.N.Y. Aug. 6, 2007); Constellation Powersource, Inc. v. Select Energy, Inc., 3:04 Cv. 983 (MRK), 2007 WL 188135, at *8 (D. Conn. Jan. 23, 2007), the Court is unwilling to reward Named Plaintiff Grant for approximately 60 hours of "preparation" for a deposition that lasted no more than 6.5 hours. Even in the case of expert witnesses, preparation time of that magnitude is not customarily considered compensable. Cf. Packer v. SN Servicing Corp., 243 F.R.D. 39, 42-43 (D. Conn. 2007) (collecting cases); Constellation Powersource, Inc., 2007 WL 188135, at *8 (holding that party whose expert was deposed "should not be reimbursed for more hours in preparation for the deposition than the deposition itself consumed").

$1,000 each to Named Plaintiffs Hill and Grant, and $500 to Named Plaintiff Winfield, are fair and reasonable.[10]

_____

[10] The Court briefly addresses the single objection (brought collectively by four class members) lodged against the request for incentive awards. First, the objectors assert that the requested incentive award is "inherently corrupting" and imply that it led the Named Plaintiffs to accept a suboptimal settlement. (See Objection to Class Action Settlement and Request for Attorney's Fees and Case Contribution Awards ("Objection") 6.) Courts should ensure that the possibility of an incentive award does not induce class representatives to put their own interests above those of the class. See, e.g., McBean v. City of New York, 233 F.R.D. 377, 391 (S.D.N.Y. 2006); White v. Nat'l Football League, 822 F. Supp. 1389, 1406 (D. Minn. 1993). In this case, however, the Court has already concluded that the Settlement--negotiated at arm's length by "experienced counsel, overseen and assisted by a court-appointed special master," and approved by an independent fiduciary--is both procedurally and substantively fair. In re AOL Time Warner ERISA Litig., 2006 WL 2789862, at *5, *5-*9. Notably, the independent fiduciary expressed no objection to the $20,000 award requested by the Named Plaintiffs. (See Independent Fiduciary's July 18 Review 1.) Moreover, "[denying] the awards now would not alter the incentives that existed at the time the [S]ettlement was negotiated." McBean, 233 F.R.D. at 391 (emphasis in original). Therefore, the Court will not deny the Named Plaintiffs' request for an incentive award on this ground.

Next, the objectors imply that, pursuant to the restrictions in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court can only approve an award that compensates a lead plaintiff for "lost wages and out-of-pocket expenses incurred in a case." (Objection 7.) The PSLRA, however, does not apply to ERISA litigation. See Smith v. Dominion Bridge Corp., 96 Cv. 7580, 2007 WL 1101272, at *11 n.12 (E.D. Pa. Apr. 11, 2007) (noting that PSLRA does not apply to ERISA litigation); Hill v. Tribune Co., 05 C 2602, 2005 WL 3299144, at *3 (N.D. Ill. Oct. 13, 2005) (finding certain PSLRA provisions inapposite in ERISA litigation). Therefore, although out-of-pocket costs provide a "powerful basis" for an incentive award, Sheppard, 2002 WL 2003206, at *6 n.9, they are not a prerequisite for such an award in ERISA cases.

Finally, the objectors argue that a $20,000 per-Named Plaintiff incentive award is excessive because it is out of proportion with the amount that each absent class member stands

No doubt the Named Plaintiffs expected to receive an award much closer to the $20,000 that they each requested. Yet "an expectation is not an entitlement," Sarnoff v. Am. Home Prods. Corp., 798 F.2d 1075, 1080 (7th Cir. 1986), and the desire to incentivize lead plaintiff participation must be tempered by an equally important quest for parity and fairness among class members. Therefore, for the reasons discussed above, the Court concludes that an incentive award is appropriate in the instant case, and that awards of $1,000 each to the deposed Named Plaintiffs and $500 to the un-deposed Named Plaintiff are fair, reasonable, and sufficient to compensate the Named Plaintiffs for their consistent efforts on behalf of the class.

### III. CONCLUSION

For the foregoing reasons, the Court approves an award to Co-Lead Counsel of $17,865,395 in fees and $267,552.64 in expenses, and incentive awards of $1,000 each to Named Plaintiffs Hill and Grant and $500 to Named Plaintiff Winfield. An appropriate Final Order and Judgment accompanies this Opinion.

---

to recover under the Settlement. (See Objection 7.) The Court has taken proportionality into account. Indeed, it is the primary justification offered for the reduction of the incentive award to an amount that comports with the $1,000-$2,000 range that at least one of the objectors is willing to accept. (See Objection 8.)

SO ORDERED.

_____
&frasl; SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE


Dated:    New York, New York
          October 26, 2007


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 10/26/07

13

Transcript of Merck Lead Plaintiff hearing and decision

1

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY
 2                      CIVIL ACTION NO. 05-1157

 3

 4   IN RE:  MERCK LITIGATION              MOTIONS FOR LEAD
                                           PLAINTIFF AND LEAD
 5                                         PLAINTIFFS' COUNSEL

 6

     ---------------------------
 7
                                  April 18, 2005
 8                                402 E. State Street
                                  Trenton, New Jersey
 9

10

11   B E F O R E:  HONORABLE STANLEY R. CHESLER, USDJ

12

13

14   Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record
15   as taken stenographically in the above-entitled proceedings.

16

17   JACQUELINE KASHMER
     Official Court Reporter
18

19

20

21
                    JACQUELINE KASHMER, C.S.R., C.R.R.
22                     OFFICIAL COURT REPORTER
                            P. O. Box 12
23                      Pittstown, NJ 08867
                          (609) 656-2595
24

25
```

□

Transcript of Merck Lead Plaintiff hearing and decision

```
 1
    A P P E A R A N C E S:
 2

 3
            TRUJILLO, RODRIGUEZ & RICHARDS, LLC
 4          8 Kings Highway West
            Haddonfield, NJ 08033
 5          BY:  LISA J. RODRIGUEZ, ESQ.,
            For Cimato and Blossom Plaintiffs
 6

 7
            SCHATZ & NOBEL
 8          20 Church Street
            Hartford, CT 06103
 9          BY:  ROBERT A. IZARD, JR., ESQ.,
                 WAYNE BOULTON, ESQ.,
10          For Cimato Plaintiffs

11

12          KELLER, ROHRBACK, LLP
            1201 Third Avenue - Suite 3200
13          Seattle, WA 98101
            BY:  JULI FARRIS DESPER, ESQ.,
14          For Cimato Plaintiffs

15

16          LITE, DE PALMA, GREENBERG & RIVAS
            Two Gateway Center
17          Newark, NJ 07102
            BY:  JOSEPH DE PALMA, ESQ.,
18          For Mortensen Plaintiffs

19

20          SCHIFFRIN & BARROWAY, LLP
            280 King of Prussia Road
21          Radnor, PA 19087
            BY:  JOSEPH H. MELTZER, ESQ.,
22               STUART BERMAN, ESQ.,
            For Mortensen Plaintiffs
23

24

25
```

⬜

3

Transcript of Merck Lead Plaintiff hearing and decision

```
 1
      A P P E A R A N C E S:
 2

 3
              JOHNSON & PERKINSON
 4            1690 Williston Road
              P.O. Box 2305
 5            S. Burlington, VT 05403
              BY:  JACOB B. PERKINSON, ESQ.,
 6            For Plaintiff Horne

 7

 8            COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
              One S. Broad Street - Suite 1850
 9            Philadelphia, PA 19107
              BY:  MARC MACHIZ, ESQ.,
10            For Plaintiff Denise Burtoff

11

12            COHN, LIFLAND, PEARLMAN, HERMANN & KNOPF
              Park 80 Plaza West One
13            Saddle Brook, NJ 07663
              BY:  LEONARD Z. KAUFMANN, ESQ.,
14            For Ugwuneri Plaintiffs

15

16            SCOTT & SCOTT
              P.O. Box 192
17            Colchester, CT 06415
              BY:  NEIL ROTHSTEIN, ESQ.,
18            For Ugwuneri Plaintiffs

19

20            CHIMICLES & TIKELLIS
              361 W. Lancaster Avenue
21            Haverford, PA
              BY:  JAMES R. MALONE, JR., ESQ.,
22            For Ugwuneri Plaintiffs

23

24

25
```

⊔

4

```
 1
      A P P E A R A N C E S:
 2
```

Transcript of Merck Lead Plaintiff hearing and decision

3

4                MILBERG, WEISS, BERSHAD & SCHULMAN, LLP
                 One Pennsylvania Plaza - 49th Floor
                 New York, NY 10119
5                BY:  DAVID BROWER, ESQ.,
                      RICHARD WEISS, ESQ.,
6                      BRUCE BERNSTEIN, ESQ.,
                 For Plaintiffs in the Securities Action

7

8

                 LERACH, COUGHLIN, STOIA, GELLER, RUDMAN &
9                ROBBINS, LLP
                 401 B Street - Suite 1700
10               San Diego, CA 92101
                 BY:  TRAVIS E. DOWNS, III, ESQ.,
11               For Proposed Derivative Plaintiffs

12

13               CRAVATH, SWAINE & MOORE, LLP
                 Worldwide Plaza
14               825 Eighth Avenue
                 New York, NY 10019-7475
15               BY:  ROBERT BARON, ESQ.,
                 For the Defendants

16

17

                 HUGHES, HUBBARD & REED
18               1775 I Street, N.W.
                 Washington, DC 20006-2401
19               BY:  WILLIAM STEIN, ESQ.,
                      ROBERTA KOSS, ESQ.,
20               For the Defendants

21

22

23

24

25

D

                                                                5

1            THE COURT:  It's still just barely good morning,

2    so, good morning, everybody.  Enter your appearances,

3    counsel.

                        Page 4

Transcript of Merck Lead Plaintiff hearing and decision

1   firm in this case or any another firm is because of what
2   happened in the Halliburton case, pure and simple. But we
3   can move forward today. But instead, Mr. Izard is putting a
4   road block and he is saying no. Why? Why can't we move
5   forward? That's my argument. And that man, he worked for
6   Merck. He's the one who has a say here, not me, not them,
7   not them. That's who we're here for. Thank you, your
8   Honor.

9           THE COURT:  Thank you. Is there anything further?
10          MR. IZARD:   Only if you have any questions, your
11  Honor.

12          THE COURT:  No, I don't. I'm satisfied based upon
13  what I've heard that the Cimato plaintiffs' proposal is
14  indeed one which the Court, in fact, should and must adopt.
15  I've read your papers with interest. While I read it with
16  interest, quite frankly, I also read it with distress.

17          Frankly, I look forward to the day when something
18  vaguely resembling the PSLRA and its selection process can
19  be enacted to govern lawsuits like this.

20          This Court regards the type of skirmishing, sniping
21  that are disclosed in these papers to be distasteful.  The
22  Cimato plaintiffs have presented a proposal which makes a
23  good deal of sense to the Court. From the Court's point of
24  view, there can only be one objective in selecting lead
25  plaintiffs and lead counsel and, that is, to come up with a

□

24

Transcript of Merck Lead Plaintiff hearing and decision

1  selection which, in fact, makes certain that a group which

2  can effectively, intelligently and vigorously represent the

3  interests of the potential ERISA class members is put

4  together.

5      This Court could not care less about who's fighting

6  to get what piece of what pie in terms of attorneys.  Quite

7  frankly, the Court does not regard class action litigation

8  as being another variant of the attorneys' full employment

9  act of 2005.

10     Quite frankly, it doesn't matter if some law firms

11  get a bigger piece of the business and some law firms do

12  not.

13     In short, the issue is which law firms can make

14  this lawsuit move most effectively and intelligently for a

15  plaintiff class.

16     The Court read, for example, the papers from

17  counsel for plaintiff Horne suggesting that in some manner

18  or other the law firms in the ERISA class action litigation

19  have created a closed club and that they are valiantly

20  trying to break into that club.  I applaud them for their

21  efforts.  That's good business development, but from the

22  Court's point of view, what is intelligent selection of

23  attorneys is picking a group of attorneys who, in fact, have

24  substantial experience and heft in this area, and there is

25  no doubt from looking through the applications of this Court

0

25

1  that the Cimato plaintiffs' structure indeed has that.

2      While Schatz & Nobel may not have that many

Page 23

Transcript of Merck Lead Plaintiff hearing and decision

3    attorneys, there are more than an adequate number of
4    attorneys in the firms which have agreed to sign on to that
5    proposal.  What is clear is that Schatz & Nobel does have
6    substantial experience in this area and much more experience
7    than other contenders.
8           The Court is satisfied that that, coupled with the
9    experience of the other counsel who have joined that group,
10   make it far and away the most appropriate proposal that's
11   been submitted to this Court.
12          The Court is prepared to adopt that proposal,
13   including the appointment to leadership positions in that
14   proposal of Scott & Scott and the Johnson & Perkinson firms.
15   Of course, if either firm does not wish such an appointment,
16   they can tell me now and I'll be glad to accommodate them.
17          MR. ROTHSTEIN:  What's the position, your Honor?
18          THE COURT:  The position, as I understand it in
19   their proposal, is participation in the discovery committee.
20   Is that correct?
21          MR. IZARD:  Yes, your Honor.
22          MR. ROTHSTEIN:  We'll accept it.
23          MR. PERKINSON:  Your Honor, we're happy to accept
24   to work with lead counsel.  Thank you.
25          THE COURT:  Fine.  As I said, the proposal

□

26

1    submitted by the Cimato group will be adopted by the Court.
2    The Cimato group lead plaintiff structure will also be
3    adopted by the Court and the Court will enter an appropriate

APR-04-2003  15:30      ORR & RENO, P.A.                    603 224 2318    P.02/05

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

Dec 18  4 42 PM '02              DEC 2 0 2002

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

In re Tyco International, Ltd.
Securities Litigation

                              MDL DOCKET NO. 02-1335-B
                              ALL CASES

### PRACTICE AND PROCEDURE ORDER NUMBER 4

Two competing groups seek appointment as lead plaintiffs and lead counsel for the ERISA class actions consolidated for pretrial purposes under MDL docket no. 02-1335-B.

The "Overby Group" consists of proposed lead plaintiffs Marvin Overby, Edmund Dunne, and Kay Jepson and proposed lead counsel Schatz & Nobel, P.C. and Stull, Stull & Brody. Attorney Robert Izard of the Schatz firm leads the Overby Group and Attorney Kenneth Bouchard of Bouchard and Kleinman, P.A. serves as local counsel.

The "Gordon Group" consists of proposed lead plaintiffs John Gordon, Virginia Konyn, Karl Peterson, Steve Swanson and Gary Johnson, and proposed lead counsel Barrett, Johnston & Parsley and Whatley Drake, LLC. Joe R. Whatley, Jr. and George E. Barrett are the group's principle attorneys, and Mark Mallory of Mallory & Friedman, PLLC serves as local counsel.

Having reviewed the supplemental memoranda and attachments,
I am satisfied that both groups of plaintiffs understand the
responsibilities that they will assume if they are named lead
plaintiffs. Further, neither group appears to be in a better
position than the other to represent the interests of the class.
I am also satisfied that lead counsel for both groups have the
necessary resources, skill and commitment to effectively
represent the proposed class. Each of the proposed lead counsel
firms has had extensive experience in both leading class actions
and prosecuting ERISA claims. Both groups are also served by
able local counsel.

In choosing between equally qualified groups, it is not
significant that the Overby Group filed its lawsuit first. Nor
does it matter that the Gordon Group was the first to file in
this district. Instead, two factors lead me to select the Overby
Group. First, its complaint is somewhat more comprehensive and
detailed than the complaint filed by the Gordon Group. This
suggests that the Overby Group is in a marginally better position
to provide effective representation to the proposed class because
its attorneys already have devoted substantial resources to the
investigation of the class's potential claims. Second, counsel
for the Overby Group have the advantage of proximity to both this

-2-

court and the litigation's likely center of gravity in New York. These two factors are sufficient to tip the balance where, as here, both groups are up to the task of representing the proposed class.

For the reasons set forth in this order, I appoint Overby, Jepson and Dunne to serve as lead plaintiffs and the law firms of Schatz & Nobel, P.C. and Stull, Stull & Brody to serve as co-lead counsel in the ERISA actions. Overby has consented to the transfer of his case to this district for all purposes. Accordingly, I amend Practice and Procedure Order Number 3 and direct lead counsel to file the consolidated ERISA complaint in <u>Overby v. Tyco International, Ltd. et al.</u>, Case No. 02-CV-1357-B.

SO ORDERED.

Paul Barbadoro
Chief Judge

December 18, 2002

cc:    Counsel of Record (Service List Attached)
       Michael Beck, Judicial Panel
           on Multidistrict Litigation

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE SPRINT CORPORATION
ERISA LITIGATION

Case No. 03-2202-JWL

This Order Relates to All Cases

---

## MEMORANDUM AND ORDER

This is a putative class action involving claims of alleged breach of fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1000-1461 ("ERISA"). Plaintiffs assert claims as participants in and on behalf of three different retirement savings plans against defendants Sprint Corporation, committees that participated in administering the plans and individual members of those committees, the individual members of Sprint's board of directors, and the third-party trustee for the plans, Fidelity Management Trust Company. The matter is presently before the court on Plaintiffs' Motion for Final Approval of Class Action Settlement (doc. #229) and Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and for an Award to the Plaintiffs (doc. #233). For the reasons explained below, the court will finally approve the parties' settlement and award plaintiffs' attorneys' fees and expenses in the amount of $3.9 million out of which $5,000 is to be paid to each of the four named plaintiffs.

## NATURE AND PROCEDURAL HISTORY OF THE CASE

In these consolidated ERISA cases, named plaintiffs Fran Lindholm, Anton P. Spanier, LaVonne M. Easter, and Jeffery M. Snethen allege that defendants breached their fiduciary duties by allowing three of Sprint's defined contribution 401(k) retirement plans to remain so highly invested in Sprint stock during a time period when Sprint stock was an imprudent investment and by failing to disclose material information to plan participants. The defendants include Sprint corporation and various Sprint employees, officers, and directors who were allegedly involved with administering the plans, as well as the third-party trustee for the plans.

Plaintiffs' complaint largely survived defendants' motions to dismiss. *See generally In re Sprint Corp. ERISA Litig.*, Case No. 03-2202-JWL, 2004 WL 2182186, at *1-*7 (D. Kan. Sept. 24, 2004); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004). Plaintiffs then filed a motion for class certification (doc. #83). Before that motion was at issue, the parties announced they had reached an agreement to settle this case. On motion, the court issued an order preliminarily certifying a class for settlement purposes, preliminary approving the proposed settlement, approving the form and dissemination of class notice, and setting the fairness hearing (doc. #223). The court held the initial fairness hearing on May 15, 2006.

On May 17, 2006, the court issued an Order for Supplemental Briefing & Hearing (doc. #244) because the court had significant concerns about some of the issues that had developed at the fairness hearing about which the court did not believe the parties had

2

adequately developed the record—namely, although the court had been aware prior to the fairness hearing that the proposed settlement conferred different types of relief on different categories of plaintiffs, the court had not been aware that those differences created such an arguably significant disparity in the value of the benefits that the proposed settlement would confer on the different categories of employees. The court also noted that the record did not support the requested $15,000 award to each of the named plaintiffs. The court allowed the proponents of the settlement and any objectors who wished to be heard to submit supplemental briefing on those issues and the court set this case for a supplemental hearing on May 26, 2006.

On May 23, 2006, the parties brought to the court's attention the fact that notice of the initial fairness hearing was not mailed to a significant number of absentee class members. After reviewing additional briefing submitted by the parties, the court issued an order (doc. #257) approving the form and dissemination of a supplemental class notice and setting a second fairness hearing for July 26, 2006. The parties and objectors filed additional papers relating to the settlement. The court held the second fairness hearing on July 26, 2006.

The court has evaluated the terms of the proposed settlement, all of the papers submitted by the settlement proponents, the objections asserted by settlement objectors, and the arguments and evidence presented at both the initial fairness hearing and the second fairness hearing. After thorough consideration of the record, the court is now prepared to rule.

## FINAL APPROVAL OF THE PROPOSED SETTLEMENT

The court may approve a settlement on finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C). The court's main concern in evaluating the settlement is to ensure that the rights of passive class members are not jeopardized by the proposed settlement. 7B Charles Alan Wright et al., Federal Practice & Procedure §1797.1, at 79 (3d ed. 2005); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise"). Moreover, it is generally accepted that where settlement precedes class certification (e.g., approval for settlement and certification are sought simultaneously, as is the case here) district courts must be "even more scrupulous than usual" when examining the fairness of the proposed settlement. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also* Manual for Complex Litigation, Fourth § 21.612, at 313 (2004) ("Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important. Courts have held that approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process.").

4

The Tenth Circuit has set forth four non-exclusive factors which this court must consider in evaluating whether the proposed settlement is fair, reasonable, and adequate: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). Another factor in this case to which the parties, the court, and the objectors have devoted considerable attention is the extent to which the proposed settlement treats particular segments of the class differently from others not only in terms of the type of relief, but more specifically in terms of the arguably significant disparity in the value of that relief. *See* Manual for Complex Litigation, Fourth § 21.62, at 317 (noting that courts have examined the extent to which "particular segments of the class are treated significantly differently from others"). The proponents of the settlement are responsible for providing sufficient evidence to support a conclusion that the settlement is fair. *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993).

## I.    The Structure of the Settlement

In the parties' Class Action Settlement Agreement dated February 2, 2006, they agreed to a structured settlement of this litigation. Key to an understanding the structure of the settlement is an understanding of the changes Sprint's corporate structure has undergone since the time when the parties first began serious settlement negotiations. In 2005, the

5

merger between Sprint and Nextel gained the necessary regulatory and shareholder approvals and became final, culminating in the creation of Sprint Nextel Corporation. As the two companies combined, this provided an opportunity for Sprint to evaluate and restructure its retirement savings plans which are the basis for this lawsuit. At the time of the merger, it was planned that Sprint's Local Telecommunications Division would be spun off from Sprint Nextel into a new, separate company once the necessary approvals were obtained. Ultimately, this resulted in the spin-off of Embarq Corporation in May of 2006. With that spin-off a significant number of the class member plaintiffs became Embarq employees. As a consequence of the spin-off, bargaining unit employees are no longer employed by Sprint; rather, they are employed (if at all) by Embarq. With this background in mind, then, the court will discuss the key components of the settlement agreement.

- Cash Settlement Fund – Sprint has paid $4,000,000 to a cash settlement fund which is to be paid to the plans and distributed among former plan participant class members according to a plan of allocation. These former plan participants consist of Embarq employees (including those who are subject to collective bargaining agreements with Embarq) as well as former Sprint employees who are no longer with Sprint Nextel or Embarq.

- Increased Vesting – Effective January 1, 2006, Sprint increased on a pro rata basis the vested amount of matching contributions in the accounts of former employees who were less than 100% vested at the time of separation from Sprint and who remain participants in the three retirement plans at issue in this lawsuit, in a uniform percentage amount which

6

in the aggregate totals $1.6 million. This aspect of the settlement, then, only pertains to former Sprint employees who remain participants in the plans and who are less than 100% vested.

●    <u>Increased Match</u> – Effective January 1, 2006, and continuing until at least January 1, 2007, Sprint increased its matching contributions to its employees' 401(k) accounts to at least 100% of the first 4% of eligible compensation. The parties had originally estimated the value of the increased match to be $17.9 million, but they later determined this estimated value was incorrect because it was based on the projected amount of the increased match for all legacy Sprint employees,[1] not just those who fall within the class definition. The parties have now estimated this aspect of the settlement to be worth approximately $8.95 million. Only current Sprint employees, not Embarq employees or any other former Sprint employees, benefit from the Increased Match as set forth in the settlement agreement.

●    <u>Plan Amendments</u> – Effective January 1, 2006, and continuing until at least January 1, 2007, Sprint enacted the following plan amendments to its employees' retirement savings plan:

1.)    increased limits on participants' pretax contributions to 80% of eligible compensation;

2.)    immediate vesting of future matching contributions;

_____

[1] The term "legacy Sprint employee" is a term of art at Sprint Nextel which refers to employees who were employed by a Sprint subsidiary company and, after the merger, remain employed by a Sprint Nextel subsidiary company except for those companies that became Embarq subsidiaries.

7

3.)    ability to diversify future matching contributions; and

4.)    unlocking matching contributions previously made by Sprint.

As with the Increased Match, the Plan Amendments only apply to current Sprint employee class members. But, in the settlement agreement, Sprint agrees to use its "best efforts" to implement similar amendments for the retirement savings plans for Embarq employees (which includes those who are subject to collective bargaining agreements with Embarq).

●    <u>Participant Communications Improvements</u> – Effective January 1, 2006, Sprint enhanced its online resources and communications to its plan participants and made available seminars and meetings with financial advisors. For former employees, these enhancements include two one-hour financial planning meetings with Ameriprise financial advisors, which Sprint has estimated to have a retail value of approximately $350-$400 to each former employee.

●    <u>Settlement Expense Fund</u> – Sprint will pay up to $3.9 million to cover the attorneys' fees of class counsel, litigation costs and expenses (including the costs of class notice, independent fiduciary review of the settlement, and settlement administration), and any awards to the named plaintiffs.

The class members, then, will receive different aspects of the settlement depending on whether they are current or former Sprint employees and, if they are former employees, whether they remain participants in the plans and whether they are 100% vested. All former employees will share in the $4 million Cash Settlement Fund and will receive two one-hour financial planning meetings. Those who are still participants in the plans and who are not

8

100% vested will receive the Increased Vesting. Current Sprint employees, on the other hand, will receive the Increased Match, the Plan Amendments, and the Participant Communications Improvements. Sprint has agreed to use its best efforts to implement similar plan amendments for Embarq employees. All of these aspects of the settlement are net of attorneys' fees and related expenses.

As the parties had originally presented the various terms of the settlement agreement to the court, it appeared there was an arguably significant disparity between the different categories of class members inasmuch as the current Sprint employees seemed to be receiving at least three times (on an average, per-employee basis) the value former employees were receiving. Thus, the court was concerned that Sprint might have been giving favored treatment to its own employees at the expense of its former employees, a significant number of which had just then become former Sprint Nextel employees by virtue of the Embarq spin-off. The arguably significant disparity in the value of relief did not seem to be attributable to any differences in the strength or value of the class members' claims.[2] Since the court voiced these concerns, the parties have focused their attention on the different types of relief being granted to the different categories of plaintiffs. This has been helpful to the court in

---

[2] The court wishes to clarify that it has never stated that the recovery for the different categories of class members must be equal. Furthermore, the court never stated that it would not grant settlement approval notwithstanding these discrepancies. The court was simply of the opinion that the parties had not adequately developed this important issue in their original submissions to the court or at the initial fairness hearing, and the court believed that the disparity was potentially significant enough that it warranted a greater level of attention from the parties in order to allow the court to scrutinize the settlement more meaningfully.

attempting to evaluate whether the settlement is fair, reasonable, and adequate. The court is not attempting to determine whether the settlement has equal value to each of the class plaintiffs. The court understands that the value class members will receive depends upon a number of factors such as their level of investment in the plans as well as their ability and willingness to capitalize on the different types of relief being offered under the terms of the settlement. But, the court believes that in determining whether the settlement is fair, reasonable, and adequate it is important to understand the settlement not only in terms of its application to the class as a whole, but also in terms of its anticipated impact on different class members.

Approximately 21,690 of the class member plaintiffs are current Sprint Nextel employees. They will receive increased matching contributions valued at $8.95 million, or approximately $413 per employee. It should be noted, however, that Randall Parker, the Sprint/Embarq benefits representative who testified at the second fairness hearing, testified that although the settlement agreement called for an increased match of 100% of the first 4% of eligible compensation, Sprint Nextel ultimately chose to implement a retirement plan with an increased match of 100% of the first **5%** of eligible compensation—a plan with more beneficial terms than the one required by the settlement agreement. In fact, he testified that this choice was also driven by competitive considerations. Thus, although this aspect of the settlement certainly has meaningful value, that value is attenuated somewhat by the fact that this result was not solely attributable to the settlement agreement. Additionally, these class members will receive the benefit of the Plan Amendments such as the contribution ceiling

10

increase, immediate vesting, diversification of future company matching contributions, and unlocking of unvested units. They also will receive the Participant Communication Improvements. The parties have not attempted to place a value on the Plan Amendments or the Participant Communication Improvements for purposes of obtaining final approval of the settlement, but suffice it to say that the court is satisfied that these aspects of the settlement certainly have some value to the current Sprint Nextel employee class members. It is important to note that in order for these employees to obtain the full value of the settlement they must continue to work for Sprint Nextel and contribute adequately to their 401(k) plans. On average, then, notwithstanding the somewhat attenuated value of the increased match, it appears that the value of relief for this category of plaintiffs likely is in excess of $413 per plaintiff.

Approximately 63,275 class member plaintiffs are former plan participants. Of these, approximately 16,409 are current Embarq employees (including Embarq employees who are subject to collective bargaining agreements) and 46,866 are former Sprint and/or Embarq employees. These class members will receive their share of the $4 million Cash Settlement Fund pursuant to the allocation plan, or approximately $63 per plaintiff. Unlike the various plan amendments which apply to the current Sprint Nextel employee class plaintiffs, this component of the settlement is not contingent upon these class members' future behavior. Additionally, these former plan participants are entitled to financial planning services with an estimated retail value of $350. Of course, the extent to which they will use these services is uncertain. Undoubtedly, some will and some will not. But, nonetheless, this relief is

11

available to them and creates some value for them. Thus, the value of relief for this category of plaintiffs is approximately $63-$413 per plaintiff. Also, Sprint has also agreed to use its best efforts to implement similar Plan Amendments for the current Embarq employees. Based on the Embarq representative's testimony at the second fairness hearing in this case, the court is satisfied that as a practical matter this aspect of the settlement already has and will continue to have real value for the Embarq employees, albeit perhaps some more than others depending on the outcome of union negotiations. Thus, this aspect of the settlement has the potential to add yet additional value to the Embarq employees' portion of the settlement.

Approximately 3,844 class member plaintiffs are former employees who still are plan participants and were less than 100% vested at the time of their separation from employment. These class members will receive their pro rata shares of the $1.6 million in Increased Vesting, or approximately $416 per plaintiff. Like the $4 million cash settlement for the other category of former employees, this aspect of the settlement is not contingent upon these class members' future behavior. This category of class members also will receive financial planning services with an estimated retail value of $350. Again, this creates some value for this category of class plaintiffs. In sum, these class members will receive a settlement value in the range of $416-$766 per plaintiff. Although this category of class members stands to receive the greatest monetary benefit, because they are no longer Sprint Nextel or Embarq employees there is no potential for them to reap the benefits of the other nonmonetary

12

components of the settlement in terms of more favorable restructuring of the Sprint Nextel and/or Embarq plans.

Having analyzed the settlement structure and the estimated impact of the settlement on the various categories of the class member plaintiffs, then, the court will now analyze the four factors the court must evaluate in determining whether the settlement is fair, reasonable, and adequate.

## II.    Analysis of the Four Factors

### A.    *The Proposed Settlement Was Fairly and Honestly Negotiated*

The court is satisfied that the settlement in this case was fairly and honestly negotiated. Plaintiffs' counsel conducted an extensive investigation of the allegations in the complaint and the losses suffered by the plans. They obtained and reviewed tens of thousands of pages of documents including plan documents and materials, communications with plan participants, internal Sprint documents, SEC filings, press releases, public statements, news articles, and other publications and documents. Defendants vigorously challenged the adequacy of the allegations in plaintiffs' consolidated complaint by filing two rounds of motions to dismiss. At the time serious settlement discussions began, plaintiffs had filed a motion for class certification and that motion was almost at issue. The parties had begun to engage in discovery.

Although the parties began serious settlement discussions relatively early in the case, the timing of the settlement negotiations was the fortuitous consequence of being able to capitalize on the timing of the Sprint/Nextel merger and the opportunity to restructure

Sprint's retirement plans during the imminent blending of the two sets of workforces. Sprint was unwilling to pay much cash to settle this case given its perception of the case's weaknesses. By utilizing the opportunity to restructure Sprint's retirement plans to benefit the existing plan participants, the parties were able to allocate the available cash to former plan participants. In doing so, they attempted to structure the settlement so as to maximize the settlement benefits for class as a whole and for each of category of class member plaintiffs. These negotiations were further complicated by the then-anticipated spin-off of Sprint's Local Telecommunications Division because the parties needed to be able to attempt to predict the consequences of that spin-off on the settlement.

In sum, counsel litigated this case during its early phases aggressively and in a manner that demonstrated legal expertise in this area of the law. Then, once the opportunity for settlement came about, plaintiffs' counsel pushed for creative settlement possibilities that worked to maximize the settlement value for the class as a whole as well as for the various categories of class members. The settlement is a result of litigation-related considerations and uncertainties as well as an opportunity for improvements in Sprint's employee benefit plans. The court is satisfied that this factor weighs in favor of settlement approval.

B.    *Serious Questions of Law and Fact Place the Ultimate Outcome in Doubt*

For the detailed reasons set forth on the record by the parties at the first fairness hearing on May 15, 2006, the court wholeheartedly agrees with the parties' assessment of this case. In short, numerous serious questions of law and fact placed the ultimate outcome of this case in real doubt. Having ruled upon defendants' motions to dismiss for failure to

14

state a claim upon which relief can be granted, the court is familiar with the law in similar cases and, to put it mildly, it would have been interesting to see if and how plaintiffs could have survived the summary judgment phase. Although plaintiffs survived defendants' motion to dismiss, they did so only under the very narrow standard of review which the court must apply to Rule 12(b)(6) motions. Additionally, even if plaintiffs could have survived defendants' motions for summary judgment, additional serious questions of law and fact also would have placed in doubt the value of the recovery plaintiffs might have been able to obtain. Although the value of the settlement might not seem like much for a case with such a potentially monumental scale at its inception, the court believes plaintiffs are faring well under the terms of the settlement compared to what the outcome of this case probably would have been in the absence of the settlement given the developing state of the law and the facts on issues that likely would have predominated this case in determining both liability and damages. The court cannot overstate the significance of this factor in the court's ultimate determination that the settlement is fair, reasonable, and adequate. This factor weighs heavily in favor of approving the settlement.

C.    *Value of Immediate Recovery*

The third factor the court must consider is "whether the value of an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation." *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993). The value of the settlement must be weighed against "the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation."

15

*Id.* at 1015. Here, if plaintiffs were to proceed with this litigation through a trial on the merits, there is a substantial risk that they would not have been able to establish liability and that the amount of damages ultimately awarded may have been less than the amounts guaranteed by the settlement. Meanwhile, the size of the recovery would have been reduced by additional costs incurred by plaintiffs' counsel in taking this case through trial and likely appeals. Given the meager prospects of establishing any significant amount of damages, the mere possibility of obtaining more meaningful relief in the future is bleak. Thus, the value of an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation. This factor, too, weighs heavily in favor of settlement approval. Indeed, it is the combination of the second and third factors – that serious questions of law and fact place the ultimate outcome of this litigation in doubt combined with the fact that the possibility of obtaining better relief after protracted and expensive litigation is unlikely – that weigh the most heavily in the court's determination that the settlement is fair, reasonable, and adequate to the class members.

D.     *The Parties' Judgment that the Settlement is Fair and Reasonable*

With respect to the fourth factor, the court is satisfied that the attorneys on both sides of this case genuinely believe the settlement is fair and reasonable. They believe it provides significant benefits to the class members, particularly when measured against the significant risks to any recovery if the action were to proceed to summary judgment and/or trial. Plaintiffs counsel explains that ERISA cases involving allegedly imprudent offering of employer stock in 401(k) plans are a fairly new type of class action as to which there has

16

been little, if any, governing case law by the Supreme Court or by the Tenth Circuit. Defendants' counsel explains that many of the class members' claims were subject to a variety of defenses that would have barred their ERISA claims entirely. Collectively, then, counsel believe that the settlement confers significant benefits on the class of plaintiffs compared to what they probably would have received in the absence of settlement. This factor also weighs in favor of settlement approval.

## III.    Objections by Class Members

### A.    Objections of Donald V. Jones

Donald V. Jones filed objections to the settlement (doc. #224) in which he raises two objections. First, he contends that all members of the class should be informed of what their benefit would be before the settlement is approved, not after. Second, on a related note, Mr. Jones argues that there should be a single list on which the benefit each class member is to receive under the settlement should be listed. The court overrules both of these objections. Notice provided to the class is adequate where it sets forth the formula for distributing the settlement fund among the class members. *Nat'l Treasury Employees Union v. United States*, 54 Fed. Cl. 791, 806 (2002); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 429-30 (S.D. Tex. 1999) ("Notice is adequate where the class member is notified of the formula of allocation."); 3 Newberg on Class Actions § 8.32, at 265 (4th ed. 2002) ("It is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover."); *cf.* Manual for Complex Litigation, Fourth § 21.312, at 295 (2004) (stating the settlement notice should "explain the procedures for allocating and

17

distributing settlement funds"). In fact, it is not at all unusual for class members not to know the amounts they will be receiving until after final approval. *Nat'l Treasury Employees Union*, 54 Fed. Cl. at 806. Here, the process of determining the amount of each class member's recovery will require a complex calculation: first, the plan administrator must calculate each participant's and former participant's net loss, then exclude those with a net gain, calculate each participant's and former participant's preliminary fractional share, use that to calculate the preliminary dollar recovery, exclude those with a de minimis preliminary dollar recovery of less than $25, then recalculate as many times as necessary so as to arrive at a final fractional share and final dollar recovery for each participant and former participant who is entitled to receive more than a de minimis amount until the sum of the final dollar recoveries equals the cash settlement fund. In evaluating a plan of allocation, the court must ensure that the distribution of funds is fair and reasonable. *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). When formulated by competent and experienced class counsel, as is the case here, an allocation plan need only have a reasonable, rational basis. *Id.* A reasonable plan may consider the relative strength and values of different categories of claims. *Id.* In this case, the court is satisfied that the plan of allocation is fair and reasonable because it appears to be rationally based on the participants' proportionate losses in the 401(k) plans. Such a "[p]ro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." *Id.*

      B.    *Objections of William Don Cline*

18

William Don Cline filed objections to the settlement (doc. #225) in which he raises two concerns. First, he wants to know if the settlement can be distributed to his Individual Retirement Account on a tax-free basis. The parties have assured the court that the settlement proceeds will be distributed through the plans on a pre-tax basis and, consequently, they can be rolled over on a tax-free basis into an IRA.

Second, Mr. Cline objects to the settlement on the grounds that he believes that combining the Sprint FON and Sprint PCS stock on a two-PCS-for-one basis was unfair. The claims in this case, however, do not relate to the FON and PCS stock combination and therefore Mr. Cline's objection is beyond the scope of this case. According to plaintiffs, numerous other lawsuits already are pending in connection with the allocations between the wireline operations and the wireless operations before the recombination of the tracking stocks and breach of fiduciary duties in the recombination. Because this objection does not present any grounds indicating that the settlement is unfair, unreasonable, and/or inadequate as it relates to the allegations asserted in this case, then, this objection is overruled.

C.    *Objections of Bonnie Faye Johns*

Bonnie Faye Johns filed objections to the settlement (doc. #226) in which she objects to the allocation formula for distributing the cash settlement fund. The thrust of her objection is that the allocation formula is unreasonable because plan participants will not recover all or the vast majority of their total losses. But the court is satisfied that the plan of allocation is fair and reasonable and that the overall recovery is adequate. Ms. Johns' objection erroneously presumes that the alleged misconduct that is the subject of this lawsuit was

19

responsible for the full drop in the value of plan assets during the relevant time period; that

settlement recovery should be 100% of the drop while ignoring the risks of plaintiffs being

unable to establish liability, causation, and damages; and the possibility that the class might

recover nothing at all in the absence of the settlement. As previously explained, serious

questions of law and fact exist which place the ultimate outcome of this lawsuit in doubt.

Ms. Johns' objection unrealistically fails to discount the value of this case in light of the

uncertainties that would be presented by ongoing litigation. Contrary to Ms. Johns'

objection, the court does not believe that the amount of the settlement is inadequate at all.

As such, her objection is overruled.

> D.     Objections of Edward C. McCulloch, Robert Herrera, James W. Jarbo, and
>        Janis L. Fisher[3]

Objectors Edward C. McCulloch, Robert Herrera, James W. Jarbo, and Janis L. Fisher

were active objectors in this case. These class members are members of the local unions of

the International Brotherhood of Electrical Workers, AFL-CIO (IBEW). They filed written

objections through counsel Francis J. Morton, who also appeared at the first and second

fairness hearings on their behalf. It is the court's understanding that the IBEW objectors

formerly were employed by Sprint and are now employed by Embarq under collective

bargaining agreements. Messrs. McCulloch and Herrera were participants in the Centel

---

[3] The court notes that it has reservations about the extent to which the IBEW objectors themselves (as opposed to the unions generally) have standing to assert some of the objections they have asserted. Mr. Morton has not discussed the actual terms of the collective bargaining agreements which apply to these four objectors' employment with Embarq.

20

Retirement Savings Plan for Bargaining Unit Employees (CRS Plan BUE). Mr. Jarbo and Ms. Fisher were participants in the Sprint Retirement Savings Plan for Bargaining Unit Employees (SRS Plan BUE). As former Sprint employees who are now employed by Embarq, under the settlement they fall within the category of employees who will receive a portion of the Cash Settlement Fund according to the plan of allocation, two meetings with a financial advisor, and Sprint agrees to use its best efforts to implement similar amendments with respect to their retirement plans. This group of objectors raised a myriad of objections to the settlement.

In the objections they first filed with the court (doc. #227), they objected to the settlement on the following grounds: they are not receiving the Increased Match; Sprint Nextel's obligation to use its best efforts to implement similar plan amendments is illusory and Embarq should make an outright offer the plan amendments to them; Sprint Nextel can change or withdraw the Plan Amendments on January 1, 2007; the settlement does not clearly indicate that bargaining unit employees will receive part of the Cash Settlement Fund; they are not being offered the Participant Communication Improvements; and the class notice is confusing because it caused bargaining unit employees to believe they would receive the Increased Match. Following the court's order allowing supplemental briefing concerning the arguably significant disparity in the value of the settlement to the different categories of class members, these objectors filed a supplemental brief (doc. #250). In that brief, they point out that the two one-hour meetings with a financial advisor is of no value to bargaining unit employees because free financial planning services already are available to them through the

21

local unions. They continue to argue that the "best efforts" clause is illusory. Given these considerations, these objectors argue that the settlement is designed to disproportionately favor the group of employees Sprint is keeping. Prior to the second fairness hearing, these objectors filed another set of objections (doc. #263). In those objections, they contend that the proposed settlement is unfair, unreasonable, and inadequate for the reasons previously stated, and also for largely the same reasons stated in their prior objections. Summarized, they believe all class members should receive substantially equal shares of the settlement value, based on the damage period of 1998 to the present, and should not favor the class members Sprint chose to retain as employees. They point out that the aspect of the settlement which pertains to current Sprint Nextel employees benefits all Sprint Nextel employees, not just the plaintiff class members. Again, they point out that financial advisor services are of no tangible value to bargaining unit employees and, therefore, Sprint should simply give $300 to those union members who elect to receive the money in lieu of financial adviser services. And, they point out that Sprint Nextel already is not living up to the "best efforts" clause because Embarq representatives have refused to meet with members of the objector unions to attempt to implement similar plan amendments.

The overall thrust of the vast majority of these objections is that the IBEW objectors believe they are getting shortchanged under the terms of the settlement, particularly compared to current Sprint Nextel employees. After careful consideration of this argument, the court disagrees with the IBEW objectors' view that the settlement is skewed against them. The IBEW objectors, like all Embarq employees, are receiving their fair share of the

22

Cash Settlement Fund which current Sprint Nextel employees are not receiving. Although Embarq employees are not receiving the $8.95 million Increased Match which current Sprint Nextel employees are receiving, that Increased Match is the most dubious aspect of the "settlement." The settlement agreement itself only required an increased match of 100% of the first 4% of eligible compensation. Sprint Nextel ended up restructuring the plan to provide for an increased match of 100% of the first **5%** of eligible compensation, and Mr. Parker testified that was the result of competitive considerations. All current Sprint Nextel employees, not just those who are plaintiff class members, are receiving the benefit of the increased match. Thus, it appears that the Increased Match aspect of the settlement was motivated as much by (and perhaps even more so by) other forces as it was by the settlement. The court is not persuaded that this aspect of the settlement itself confers such a significant benefit on the current Sprint Nextel employees as the IBEW objectors seem to believe that it does. Rather, it appears to the court that Sprint Nextel employees would have received a favorable restructuring of their retirement plan even in the absence of the settlement. And, significantly, because the parties chose to allocate this aspect of the settlement to the current Sprint Nextel employees, this freed up the Cash Settlement Fund so that it could be devoted entirely to former employees such as the IBEW objectors.

In addition to the court being unpersuaded that the Increased Match necessarily confers significant benefits on current Sprint Nextel employees insofar as it is labeled a provision of the settlement agreement itself, the court further notes that Embarq employees potentially stand to gain more than the current Sprint Nextel employees because they will

receive their portion of the Cash Settlement Fund (a benefit not conferred on current Sprint Nextel employees) plus they stand to benefit from amendments to their retirement plans similar to the Plan Amendments, as well. Although the parties have not attempted to place a value on the Plan Amendments, they obviously confer some value, perhaps even significant value, on those plaintiffs who will benefit from them. Notwithstanding the IBEW objectors' arguments to the contrary, the settlement **does** require Sprint Nextel to use its best efforts to implement similar plan amendments for Embarq employees. Simply because that has not yet occurred does not obviate the legal obligation that will arise upon final approval of the settlement by the court. The court rejects the IBEW objectors' argument that this provision of the settlement is illusory. This objection seems to be geared primarily toward forcing Embarq to place an offer on the table. But the settlement agreement does not require Embarq to extend such an unconditional offer; it only requires Sprint Nextel to use its "best efforts" to implement similar plan amendments. Regardless of the outcome that ultimately may come to fruition as a result of this provision, the court believes that the proposed settlement is sufficiently fair and reasonable as a whole and to the Embarq employees—union as well as non-union—that the court would approve the settlement even in the absence of the "best efforts" clause. This "best efforts" clause exists largely because of the logistics of the Embarq spin-off and the fact that the Embarq union employees are subject to a series of thirty-four separately negotiated collective bargaining agreements which are subject to renewal approximately every three years with approximately one-third of the agreements coming up for renegotiation each year. Many of these agreements already have in place

24

similar provisions to the Plan Amendments. Thus, the court finds the IBEW objectors' arguments in this regard to be without merit.

The court also finds the IBEW objectors' arguments concerning the duration of the Plan Amendments to be without merit. Under the plain language of the proposed settlement those Plan Amendments apply only to Sprint Nextel employees, not to Embarq employees. To the extent Embarq employees ultimately may receive the benefit of similar plan amendments by virtue of the "best efforts" clause, the court simply notes that the settlement agreement is subject to the duty of good faith and fair dealing which is implied in every contract. Moreover, the collective bargaining agreements are generally for three-year terms, and therefore it seems unlikely that any of the IBEW objectors would stand to benefit from similar plan amendments for less than three years.

Turning to the IBEW objectors' objection that the financial planning services are of no value to them because they already receive financial planning services through the local unions, the court also does not find that this consideration renders the settlement unfair, unreasonable, and/or inadequate. While these financial planning services may be of diminished value to these union members, the court simply cannot find that they are of NO value whatsoever to the IBEW objectors. The decision whether to take advantage of these sessions rests with each individual class member. The court also rejects the IBEW objectors' suggestion that Sprint should give them $300 instead of the financial planning services. "The court may not modify the terms of a proposed settlement. Rather, a court must approve or

25

disapprove of the settlement as a whole." 5 Moore's Federal Practice § 23.168, at 23-522 (3d ed. 2006).

The IBEW objectors' objections to the form of the initial class notice are overruled as moot because the court approved a supplemental notice which was intended to address, among other things, the IBEW objectors' original concerns regarding arguable ambiguities in the original class notice. The only lingering notice issue, then, is the objection Mr. Morton raised at the second fairness hearing that the supplemental notice deprives class members of fair notice because it states the Increased Match for current Sprint Nextel employees is valued at $17.9 million when, in fact, the parties later placed a more accurate value on the Increased Match of approximately $8.95 million. Although counsel for the IBEW objectors seems to advance this argument as a reason the court should withhold final approval of the settlement, the court believes that the more appropriate inquiry is whether a corrective notice should be issued. One of the policies of Rule 23's notice provision is to protect class members from misleading communications from the parties or their counsel. *Erhardt v. Prudential Group*, 629 F.2d 843, 846 (2d Cir. 1980). Thus, it would be within the court's discretion to order a corrective notice to be issued to correct this arguably misleading statement. But, after careful consideration of this issue, the court determines that a corrective notice is unnecessary here because the supplemental notice was not materially misleading. The supplemental notice explains the Increased Match as follows:

> The Increased Match involves an increased matching contribution from Sprint for the benefit of Sprint employees who participate in the Sprint Retirement Savings Plan or the equivalent plan which resulted from the merger

26

of Sprint and Nextel Communications, Inc. Under the Settlement, Sprint has agreed that . . . it will increase its matching contributions allocated to the accounts of Sprint employees who participate in the Sprint Retirement Savings Plan (but not the [SRS Plan BUE] or the [CRS Plan BUE]) to at least 100% of the first 4% of eligible compensation. Co-Lead Counsel and the Company believe that the guaranteed value of the Increased Match to the Settlement Class (referred to as the "Guaranteed Increased Match" in the remainder of this Supplemental Notice) is approximately $17.9 million.

To be sure, at the time this supplemental notice was issued counsel and Sprint did, in fact, believe that the Increased Match had a value of approximately $17.9 million; it was not until later that they realized this number was incorrect. Thus, the $17.9 million number was an inadvertent misstatement at the time, albeit it was arguably misleading. Ultimately, however, the court does not believe that the $17.9 million number was materially misleading because the notice did not state the number of plaintiffs who would share in this Increased Match and, consequently, the court doubts that class members reading the notice would have ascribed much significance to the $17.9 million number because the notice did not provide the rest of the information they would have needed to translate that number into an estimated value for each recipient of the notice. The court believes that a class member plaintiff reading the notice probably would have focused more on the fact that the notice states Sprint is increasing its matching contribution to 100% of the first 4% of eligible compensation. This information provides each class member with the information he or she needs in order to be able to determine the value of the settlement to him or her. Thus, notwithstanding this discrepancy in the class notice, the court believes issuance of a corrective notice is unnecessary here.

For all of these reasons, then, all of the IBEW objectors' objections to the settlement are overruled. The court does note that it has given careful considerations to these objections because they have served the important function of focusing the court's attention on the arguable discrepancies between what various categories of class members are receiving. After close scrutiny of those discrepancies, the court nonetheless determines that the settlement is fair, reasonable, and adequate

    *E.*    *Objections of Bob Richard, Ralph Nesler, Stan Ruhnke, Rodger Ruhl, Frank Appodaca, and Melvin Simon*

Objectors Bob Richard, Ralph Nesler, Stan Ruhnke, Rodger Ruhl, Frank Appodaca, and Melvin Simon also were active objectors in this case. These class members are members of the local unions of the Communications Workers of America, AFL-CIO (CWA). They filed written objections through counsel, and counsel appeared at the second fairness hearing on their behalf. The overall thrust of their objections is similar to the nature of the objections raised by the IBEW objectors. For the same reasons that those objections were overruled with respect to the IBEW objectors, then, those same objections are overruled with respect to the CWA objectors.

Additionally, the CWA objectors contend that the failure to include any members of the CWA in the settlement negotiations resulted in the proposed settlement inadequately compensating this portion of the class while providing substantially greater compensation to another portion of the class and reflected inherent unfairness in the negotiation process. The court disagrees. As explained previously, the court believes that Embarq employees

28

have fared adequately under the terms of the settlement. The law does not require involvement of absentee class members' attorneys in the settlement negotiation process. Moreover, the CWA objectors' interests were adequately represented by the named class members—in particular, by plaintiff Anton P. Spanier, who was a participant in the CRS Plan BUE. Accordingly, this objection is overruled.

F.    Objections of Cheryl Thomas-Lightner

Cheryl Thomas-Lightner filed written objections to the settlement (doc. #262) in which she raises four different objections to the settlement. First, she contends that the different values of awards for the different classes of people are unfair and that all participants should share proportionately in the cash settlement fund. As explained above, the court has already determined that the plan of allocation is fair and reasonable.

Second, Ms. Thomas-Lightner contends that the de minimis amount is unfair. Again, as discussed previously, the plan of allocation excludes from participation in the Cash Settlement Fund those plan participants and former participants who would receive less than $25. The court believes this de minimis floor is fair and reasonable in order to preserve the Cash Settlement Fund from excessive and unnecessary expenses in the overall interests of the class as a whole. Cf. In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (finding $10 de minimis threshold in the allocation plan was reasonable).

Third, Ms. Thomas-Lightner contends that the amount of cash included in the settlement is unfair. She asks to have the $300 for financial planning meetings deposited directly into her account. As explained previously, however, the court may not modify the

terms of the settlement, but instead must approve or disapprove of the settlement as a whole. Ms. Thomas-Lightner has the prerogative to decide whether to utilize the financial planning meetings. Whether she chooses to do so does not change the court's determination that the settlement as a whole is fair, reasonable, and adequate.

Fourth, she complains about the Sprint stock options purchased as a part of Sprint's Management Incentive Plan. Like Mr. Cline's objection concerning the Sprint FON and PCS stock combination, this objection is based on considerations that are outside of the scope of this lawsuit. Consequently, this consideration is irrelevant to the settlement and release of the claims at issue in this lawsuit, which are confined to Sprint's 401(k) retirement savings plans. For all of these reasons, then, Ms. Thomas-Lightner's objections are overruled.

## IV.    Conclusion

In sum, the court concludes that the disparity in the value of relief among the different categories of class members is not as significant as the court had first understood it to be after the initial fairness hearing. Additionally, the court is satisfied that the disparities that exist were created in an attempt to maximize the settlement value for the class as a whole by allocating cash resources to former plan participants while capitalizing on the ability to restructure the retirement plans for current Sprint Nextel employees. Ultimately, the recovery for each of the categories of class member plaintiffs will depend upon a number of considerations such as their relative losses in the plans, their continued participation in the Sprint Nextel plans, and union negotiations. The court is satisfied that the settlement was fairly and honestly negotiated in a genuine effort to maximize recovery for the class as a

whole given the minimal amount of cash that Sprint was willing to contribute to settle this case. Moreover, Sprint's unwillingness to contribute more money to settle this case is fully justified given the serious questions of law and fact that exist placing the ultimate outcome of this litigation in doubt, particularly when combined with the fact that it is highly unlikely plaintiffs would have been able to obtain more favorable relief after protracted and expensive litigation. The court fully credits the parties' judgment, as well as the independent fiduciary's opinion, that the settlement is fair and reasonable. For all of these reasons, the court finds that the settlement is fair, reasonable, and adequate. Accordingly, the settlement is approved.

## ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES AND AN AWARD TO THE NAMED PLAINTIFFS

Plaintiffs' attorneys ask the court to award $3.9 million in fees and expenses and $15,000 to each of the four named plaintiffs.[4] Section 8.4 of the settlement agreement requires Sprint to pay plaintiffs' attorneys' fees, costs and expenses, any court approved award to the named plaintiffs, and the costs of providing notice to class members and administering the settlement, up to a total maximum amount of $3.9 million. Sprint states

---

[4] It is not clear from this motion whether plaintiffs are requesting $3.9 million **plus** $15,000 to each of the four named plaintiffs or $3.9 million **out of which** $15,000 is to be paid to each of the four named plaintiffs. To be sure, the settlement agreement provides that any court approved award to the named plaintiffs is to come from the $3.9 million Settlement Expense Fund. Thus, the court construes the request for an award to the named plaintiffs to conform to the terms of the settlement, meaning that award must come out of the $3.9 million Settlement Expense Fund being requested by plaintiffs' counsel.

31

that it does not oppose this motion (doc. #240). The class was given notice of these anticipated requests, but no objectors raised any objections to these projected awards.

When there is a common fund created by a settlement, the court must apply one of two methods of determining reasonable attorneys' fee awards: the percentage of the fund method, or the lodestar method developed in the statutory fee shifting cases. *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995). Under either methodology, the fee awarded must be reasonable. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994). The preferred method in common fund cases is the percentage of the fund analysis. *Rosenbaum*, 64 F.3d at 1445. Regardless of which method is used, the court must consider the following twelve factors: (1) the time and labor required, (2) the novelty and difficulty of the questions presented by the case, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorneys due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) any time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* & n.3. In this case, the court finds that after considering these twelve factors the requested fee is justified under both the percentage-of-the-fund and the lodestar methods.

As to the time and labor required (factor 1), counsel have submitted declarations stating they spent thousands of hours on this lawsuit during a time period spanning more than

three years. They conducted investigations of Sprint's 401(k) retirement plans before filing this lawsuit. They filed their initial pleadings in mid 2003; the cases were consolidated; they began preliminary discovery; they filed their initial consolidated pleading; they intervened during the settlement approval process in a previously filed securities fraud class action in order to prevent the ERISA claims in this case from being released; they devoted significant attention to responding to defendants' motions to dismiss; they commenced full blown discovery; and they filed a motion for class certification. They began to engage in settlement negotiations in February of 2005, these negotiations took many months, and the settlement agreement finally was signed in early 2006. The settlement approval process before this court has taken several months. It has involved two class notices, three rounds of briefing, and two fairness hearings. The countless hours plaintiffs' counsel devoted to this lawsuit clearly precluded them from spending that time on other cases (factor 4).

As the court alluded to previously in its discussion of whether the settlement was fair, reasonable, and adequate, this case presented novel and difficult issues (factor 2). The applicable law is complex, unsettled, and in a rapid state of development. This case was "undesirable" (factor 10) from the start in the sense that the issues presented were inherently risky. Consequently, a high level of skill in this area of the law was necessary to perform the legal services in this case properly (factor 3). Plaintiffs' counsel possessed the requisite level of experience, reputation, and ability in the field of ERISA class actions and other complex litigation (factor 9). The high quality of plaintiffs' counsel's work culminated in the successful resolution of this complex case. This was demonstrated by their successful and

33

commendable prosecution of this case through the motion to dismiss stage and the ultimate settlement of this case under favorable terms.

Factors 6, 7, and 11 do not apply here. There was no prearranged fee in this case. Plaintiffs' counsel states there were no real time limitations imposed by the client or the circumstances. And, plaintiffs' counsel states that the factor relating to the nature and length of the professional relationship with the client does not apply here.

The court turns, then, to the remaining three factors—the customary fee for similar work (factor 5), the amount involved and the results obtained (factor 8), and awards in similar cases (factor 12). The court is satisfied that the total value of the settlement in this case likely is well in excess of $25 million. This includes the $4 million Cash Settlement Fund, the $1.6 million in Increased Vesting, and the $8.95 Increased Match. Additionally, these amounts are net of the $3.9 million Settlement Expense Fund which will cover attorneys' fees and expenses, including the cost of both class notices and the cost of retaining an independent fiduciary to review the fairness of the settlement. Although the parties have not devoted significant attention to attempting to place a value on the Plan Amendments and the Participant Communications Improvements, those aspects of the settlement are worth significant value to the class members which the court estimates to be in the range of millions of dollars. For example, the two one-hour meetings with a financial advisor, a $350 value, are being made available to more than 67,000 class members. If only one-third of these class members elect to take advantage of those meetings, that confers an additional benefit of nearly $8 million. Also, although it might be difficult to place a value on the "unlocking"

34

of matching contributions, the court is persuaded that this component of the settlement probably has a value well in excess of $10 million. Plaintiffs have submitted a financial report that places a value on this "unlocking" component of the settlement of more than $28 million and plaintiffs have directed the court's attention to other authority suggesting that this component of the settlement probably has a value in the tens of millions of dollars. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 209 F.R.D. 94, 99 (E.D. Pa. 2002) (relying on an expert report which valued a similar unlocking component of a settlement at more than $50 million; noting that "[r]ecent scholarly articles . . . strongly support the theory that employee retirement savings are quantifiably more valuable when diversified than when they are concentrated in an employer's stock"). Plaintiffs submitted a declaration from Edwin J. Mills in which he opines that the plaintiffs' recovery in this case might have been less than $12 million based on the loss in the value of plan assets which could have been linked to the alleged misconduct in this case. Thus, the results obtained by virtue of the settlement are extraordinary compared to the anticipated difficulties of establishing significant amounts of damages even if plaintiffs could have overcome the numerous obstacles for establishing liability.

Based on a conservative value of the settlement of $25 million, then, plaintiffs' requested fees and expenses of $3.9 million represent less than 16% of the benefit conferred on the plaintiff class members. The court has no difficulty concluding that this is an imminently reasonable percentage under the percentage-of-the-fund method based on the customary fee for similar work and awards in similar cases. *See, e.g., Gottlieb v. Barry*, 43

F.3d 474, 487-88 (10th Cir. 1994) (finding 22.5% of common fund was "well within the range of permissible reasonable fee awards" and citing case law for the proposition that 25% of the common fund is the benchmark); *see also In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving attorneys fees of 25% plus expenses); *In re WorldCom, Inc. ERISA Litig.*, Case No. 02-4816, 2004 WL 2338151, at *11 (S.D.N.Y. Oct. 18, 2004) (approving set-aside of 20% of the cash component of the settlement fund for attorneys' fees).

The court also finds that the requested fees and expenses of $3.9 million are reasonable based on the lodestar method. Plaintiffs' counsel's collective lodestar is now $3,046,545, plaintiffs' counsel's expenses to date are $176,467, and the claims administrator's costs for printing and mailing the class notice were $81,631. Thus, plaintiffs' total expenses thus far are $258,098. Backing this expense out of the $3.9 million, then, this leaves approximately $3.6 million in attorneys' fees, which results in a lodestar multiplier of only 1.18, a multiplier which the court finds to be imminently reasonable based on the risks associated with counsel taking on this case.

As to plaintiffs' request for an award of $15,000 to each of the named plaintiffs, however, the court simply cannot find that such an award is reasonable. Named plaintiff LaVonne Easter estimated that she spent 40 hours on this litigation; Jeffery Snethen estimated that he spent 84 hours on this litigation; Fran Lindholm estimated that he spent 83 hours on this litigation; and Anton P. Spanier estimated that he spent 110 hours on this litigation. The court certainly recognizes that the time these individuals devoted to this

lawsuit inured to the common benefit of the class and, to that end, the court believes they are entitled to some type of incentive award above and beyond what the typical class member is receiving. They have performed an important service to the class and the burden of this commitment deserves to be recognized through an award. But, although the aggregate value of the settlement is significant, no class member stands to gain more than $1,000 on an average, per-plaintiff basis. The named plaintiffs devoted approximately 80 hours, on average, to this lawsuit. The court believes that an award of $5,000 adequately compensates each of them for their time. *See, e.g.*, *In re WorldCom, Inc. ERISA Litig.*, Case No. 02-4816, 2004 WL 2338151, at *11 (approving an award of $5,000 to each of the three named plaintiffs).

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Final Approval of Class Action Settlement (doc. #229) is granted and Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and for an Award to the Plaintiffs (doc. #233) are granted in part and denied in part. The court hereby finally approves the parties' settlement and awards plaintiffs' attorneys' fees and expenses in the amount of $3.9 million out of which $5,000 is to be paid to each of the four named plaintiffs.

**IT IS SO ORDERED** this 3rd day of August, 2006.

s/ John W. Lungstrum

_____

37

John W. Lungstrum
United States District Judge

SNI Schatz Nobel Izard p.c.
Attorneys at Law

20 Church Street    Phone  860 493 6292
Suite 1700          Fax  860 493 6290
Hartford. CT 06103  www.snilaw.com

## RESUME OF SCHATZ NOBEL IZARD P.C.

Schatz Nobel Izard P.C. is one of the premier firms engaged in class action litigation on behalf of investors alleging misrepresentations in connection with the purchase or sale of securities.  We are currently lead or primary counsel in many large securities or ERISA class actions, including cases against AT&T, AOL Time Warner, JDS Uniphase, Cable & Wireless, Sprint, and Tyco International.  In the securities fraud class action against Campbell Soup Company, we represented the pension funds of the State of Connecticut as lead plaintiff.  We recently settled the securities fraud class action on behalf of investors in Smallworldwide plc, for over 85% of the total losses claimed by class members.

Schatz Nobel Izard P.C. has been formally appointed by many courts as lead counsel or co-lead counsel for investors in securities class actions, including  Papanikolaou v. Value-Added Communications, et al., No. 3-95CV0346-H (N.D. Tex.), Gorga v. Uniroyal Chemical Corporation et al., No. CV-96-0132014-S (Conn. Super.); David v. Simware, Inc. et al., No. 96/602143 (N.Y. Sup.), Butler et al. v. Northstar Health Services, Inc. et al., No. 96-701 (W.D. Pa.), Allen, et al v. Johansson, et al., 397CV02172 (RNC) (D. Conn.), Feiner v. SS&C Technologies, Inc. et al., 397CV0656 (D. Conn.), Berti, et al. v. Videolan Technologies, Inc., et al., No.3:97CV296H (W.D. Ky.), Ganino, et al v. Citizens Utilities Company, et al., No. 398CV00480 (JBA) (D. Conn.), Bunting, et al v. HealthCor Holdings, Inc., et al., No. 398CV0744-D (N.D. Tex.), Hirsch, et al. v. PSS World Medical, Inc., et al., No. 98 502 Civ. J20A (M.D. Fla.), Kenneth Blau, et al v. Douglas Murphy, et al., No. H 99 0535 (S.D. Tex.), Angres v. Smallworldwide plc, No. 99-K-1254 (D. Colo.), In re Complete Management, Inc. Sec. Litig., No. 99 Civ. 1454 (S.D.N.Y.), Allain Roy v. dElia*s, Inc., et al., No. 99 Civ. 3951 (JES)

Schatz Nobel Izard p.c.

(S.D.N.Y.), Russo, et al v. KTI, Inc., et al., No. 99-1780 (JAG) (D.N.J.); Laborers Local 1298 Pension Fund v. Campbell Soup Company, et al., No. 00-152 (JEI) (D.N.J.); Hart v. Internet Wire, et al., No. 00 Civ. 6571 (S.D.N.Y.), Ottmann v. Hanger Orthopedic Group, Inc., et al., Civil Action No. AW 00CV3508 (D. Md.), In re PolyMedica Corp. Sec. Litig., No. 00-12426-REK (D. Mass.), Karl L. Kapps, et al. v. Torch Offshore, Inc., et al., Case No. 02-CV-0582 (E.D. La), In re Cable and Wireless, PLC, Sec. Litig., Civil Action No. 02-1860 (E.D. Va), In re Alloy, Inc. Sec. Litig., Case No. 03-CV-1597 (S.D.N.Y.), In re Surebeam Corporation Sec. Litig., Case No. 03-CV-1721 (S.D. Cal); In re Primus Telecommunications Group, Inc. Sec. Litig., Master Case No. 04-970-A (E.D. Va.); In re Netopia Sec. Litig., Case No. C 04-3364 (N.D. Cal); Malasky v. IAC/InterActive Corp., et al., Case No. 04-CV-7447 (S.D.N.Y.); In re Supportsoft, Inc. Sec. Litig., C 04-5222 SI (N.D.Cal.); Berson v. Applied Signal Technology Inc. et al, 4:05-cv-01027-SBA (N.D.Cal.); The Cornelia I.. Crowell GST Trust v. Pemstar, Inc. et al., 05-CV-1182 (D. MN); UFCW Local 880 Retail Food Employers Joint Pension Fund v. Newmont Mining Corp. et al., No. 05-CV-01046 (D. Colo.); Aviva Partners v. Exide Technologies et al., 3:05-CV-03098 (D. NJ); In re Veritas Software Corp. Sec. Litig., No. 04-831 (D. Del.); and In re Ionatron, Inc. Sec. Litig., Case No. 06-354 (D. AZ).

We have also been responsible for many important decisions which have advanced the cause of shareholder protection through the federal securities laws, including in Ganino, et al v. Citizens Utilities Company, et al, 228 F.3d 154 (2d Cir. 2000), In re Campbell Soup Sec. Litig., 145 F. Supp.2d 574 (D.N.J. 2001), In re Complete Management, Inc. Sec. Litig., 153 F.Supp. 2d 314 (S.D.N.Y. 2001), Angres v. Smallworldwide, plc, 94 F. Supp.2d 1167 (D. Colo. 2000), and Feiner v.S&C Technologies, Inc., 47 F. Supp.2d 250 (D. Conn. 1999).

In ERISA cases, Schatz Nobel Izard has been formally appointed as sole or co-lead counsel in Overby v. Tyco International, Ltd., No. 02-CV-1357-B (D.N.H.); In re Reliant Energy

SCHATZ NOBEL IZARD P.C.

ERISA Litig.., No. H-02-2051 (S.D. Tex.); In re AOL Time Warner, Inc. Sec. and ERISA Litig.,

MDL Docket No. 1500 (S.D.N.Y.); Furstenau v. AT&T, Case No. 02 CV 8853 (D.N.J.); In re

AEP ERISA Litig., Case No. C2-03-67 (S.D.Ohio); Pettit v. JDS Uniphase Corporation, Civil

Action No. 03-4743-CW (N.D.Cal.); In re Sprint Corporation ERISA Litig., Master File No.

2:03-cv-02202-JWL (D.Kan.); In re Cardinal Health, Inc. ERISA Litig., Case No. C 2-04-642

(S.D.Ohio); Spear v. Hartford Fin. Svcs Group. Inc., No. 04-1790 (D.Conn.); In re Merck & Co.,

Inc. Securities, Derivative and ERISA Litig., MDL No. 1658 (D.N.J.); In re Diebold ERISA

Litig. No.5:06-CV- 0170 N.D.Ohio; In re Dell, Inc. ERISA Litig, Case No. 06-CA- 758-SS

(W.D.Tex.); In re Bausch & Lomb, Inc. ERISA Litig., Master File No. 06-CV-6297-MAT-MWP

(W.D.N.Y.); and to the Steering Committee in Tittle v. Enron Corp., No. H-01-3913 (S.D. Tex.);

In re Electronic Data Systems ERISA Litig., 3:02-cv-1323 (E.D.Tex.); and In re Marsh ERISA

Litig., Master File No. 04 cv 8157 (S.D.N.Y.). We are responsible for the seminal decision in

Vivien v. Worldcom, Civil Action No. 2-01329 (N.D.Cal.), in which the Court in denying a

motion to dismiss affirmed the legal theory upon which these cases are based.

## PARTNERS

Andrew M. Schatz has concentrated his practice on class action litigation for over 30

years, representing both plaintiffs and defendants. Since founding the firm in 1995, has been,

and remains, actively involved in all areas of the firm's practice.

Mr. Schatz graduated Cornell University with honors in 1972 and Harvard Law School

with honors in 1976, where he was the Articles Editor of the *Harvard Civil Rights-Civil Liberties

Law Review*. In 1976, Mr. Schatz joined the Chicago law firm of Sachnoff, Schrager, Jones &

Weaver, where he was a partner from 1979 until 1987 and managed the firm's office in Hartford,

Connecticut in 1986-87. Mr. Schatz played a key role in that firm's representation of plaintiffs in

numerous securities, antitrust and consumer class actions, including national antitrust class

SCHATZ NOBEL IZARD P.C.

actions against the paper industry, major national securities class actions against Equity Funding

Corp. of America and the Washington Public Power Supply System, and consumer class actions

against Allstate and other insurance companies, as well as serving as counsel for plaintiffs and

defendants in many non-class cases.

In 1987, Mr. Schatz joined Schatz & Schatz, Ribicoff & Kotkin in Hartford, Connecticut,

where he headed that firm's corporate and securities litigation practice. While at that firm, Mr.

Schatz represented publicly-held corporations and their directors and officers as defendants in

many securities class actions and derivative actions, including numerous corporations in the

retail, banking and brokerage industries.

Mr. Schatz has also been active in *pro bono* cases in both Chicago and Hartford,

including cases seeking to protect rights of those with physical and mental disabilities and other

forms of discrimination. He has served as co-counsel in numerous cases with the American

Civil Liberties Union and Lawyers Committee for Civil Rights as well as other organizations.

Mr. Schatz is a director of the American Civil Liberties Union of Connecticut, the Greater

Hartford Legal Aid Foundation and numerous community organizations, a member of the

Securities Advisory Council to the Connecticut Department of Banking, a member of the

Connecticut and American Bar Associations and a speaker on panels relating to securities fraud

and the duties of directors of publicly held corporations.

Jeffrey S. Nobel co-founded the firm in 1995. Mr. Nobel is a 1989 graduate of Albany

Law School, where he served as an Associate Editor of its Law Review, and is also a 1986 *cum*

*laude* graduate of the University of Connecticut, Storrs, where he received a Bachelors of Arts

degree in Political Science.

Following his law school graduation in 1989, Mr. Nobel was employed as a litigation

associate with the Hartford, Connecticut law firm of Schatz & Schatz, Ribicoff & Kotkin, where

SCHATZ NOBEL IZARD P.C.

he represented officers and directors in various securities class action cases, as well as

corporations and financial institutions in complex litigation matters.

Since co-founding the firm in 1995, Mr. Nobel has concentrated his practice on

representing investors, consumers and employees harmed by corporate wrongdoing. Mr. Nobel is

admitted to practice in Connecticut, and has prosecuted class action suits in numerous State and

Federal courts throughout the country, including the District of Connecticut, the District of New

Jersey, the District of Colorado, the Northern, Central and Southern Districts of California, the

Northern and Southern Districts of Texas, the Southern District of New York, the Middle District

of Florida, the District of Minnesota, and the Eastern District of Virginia.

Robert A. Izard is the former chair of the Commercial and Business Litigation Committee

of the Litigation Section of the American Bar Association. He leads the firm's ERISA team,

which is at the forefront of retirement plan litigation in this country. He is lead counsel in many

of the nation's most significant class actions, including cases against Merck, Tyco International,

Time Warner, AT&T and Sprint among others.

Mr. Izard has substantial experience in other types of complex class action and

commercial litigation matters. For example, he represented a class of milk purchasers in a price

fixing case. He also represented a large gasoline terminal in a gasoline distribution

monopolization lawsuit.

Prior to joining the firm, he was a partner at Robinson & Cole where he represented large

corporate clients in a variety of business litigation matters. For example, he represented a large

worker's compensation insurer in numerous class action lawsuits filed throughout the country

concerning an alleged conspiracy to fix worker's compensation insurance rates.

## Schatz Nobel Izard p.c.

As part of his twenty plus years litigating complex commercial cases, Mr. Izard has substantial jury and nonjury trial experience, including a seven-month jury trial in federal district court.

He is also experienced in various forms of alternative dispute resolution, including mediation and arbitration, and is a Distinguished Neutral for the CPR Institute for Dispute Resolution.

Mr. Izard is the author of Lawyers and Lawsuits: A Guide to Litigation published by Simon and Schuster and a contributing author to the Mediation Practice Guide.

He received his B.A. from Yale University and his J.D., with honors, from Emory University, where he was elected to the Order of the Coif and was an editor of the Emory Law Journal.

Seth R. Klein graduated *cum laude* from both Yale University and, in 1996, from the University of Michigan Law School, where he was a member of the Michigan Law Review and the Moot Court Board and where he was elected to the Order of the Coif. After clerking for the Hon. David M. Borden of the Connecticut Supreme Court, Mr. Klein served as an Assistant Attorney General for the State of Connecticut, where he specialized in consumer protection matters and was a founding member of the office's electronic commerce unit. Mr. Klein thereafter joined the reinsurance litigation group at Cadwalader, Wickersham & Taft LLP in New York, where he focused on complex business disputes routinely involving hundreds of millions of dollars. At Schatz Nobel Izard, Mr. Klein's practice continues to focus on consumer protection matters as well as on complex securities and antitrust litigation

Mark P. Kindall is a 1988 graduate of Boalt Hall School of Law at the University of California at Berkeley, where he served as Book Review Editor of the California Law Review and was elected to the Order of the Coif. He has a bachelor's degree in history with highest

SCHATZ NOBEL IZARD P.C.

honors from the University of California at Riverside, and he also studied history at the University of St. Andrews in Scotland.

Mr. Kindall was an associate at Covington & Burling in Washington, D.C. from 1988 until 1990. In 1990 he joined the United States Environmental Protection Agency as an Attorney Advisor. He represented the U.S. government in international negotiations at the United Nations, the Organization for Economic Cooperation and Development, and the predecessor of the World Trade Organization. He was also a member of the U.S. Delegation to the United Nations Conference on Environment and Development (the "Earth Summit") in Rio de Janeiro in 1992.

In 1994, Mr. Kindall joined the Connecticut Attorney General's Office. As an Assistant Attorney General, he represented the State of Connecticut in numerous cases in federal and state court, as well as in various administrative tribunals. On several occasions, he argued appeals before the Connecticut Supreme Court and the United States Court of Appeals for the Second Circuit. In 2005, Mr. Kindall joined Schatz Nobel Izard, where his practice has focused on securities, pension and consumer fraud cases.

Mr. Kindall has taught courses in appellate advocacy and administrative law at the University of Connecticut School of Law. He is admitted to practice in Connecticut, California, and the District of Columbia. He is also a member of the bar of the United States Supreme Court, the U.S. Courts of Appeals for the Second, Ninth, and D.C. Circuits, and the United States District Courts for Connecticut, the District of Columbia, the Northern, Southern, and Eastern Districts of New York, and the Northern, Central and Southern Districts of California.

SCHATZ NOBEL IZARD P.C.

<u>ASSOCIATES</u>

<u>William Bernarduci</u> graduated from Bucknell University with a Business Administration degree and graduated *magna cum laude* from New York Law School, where he was a member of the New York Law School Law Review. Upon graduation, he served as a law clerk for the Honorable Nina Gershon, United States District Judge for the Eastern District of New York.

His practice focuses on class action litigation in a variety of areas including ERISA, consumer and securities law, with a particular emphasis on litigation involving 401(k) retirement plans.

Prior to joining the firm, Mr. Bernarduci was associated with the New York law firms Skadden, Arps, Slate Meagher & Flom LLP and Dornbush Schaeffer, where he was involved primarily in complex commercial and securities litigation.

Mr. Bernarduci is admitted to the state and federal bars of Connecticut and New York, and is a member of the Connecticut Bar Association and the New York City Bar Association. He has had notable *pro bono* experience including a successful political asylum case on behalf of a Tibetan nun who was imprisoned for her political and religious activism.

<u>Wayne T. Boulton</u> received his bachelor's degree, cum laude, from Colgate University, and received his law degree, with honors, from the University of Connecticut School of Law. Mr. Boulton served as Special Deputy Assistant States Attorney for the State of Connecticut before joining the law firm of O'Connell Flaherty & Attmore LLP in Hartford, Connecticut. Mr. Boulton joined Schatz & Nobel P.C., in 2001.

Mr. Boulton has held numerous elected and appointed positions within the American Bar Association and the Connecticut Bar Association, including District Representative for the states of Connecticut and Rhode Island before the ABA's Young Lawyers Division. Through a compact between the ABA and the United States Federal Emergency Management Agency, Mr.

SCHATZ NOBEL IZARD P.C.

Boulton became a director of Disaster Legal Services during recovery operations following the September 11, 2001 terrorist attacks.

Mr. Boulton's practice at Schatz Nobel Izard has focused on Employee Benefits Law, including Employee Retirement Income Security Act ("ERISA") litigation, as well as securities fraud and consumer class actions. His pro bono and community service work includes representation of the American Civil Liberties Union of Connecticut, including In re National Security Agency Telecommunications Records Litig., and projects with the American Friends Service Committee.

Eric Palmquist graduated from Cornell Law School magna cum laude in 1999, where he was a member of the Cornell Law Review and elected Order of the Coif. Before joining Schatz Nobel Izard in 2004, Mr. Palmquist worked in the bankruptcy department at Dewey Ballantine LLP in New York City, where his work included representation of investors in a fraudulent Ponzi scheme, and at Axinn, Veltrop & Harkrider in Hartford, Connecticut, where he represented clients in antitrust, patent and commercial litigations, including litigation to prevent anticompetitive practices in the contact lens industry.

Since joining Schatz Nobel Izard, Mr. Palmquist has focused his practice on cases involving consumer fraud, pension fraud and antitrust violations.

Nancy A. Kulesa graduated from Fordham University with a B.A. with honors in International Politics, and earned her Juris Doctor from the University of Connecticut School of Law in 2001. Ms. Kulesa also studied comparative and international law at the University of London. Prior to joining Schatz Nobel Izard, Ms. Kulesa was involved in representing corporations seeking antitrust clearance of mergers and acquisitions.

Ms. Kulesa is involved in all of the firm's practice areas, with a primary focus on investigations, new cases and issues relating to the administration of individual and class actions.

**SCHATZ NOBEL IZARD P.C.**

Ms. Kulesa is admitted to the Connecticut Bar and the United States District Court for the District of Connecticut.

# citigroup⌃

# Citigroup 401(k) Plan

January 1, 2005

Prospectus and summary plan description

**citigroup**

# Citigroup 401(k) Plan

Important information about the contents of this document.................................................................1

About your 401(k) Plan .................................................................................................................2
   Common stock investment ........................................................................................................2
   Plan administration ..................................................................................................................2

Eligibility and enrollment ..............................................................................................................3
     Who is eligible ...................................................................................................................3
   Enrolling in the Plan ................................................................................................................3
   Automatic enrollment...............................................................................................................4
   Naming a beneficiary ...............................................................................................................4

Contributions to your account .......................................................................................................5
   Eligible pay .............................................................................................................................5
   Contribution limits ...................................................................................................................5
   Before-tax contributions ..........................................................................................................6
     Changing your contributions ..............................................................................................6
     Non-discrimination testing ..................................................................................................7
     Catch-up contributions ......................................................................................................7
   Contributions from incentive awards ........................................................................................7
   Rollover contributions ..............................................................................................................8
   Company Matching Contributions .............................................................................................8
     Determining qualifying compensation and eligible pay .........................................................9
     Restrictions on the Company Matching Contribution ..........................................................10
   Supplemental Company Contributions.....................................................................................10
   Citibuilder Contribution ..........................................................................................................12

Investing your savings ................................................................................................................13
   Financial education ................................................................................................................13
     Changing your elections....................................................................................................13
   Transfers ...............................................................................................................................13
     Transfer restrictions  .......................................................................................................14
   Changing your elections..........................................................................................................15
   Citigroup Common Stock Fund ...............................................................................................15
     Citigroup Common Stock Fund dividends ..........................................................................15

Vesting........................................................................................................................................16
   Special vesting rules ..............................................................................................................16
   If you are rehired ...................................................................................................................16

Distributions from your account ...................................................................................................17
   Withdrawals............................................................................................................................17
   Hardship withdrawals .............................................................................................................20
   Loans.....................................................................................................................................21
     Interest rates ...................................................................................................................21
     Loan payments.................................................................................................................21
     Repaying your loan if you leave the Company.....................................................................22

citigroup

Defaulted loans ........................................................................................22
Check your pay statement ...................................................................22
Distributions at termination of employment, disability, and death ...............22
Required minimum distributions ............................................................23
Forms of payment ...............................................................................23
If you become disabled .......................................................................24
If you die..............................................................................................24
Updating beneficiary information ..........................................................24

How benefits are taxed .................................................................................25
Special withholding...................................................................................25
Withholding on installment payments .......................................................26
Withholding on hardship withdrawals .......................................................26
State tax withholding ................................................................................26
Tax rules for common stock .................................................................26
Taxation of employer ...............................................................................27
State Street stock .....................................................................................27

Other important information.............................................................................28
Charges and expenses .............................................................................28
Account statements ..................................................................................28
Top-heavy provisions ...............................................................................28
Fiduciary liability .......................................................................................28
Responsibility for investment allocations..................................................29
Plan confidentiality ...................................................................................29
Restrictions on alienation .........................................................................29
Future of the Plan .....................................................................................29
When benefits are not paid .......................................................................30
Claims and appeals ..................................................................................30
Claims procedure .................................................................................30
Appeals procedure ...............................................................................31
Other procedures .................................................................................31
Plan type and funding................................................................................31
General information ...................................................................................32
Administrative fees ...................................................................................32
Information about Citigroup .......................................................................32
Incorporation of certain documents by reference .................................33
Your rights under ERISA ...........................................................................33
Receive information ..............................................................................33
Prudent actions by Plan fiduciaries ......................................................34
Enforce your rights ...............................................................................34
For more information .............................................................................34

Glossary ........................................................................................................35

Appendix A: Information for participants in the former Salomon Inc Retirement Plan................38

citigroup﹀

Distributions ............................................................................................................... 38

Appendix B: Information for employees of the Retirement Services Division (RSD) of CitiStreet LLC ...... 39
Spousal consent for distributions ............................................................................ 39

Appendix C: Information for employees of Travelers Property Casualty Co. and Travelers Life & Annuity Co. 40
Loans ...................................................................................................................... 40
Qualified voluntary employee contributions (QVEC) ................................................ 40

Appendix D: Information for employees of The Associates Savings and Profit Sharing Plan ................... 41
Withdrawals during employment .............................................................................. 41

Appendix E: Information for participants in the former Geneva Group, Inc. Employee Stock Ownership Plan (ESOP) ................................................................................................................................. 42

Appendix F: Information for participants in the former California Federal Employees' Investment Plan (the "Cal Fed Plan") ..................................................................................................................... 43

Appendix G: Information for participants in the former Banamex USA Bancorp 401(k) Plan (the "Banamex 401[k] Plan") and the former Banamex USA Bancorp Money Purchase Pension Plan (the "Banamex MP Plan") ................................................................................................................................. 44
Spousal consent for Banamex MP Plan distributions ............................................... 44

Appendix H: Information for participants in the former Forum Financial Group Savings Plan (the "Forum Plan") ................................................................................................................................. 45

Appendix I: Information for participants in the former Sears 401(k) Savings Plan (the "Sears Plan") ........ 46

Appendix J: Information for participants in the former Principal Select Savings Plan (the "Principal Plan") .. 47

Appendix K: Information for participants in the former Washington Mutual Savings Plan (the "WaMu Plan") 48



citigroup                                      **Citigroup 401(k) Plan**

# Important information about the contents of this document

The information contained in this document constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended (the "Act"), in connection with the Citigroup 401(k) Plan, as it may be amended from time to time (the "Plan").

This document describes the Citigroup 401(k) Plan as in effect January 1, 2005, for certain employees of Citigroup Inc. ("Citigroup") and its participating companies including, but not limited to, Citibank, N.A., CitiFinancial, National Benefit Life Insurance Co., Primerica, Citigroup Global Corporate and Investment Bank, Global Wealth Management, CitiStreet LLC, Travelers Life & Annuity, the Travelers Insurance Co., Associates First Capital Corp., and their participating companies (collectively, the "Company").

This document also serves as a summary plan description. This summary has been written, to the extent possible, in non-technical language to help you understand the basic terms and conditions of the Plan as they are in effect. This description is intended only to be a summary of the major highlights of the Plan.

No general explanation can adequately give you all the details of the Plan. This general explanation does not change, expand, or otherwise interpret the terms of the Plan. If there is any conflict between the Plan document and this description, the terms of the Plan document will be followed in determining your rights and benefits under the Plan.

To obtain a copy of the Plan, write to:

Citigroup Inc.
Corporate Benefits Department
125 Broad Street, 8th Floor
New York, NY 10004.

The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Internal Revenue Code of 1986, as amended (the "Code").

Citigroup may change or discontinue the Plan or any part thereof at any time without prior notice.

This document is neither a contract nor a guarantee of continued employment for any definite period of time. Your employment is always on an at-will basis.



# About your 401(k) Plan

Citigroup encourages you to become an active participant in planning and saving for your financial future by offering the Citigroup 401(k) Plan. The Plan provides a convenient way to save for your retirement through tax-deferred contributions from your pay. Under this Plan, the normal retirement age is 65.

Here are the highlights of the Plan:

- **Your contributions.** You can contribute up to 50% of your eligible pay to the Plan on a before-tax basis, up to Code limits. When you contribute on a before-tax basis, your federal taxable income is reduced, and you pay less in current federal income taxes. (Your contribution may be treated differently for state income tax purposes. See your tax adviser for more information.)

- **Investing your savings.** You decide how your before-tax contributions are invested among a wide range of investment funds.

- **Company contributions.** If eligible, your account also can grow through Company contributions made on your behalf.

- **Changing your Plan elections.** You may change your elections, such as the percentage you save and how you invest your savings, at any time.

- **Accessing your savings.** You have access to your account while an active employee through loans and withdrawals. You also can request a distribution of your account balance when you leave the Company for any reason.

- **Account information.** You can obtain information about your account balance and make certain Plan transactions by telephone or by visiting the Plan's Web site.

## Common stock investment

One of the investment options under the Plan is the Citigroup Inc. Common Stock Fund, which consists of shares of Citigroup Inc. common stock, par value $.01 per share ("C" Common Stock). Shares of "C" Common Stock, and interests in the Plan, have been registered under the Act.

## Plan administration

The Plans Administration Committee of Citigroup Inc. (the "Committee") is the Plan Administrator and is responsible for the operation and administration of the Plan.

The Plan Administrator has such powers as may be necessary to carry out the provisions of the Plan, including the power and discretion to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of Plan provisions either by rules of general applicability or by particular decisions. Only written responses of the Plan Administrator may be relied on; oral representations may not be relied on.



# Eligibility and enrollment

### Who is eligible

If you are a full-time employee of the Company, you are eligible to participate in the Plan beginning with the first pay period following your date of hire.

If you are a part-time employee of the Company, you are eligible to participate on the January 1 or July 1 after you work at least 1,000 hours during your first 12 months with the Company or 1,000 hours in any calendar year after your date of hire.

You also are eligible to participate in the Plan if you are a U.S. citizen or a lawful permanent resident of the United States in an expatriate employment classification. An expatriate employment classification means that you are engaged in a foreign assignment for the Company outside the United States.

You are *not* eligible to participate in the Plan if:

- Your compensation is not reported on a Form W-2 Wage and Tax Statement issued by the Company;

- You are a leased employee paid through a manpower, employee leasing, or other firm;

- You are employed by a Citigroup subsidiary that is not a participating company;

- You are a non-resident alien with no U.S. source of income;

- You are classified by Citigroup as an independent contractor or consultant; or

- You are a party to an agreement that indicates you are not eligible for Plan benefits or have waived rights to Plan benefits;

If a court, regulatory body, administrative agency, or other entity having jurisdiction later decides that such an individual is considered an employee of the Company, or is otherwise entitled to receive a Form W-2 from the Company, he or she still will not be eligible to participate in the Plan.

## Enrolling in the Plan

You may begin contributing to the Plan as of the first pay period following the date you become eligible. When you enroll, you decide:

- What percentage of your pay you want to contribute to the Plan and

- In which funds you want your contributions to be invested.

Your contributions will be deducted from your next available pay.

You can enroll by calling the Plan or, once you receive your PIN (personal identification number), visiting the Plan online.

- Call ConnectOne 1-800-881-3938. When prompted, enter your Social Security number and ConnectOne PIN. If you do not have a ConnectOne PIN, follow the prompts. The Citigroup 401(k) Plan voice response unit (VRU) is available from 6 a.m. to 11:45 p.m. Eastern time daily. Participant service representatives are available from 8 a.m. to 8 p.m. Eastern time on weekdays, excluding New York Stock Exchange holidays.

  For text telephone service, call 1-877-245-2985.

  If you are an expatriate employee or calling from outside the United States, call 972-652-4582.



▫ Visit the Web site at **https://mybenefits.csplans.com** or, once you are eligible, through **www.totalcomponline.com**.

## Automatic enrollment

The Plan has an automatic enrollment feature to encourage savings from the time you begin working at Citigroup.

If you are a full-time employee, you will be enrolled in the plan automatically 90 days from your date of hire. At that time, 3% of your eligible pay will be will be deducted each pay period and deposited into the Citi Institutional Liquid Reserves Fund.

To contribute more or less than 3% of your pay, to contribute to the plan as soon as possible, and/or to invest in any of the other plan funds, call the Plan or visit the Plan's Web site as instructed under **Enrolling in the Plan**.

If you do not want to contribute to the Plan, you will need to opt out within 90 days of your hire/rehire date by calling the plan or visiting the Plan's Web site.

Once payroll contributions begin, you can stop contributing, change your contribution rate, and/or transfer your money out of the Citi Institutional Liquid Reserves Fund into other Plan funds at any time. However, once enrolled in the Plan, you cannot receive a refund of any payroll contributions. For more information on these topics, see **Contributions limits** and **Transfers**.

## Naming a beneficiary

As a participant in the Plan, you will be asked to name a beneficiary (the person or persons who will receive benefits in the event of your death). You can change your beneficiary designation at any time by visiting the Your Benefits Resources™ Web site at **http://resources.hewitt.com/citigroup** available from the Citigroup intranet or through the Internet. A password to enter Your Benefits Resources will be mailed to your home address within two weeks of your hire date.

If you are married and you name someone other than your spouse as a beneficiary, an authorization form may be mailed to your home. You must obtain your spouse's written consent witnessed by a notary public and return the authorization form within 60 days for your beneficiary information to take effect.

If you do not name a beneficiary, or if no designated beneficiary is alive at the time of your death, your beneficiary will be deemed to be your surviving spouse. If there is no surviving spouse, your beneficiary will be your estate.

If you do not have access to the Web, call ConnectOne at 1-800-881-3938. From the main menu, choose the "pension" option and follow the prompts to speak with a representative to name your beneficiary(ies). Representatives are available from 9 a.m. to 6 p.m. Eastern time on weekdays, excluding holidays.

For text telephone service, call 1-800-845-8531.



# Contributions to your account

When you enroll in the Plan, an account will be set up in your name. Your account balance can grow through:

- Before-tax contributions made each pay period;
- Rollover contributions, if any;
- Company contributions, if any; and
- Investment growth.

## Eligible pay

The Plan uses the term "eligible pay" when referring to the types of pay from which employee contributions will be taken before taxes are withheld. Eligible pay is made up of the following:

- Base pay, plus shift differential, paid to you during the year of the contribution;
- Annual, monthly, or quarterly incentive awards, if any, paid to you during such year;
- Commissions, if any, paid to you during such year; and
- Overtime paid to you during such year.

Eligible pay does not include:

- Pay for employment not covered by the Plan;
- Sign-on or retention bonuses;
- Equity incentive awards;
- Proceeds from any stock option exercises;
- Reimbursements, tuition benefits, and payment for unused vacation;
- Cash and non-cash fringe benefits;
- Deferred compensation;
- Relocation expenses;
- Disability benefits;
- Severance pay; and
- Payments made after your termination of employment.

## Contribution limits

The Code limits how much money you can contribute to the Plan each year on a before-tax basis. The limit may be adjusted each year for changes in the cost of living. The limit for 2005 is $14,000. The catch-up contribution limit for 2005 is $4,000.

If you also have contributed to another employer's Plan during the current calendar year, it is your responsibility to ensure that you do not exceed the before-tax contribution limit once you start contributing to the Plan. To help ensure you do not exceed the limit, you may request a Year-to-Date Prior Employee 401(k) Contribution Form from the Plan. Complete the form and return it to the Plan with the amount you contributed to another employer's plan during the current calendar year.



The Code also limits the total amount of Plan contributions (that is, the before-tax and Company contributions) that can be made to your account each year. The limit for 2005 is $42,000 or 100% of your annual compensation (as defined by the Code), whichever is less. You will be notified if your total contributions are affected by this limit.

## Before-tax contributions

### Changing your contributions

You can change your contribution rate (the percentage of pay you contribute to the Plan), stop your contributions, or start them again at any time.

To make a change, call the Plan or visit the Plan's Web site. Your change will become effective as soon as administratively possible.

Note: Whenever the amount of your pay changes, the amount you contribute to the Plan also will change. For example, if your eligible pay increases from $2,000 to $2,100 per pay period, and you are contributing 5% of your eligible pay to the Plan, your contribution automatically will increase from $100 to $105 each pay period.

You may save from 1% to 50% — in whole percentages — of your eligible pay before taxes are withheld. Your annual before-tax contributions cannot exceed certain limits imposed by the Code. These limits are adjusted each year by the Internal Revenue Service (IRS). For more details, see **Contribution limits**.

The Code limits the amount of pay the Plan can recognize each year. For example, for 2005 the limit is $210,000.

Before-tax contributions are deducted from your pay before federal — and, in most locations, state and local — income taxes are withheld. Since your taxable income is reduced, you pay less in taxes.

Taxes are deferred on your contributions and any investment earnings on those contributions for as long as they remain in the Plan. However, you will pay taxes on this money when you receive a distribution of your account balance.

Even though your taxable income is reduced when you make before-tax contributions to the Plan, the level of your other pay-related benefits — such as life insurance and retirement benefits — will not be affected. The value of these benefits continues to be based on your full pay (as defined under those plans) before you contribute to the Plan.

Note: Before-tax contributions do not reduce Social Security or Medicare taxes or Social Security benefits.

*An example.* Assume you are in a 28% tax bracket, earn $40,000 a year, and contribute 5% of your eligible pay to the Plan. Here is how before-tax contributions increase your spendable income.

| Example: the benefits of before-tax savings | | |
|---|---|---|
| | Saving outside the Plan | Saving in the 401(k) Plan |
| Your eligible pay | $40,000 | $40,000 |
| 5% before-tax contributions | 0 | $2,000 |
| Taxable pay | $40,000 | $38,000 |

citigroup‍

| Applicable taxes | $11,200 | $10,640 |
|---|---|---|
| Net pay after taxes | $28,800 | $27,360 |
| 5% after-tax contributions | $2,000 | 0 |
| Spendable income | $26,800 | $27,360 |
| **Increase in spendable income** | **Not applicable** | **$560** |

### Non-discrimination testing

The Code requires plans with before-tax savings to pass special non-discrimination tests. These tests are designed to assure a fair mixture of savings from employees at all income levels. These tests are done on an ongoing basis. If these tests are not met, the contributions made by highly compensated employees may be limited.

### Catch-up contributions

Catch-up contributions allow participants age 50 and older (by Plan year-end) to contribute additional before-tax dollars from their pay to the Plan.

Catch-up contributions are subject to their own separate limit ($4,000 for 2005 and $5,000 for 2006). An eligible participant who makes catch-up contributions for 2005 can contribute as much as $18,000 to the Plan ($14,000 in regular contributions plus $4,000 in catch-up contributions).

The catch-up contribution election is separate from the regular before-tax contribution election and can be for a different percentage from the regular contribution. In addition to contributing up to 50% of eligible pay for regular before-tax contributions, if eligible, you may elect to contribute up to an additional 49% of eligible pay for catch-up contributions.

Your regular before-tax contributions will be deducted from your pay before catch-up contributions are deducted. Once you reach the maximum catch-up contribution for the year, your payroll deductions for catch-up contributions will stop automatically. The following year they will resume automatically as long as you continue to have a catch-up contribution rate on file.

Catch-up contributions are not considered in the calculation of the Citigroup Company Matching Contribution.

You can call the Plan or visit the Plan's Web site to enroll to make catch-up contributions.

If you make catch-up contributions to another employer's 401(k) plan and to the Citigroup 401(k) Plan in the same calendar year, you are responsible for ensuring that the total amount of catch-up contributions does not exceed the maximum catch-up contribution allowed by law for that year.

## Contributions from incentive awards

If you receive monthly, quarterly, or annual incentive awards and you contribute to the Plan, a regular contribution and, if applicable, a catch-up contribution automatically will be deducted from your incentive award. The same percentage as that of your regular before-tax payroll contribution and, if applicable, your catch-up contribution will be applied to your incentive awards.

However, you can suspend your contribution from your annual incentive award only.

If you receive a discretionary award package composed of a cash award and a Capital Accumulation Program (CAP) award, the Plan contribution will be taken from the cash portion of the award package only.



## Rollover contributions

You may contribute taxable and after-tax amounts distributed to you from another employer's qualified plan, a 403(b) plan, a 457(b) plan of a government entity, or a conduit IRA (a traditional individual retirement account that holds only assets distributed from a qualified plan). These amounts must be rolled over into the Plan within 60 days from the date they are distributed to you. You also may request that these amounts be directly rolled over into the Plan from a prior employer's qualified plan.

Rollover contributions may be invested in any of the available investment funds.

Call the Plan or visit the Plan's Web site to obtain a Rollover Form.

## Company Matching Contributions

If you have been employed by a participating company for longer than 12 full months, you may be eligible for a Company Matching Contribution. This Company Matching Contribution automatically will be invested in the Citigroup Common Stock Fund.

You will not be eligible for a Company Matching Contribution if your qualifying compensation for the current year of participation is more than $100,000. For a description of how qualifying compensation is used to calculate your contribution, see **Determining qualifying compensation and eligible pay**.

| Company Matching Contribution | | |
| --- | --- | --- |
| **If your qualifying compensation for the current year of participation is:** | **For each $1 you contribute during the current year of participation, the Company will contribute:** | **To a maximum of:** |
| $0 to $50,000 | $3 | 3% of eligible pay to a maximum of $1,500 annually |
| $50,000.01 - $75,000 | $2 | |
| $75,000.01 - $100,000 | $1 | |
| Greater than $100,000 | No matching contribution will be made. | |

You will receive a Company Matching Contribution for the current calendar year if:

- You have been employed by the Company for at least 12 full months prior to December 31 of the current year; (if you were employed for less than a full year prior to the beginning of the current calendar year and are eligible for the Company Matching Contribution, your contribution for the current calendar year will be pro-rated based on the amount of your eligible pay for the period from your eligibility date through year end);

- Your qualifying compensation for the current year is less than or equal to $100,000. For example, if your 2005 qualifying compensation, is less than or equal to $100,000, you will be eligible for the 2005 contribution;

- You are employed on December 31 of the current year or your employment ended due to involuntary termination (other than for gross misconduct or substantial failure to perform duties), disability, retirement at or after age 55, or death; and

- You make before-tax contributions to the Plan.



If you are eligible, the Company Matching Contribution will be made to the Plan account as soon as administratively possible in the next calendar year.

### Determining qualifying compensation and eligible pay

Both *qualifying compensation* and *eligible pay* are used to determine the amount of your Company Matching Contribution.

| Qualifying compensation | Eligible pay |
|---|---|
| The Plan uses **qualifying compensation** for the current year of participation to determine the type of Company Matching Contribution ($1, $2, or $3) for which you are eligible. | The Plan uses **eligible pay** for the current year of participation to determine the maximum amount of your Company Matching Contribution at the time the contribution amount is calculated. |
| Qualifying compensation for the current year is made up of: <br><br> • Base pay annualized as of July 1 of the current year, excluding any shift differential (for participants hired after July 1, regular base salary as of hire date will be used); <br><br> • Annual incentive award, if any, earned for the year prior to the current year and either paid in cash during such prior year or the current year; <br><br> • Annual equity incentive award, if any, the amount of which was determined in recognition of performance for the year prior to the current year and awarded in the current year under the Core Capital Accumulation Program; <br><br> • Commissions, if any, paid during the year prior to the current year; and <br><br> • Monthly and quarterly cash incentive bonuses, if any, paid during the year prior to the current year. | Eligible pay for the current year is made up of: <br><br> • Base salary plus shift differential paid to you during the current year; <br><br> • Annual cash bonus, if any, paid to you during the current year; <br><br> • Commissions paid to you during the current year; <br><br> • Overtime paid to you during the current year; and <br><br> • Monthly and quarterly cash bonuses, if any, paid to you during the current year. |

| Qualifying compensation does not include: | Eligible pay does not include: |
|---|---|
| • Overtime; | • Pay for employment not covered by the Plan; |
| • Shift differential; | • Sign-on or retention bonuses; |
| • Pay for employment not covered by the Plan; | • Any equity incentive awards; |
| • Sign-on or retention bonuses; | • Proceeds from any stock option exercises; |
| • Proceeds from any stock option exercises; | • Reimbursements, tuition benefits, and payment for unused vacation; |
| • Reimbursements, tuition benefits, and payment for unused vacation; | • Cash and non-cash fringe benefits; |
| • Cash and non-cash fringe benefits; | • Deferred compensation; |
| • Deferred compensation; | • Disability benefits; |
| • Disability benefits; | • Severance pay; |
| • Severance pay; and | • Relocation expenses; and |
| • Relocation expenses. | • Payments made after your termination of employment. |

**Example:** Here is how the Plan calculates your qualifying compensation and eligible pay for the 2005 Company Matching Contribution to be credited to your Plan account in early 2006.

- The Plan calculates your qualifying compensation to determine whether you are eligible for a $1, $2, or $3 Company Matching Contribution for 2005.

- The amount of your 2005 Company Matching Contribution is based on the percentage of eligible pay you contribute to the Plan in 2005. The maximum contribution is 3% of eligible pay to a maximum of $1,500.

- Your 2005 Company Matching Contribution is credited to your account in early 2006.

### Restrictions on the Company Matching Contribution

Company Matching Contributions made to your account must stay in the Citigroup Common Stock Fund for five Plan years. After five Plan years, you can transfer the Company Matching Contribution made five years earlier (and its earnings) into any of the investment options available to you at that time. This five-year restriction will not apply once you reach age 55.

## Supplemental Company Contributions

As part of the merger agreement between Travelers Property Casualty and Aetna Casualty & Surety, the Plan provides a Supplemental Company Contribution to certain former Aetna employees. You are eligible for this supplemental contribution if you:

- Participated in the Retirement Plan for Employees of Aetna Life & Casualty Co. as of April 2, 1996, transferred from Aetna Casualty & Surety Co. to Travelers Property Casualty, and did not transfer back to Aetna prior to January 1, 1997, or

- Were continuously employed by Aetna immediately prior to and after April 2, 1996, and then transferred to Travelers Property Casualty between April 3 and December 31, 1996, and have remained continuously employed by the Company or a participating company.

**citigroup**

As soon as administratively possible following the end of the calendar year, the Company will contribute an amount determined under a point formula to the 401(k) account of each eligible former Aetna employee. The points that a former Aetna employee is entitled to are as follows:

| Your annual base compensation and bonus received as of April 2, 1996 (up to a maximum of $150,000) | × | Point assignment based on age (on April 2, 1996) and years of service through December 31, 1997 (see table below) | = | Allocation points |
|---|---|---|---|---|

| Age | Years of service | | |
|---|---|---|---|
| | 0 to 5 years | 6 to 14 years | 15 or more years |
| Less than 35 | 0.75 | 1.25 | 1.25 |
| 35 to 44 | 1.80 | 2.00 | 2.50 |
| 45 to 54 | 2.90 | 3.50 | 4.50 |
| 55 or older | 4.00 | 5.00 | 7.00 |

The value of an allocation point equals the quotient of $4 million divided by the sum of all allocation points for all transferred employees. Points were calculated and fixed as of April 2, 1996, according to the table above.

As the total number of points assigned to Aetna participants declines as a result of terminations of employment by Aetna participants (due to resignation, retirement, death, or otherwise), the total amount to be allocated in each Plan year will be reduced by the value of the terminated Aetna participants' point values.

If eligible, your contribution amount is fixed for each year during which you remain actively employed. In the year you terminate employment, retire, become disabled, or die, the contribution will be pro-rated to reflect the number of full months worked. You are always 100% vested in these Supplemental Company Contributions.

If you terminate employment voluntarily and then return to active service, you no longer will be eligible for any future Supplemental Company Contributions. If you terminate involuntarily, then subsequently return to active service, the rights to all future Supplemental Company Contributions will be reinstated, as long as you qualify under the Plan's break-in-service rules.

The contribution will be made to your Plan account and will be invested according to your current investment elections.

If you do not have a balance in the Plan, an account will be opened for you, and you automatically will be enrolled with a 0% contribution rate. The default investment election for the annual Supplemental Company Contribution will be the Citi Institutional Liquid Reserves Fund.

The annual Supplemental Company Contribution does not carry any unique transfer restrictions. Depending on how the money is invested, some fund-specific restrictions may apply. For fund transfer restrictions, see **Transfer restrictions**. For withdrawal and loan restrictions, see **Distributions from your account**.

## Citibuilder Contribution

If you were eligible for the Citibuilder Contribution, the Plan provided a contribution into the Citigroup Common Stock Fund. The Citibuilder Contribution was eliminated for Plan years beginning after December 31, 2001.

Citibuilder Contributions made to your account must stay in the Citigroup Common Stock Fund for five Plan years. After five Plan years, the restriction no longer applies, and you can transfer the Citibuilder Contribution made five years earlier (and its earnings) into any of the investment options available to you at that time. The five-year restriction also will not apply once you reach age 55.

# Investing your savings

You can choose from a wide range of funds in which to invest your before-tax contributions and rollover contributions, if any. Each fund is managed by a professional investment firm. You may invest your contributions in one or more of the funds in whole percentages totaling 100%.

The level of diversification appropriate for you may depend on a variety of factors including personal risk tolerance, age, and investment goals.

See the investment options brochure for a brief description of each Plan fund. To obtain a prospectus or information sheet for the investment funds, call the Plan or visit the Plan's Web site.

Note: Certain investment funds are bank collective funds for which an information sheet is available rather than a prospectus. In addition, an information sheet is available for the Citigroup Common Stock fund, which is individually managed.

## Financial education

How you invest your before-tax and rollover contributions is entirely up to you. As a Citigroup employee, you have access to tools that let you plan for retirement on your own terms and at your own comfort level. Whether you haven't yet started your retirement savings, you're actively saving and investing for retirement, or you're setting aside some pay for the future but feel you could do more, these tools will simplify achieving your goals for your financial future. The tools are available through the Ernst & Young Financial Planning Program for Citigroup Employees.

Citigroup offers the Financial Education Program free of charge to benefits-eligible employees. The program represents Citigroup's commitment to ensuring that you have the support you need to plan for your retirement.

If you are a new employee, you will receive more information approximately 60 days after your hire/rehire date.

### Changing your elections

At any time you can change the funds in which future contributions will be invested by calling the Plan or visiting the Plan's Web site. If your change is received and confirmed by 4 p.m. Eastern time on any business day, your new investment mix will take effect that day. If the New York Stock Exchange closes before 4 p.m. ET, the deadline is the time the market closes.

## Transfers

You can move money from one fund to another by calling the Plan or visiting the Plan's Web site. Transfers may be made in 1% increments or in full dollar amounts. If the request is received and confirmed by 4 p.m. Eastern time on any business day, your transfer will take effect that day. If the New York Stock Exchange closes before 4 p.m. ET, the deadline is the time the market closes.

Restrictions may apply to transferring certain contributions as well as transferring money from or to certain investment funds. For more information, see "Transfer restrictions" below.



## Transfer restrictions

The following restrictions apply to transfers from your account:

- **Closed fund.** You are not permitted to transfer your savings into the Plan's closed fund. You may transfer all or part of your savings out of the Plan's closed funds.

- **15-day hold.** You cannot transfer money into a fund within 15 calendar days following the effective date of a transfer out of that same fund. You cannot transfer money out of a fund within 15 calendar days following the effective date of a transfer into the same fund.

  The 15-day hold applies to all funds except the Stable Value Fund, which has its own set of restrictions, and the Citi Institutional Liquid Reserves Fund.

- **Stable Value Fund.** You may not transfer your investment in the Stable Value Fund into any of the following "competing" Plan funds:

  - Citi Institutional Liquid Reserves Fund;

  - Fixed-Income Securities Fund;

  - Smith Barney Government Securities Fund; or

  - Smith Barney High Yield Bond Fund.

  These restrictions enable the Stable Value Fund to secure competitive fixed-interest investments that preserve your principal and earned interest. If you transfer money from the Stable Value Fund into an equity or balanced fund (any fund except those listed above), the amount transferred must remain invested in the equity or balanced fund for at least 90 days before you can transfer it into any of the competing funds listed above.

- **Company Matching Contribution.** Company Matching Contributions deposited into your Plan account must stay in the Citigroup Common Stock Fund for five Plan years. After five Plan years, the restriction does not apply and you can transfer the Company Matching Contribution made five years earlier (and its earnings) into any of the investment options available to you at that time. The five-year restriction will not apply once you reach age 55.

- **Citibuilder Contributions.** Citibuilder Contributions deposited into your Plan account after December 31, 1999, must stay in the Citigroup Common Stock Fund for five Plan years. After five Plan years, the restriction does not apply and you can transfer the Citibuilder Contribution made five years earlier (and its earnings) into any of the investment options available to you at that time. The five-year restriction will not apply once you reach age 55.

The following contributions, which are no longer made under the Plan, must remain invested in the Citigroup Common Stock Fund until you reach age 55 (see the Glossary for the definition of these contributions):

- Employer Match: Contributions for Travelers Property Casualty and Copeland employees made before 1997, except for TPC Transitional Benefit employees who received this match until December 31, 1998;

- Employer Pre-Merger Match and Profit Sharing for Travelers Group and Smith Barney employees made before 1997;

- Aetna Employer Match: 1996 matching contributions for former Aetna employees;

- 5% Discount Restricted: Pre-1997 employer 5% discount on certain purchases of Citigroup common stock; and

- Salomon PAYSOP contributions made prior to 1999 for Salomon employees.



## Changing your elections

At any time you can change the funds in which future contributions will be invested by calling the Plan or visiting the Plan's Web site. If your change is received and confirmed by 4 p.m. Eastern time on any business day, your new investment mix will take effect that day. If the New York Stock Exchange closes before 4 p.m. ET, the deadline is the time the market closes.

## Citigroup Common Stock Fund

The Citigroup Common Stock Fund is a collective investment fund that invests only in shares of Citigroup common stock, which are retained in this fund regardless of market fluctuations. In the normal course, cash equivalents also will be held for liquidity purposes to meet administrative and distribution requirements. Plan participants who have an ownership interest in this fund do not directly own shares of Citigroup common stock.

The Plan's recordkeeper has adopted unitized accounting to value each participant's interest in the Citigroup Common Stock Fund and other funds offered by the Plan. "Share equivalents" are the accounting measure for determining a participant's ownership interest in the fund. The number of share equivalents credited to a participant's account represents the number of hypothetical shares that would be held in such account if the fund were 100% invested in shares of Citigroup common stock.

Since a small portion of the fund is actually invested in cash equivalents for liquidity reasons, the actual number of shares allocated to a participant's account will be slightly less than the number of share equivalents credited to the participant's account.

Each participant will have the opportunity to direct the voting of shares of Citigroup common stock allocated to the participant's account based on the participant's proportionate ownership interest in the Citigroup Common Stock Fund. If voting directions are not provided by participants in a timely manner, the participant's allocated shares in the fund will be voted in the same proportion as the shares for which voting instructions were provided, subject to the requirements of the Plan and applicable law.

### Citigroup Common Stock Fund dividends

Citigroup Common Stock Fund dividends are vested as soon as they are allocated to your account.

You may elect to receive any dividends from your investment in the Citigroup Common Stock Fund in cash. Dividends are declared quarterly, and the payout is made once a year in December.

You may change your election at any time. If you elect to take dividends in cash, they will be taxable to you at ordinary income tax rates in the year of the distribution. If you receive a dividend payment in 2005, you will receive a Form 1099-DIV in early 2006.

Dividend payments are not subject to early withdrawal penalties. You cannot deposit your cash dividends into another qualified plan or IRA. Each dividend will be credited to your account or made in cash based on your election on file at the time the dividend is paid.

If you elect to receive dividend payments, you are reducing the investment in your Plan account. If you do not make an election, dividends will be reinvested in your account automatically.

#### How to make a dividend election

You can call the Plan or visit the Plan's Web site to elect to receive any dividends allocated.

Your election on file on the day the dividend is allocated will determine if your dividend will be held in cash or reinvested in the Citigroup Common Stock Fund. You may change your election at any time.

citigroup⌃

# Vesting

Vesting refers to your permanent right to the value of your Plan account, including your contributions and the contributions made to your account by Citigroup.

You are always 100% vested in:

- Your before-tax contributions;
- Rollover contributions;
- Special Company Contributions (last contribution made in 2002 for 2001);
- Supplemental contributions for former Aetna employees; and
- Any investment earnings on these contributions.

You become 100% vested in your Company Matching Contributions and any investment gains or losses on them after three years of service. However, you will automatically become 100% vested — even without three years of service — if you reach age 55 while employed by the Company, become disabled as defined by the Company, or die while you are employed.

You will be credited with a year of service for vesting purposes for each calendar year in which you work at least 1,000 hours for the Company.

If you are not vested in any of your Company Matching Contributions when you leave the Company, you will forfeit all of the Company Matching Contributions and their investment earnings in your account at termination (except in certain circumstances). For more information, see "If you are rehired" below.

## Special vesting rules

- Any individual hired by Citibank, N.A. prior to December 31, 1998, will be fully vested in his or her Citibuilder Contributions, Company Matching Contributions, and in all other Company Contributions.
- **CitiStreet Institutional Division (ID) employees:** If you were an employee of CitiStreet ID on December 31, 2000, you became vested in your Citibuilder Contributions and Company Matching Contributions after one year of service.
- **Copelco employees:** If you were a Copelco employee on May 16, 2000, you are 100% vested in your Citibuilder Contributions and Company Matching Contributions.

## If you are rehired

If you are not fully vested when you leave the Company and are subsequently rehired, the length of your absence, called a break in service, can affect your vesting service for the Plan.

If you are rehired before a five-year period of absence, also referred to as a five-year break in service, your non-vested account will be restored when you return. Any service credit earned for vesting purposes before you left will be restored.

A break in service will not result from a military leave as long as you return within the period in which your re-employment rights are protected by law.



Citigroup 401(k) Plan

# Distributions from your account

The Plan is designed so that your account will be distributed to you at retirement or when you leave the Company, if sooner. However, you may be able to receive your money through loans and withdrawals while your status is active.

## Withdrawals

The Plan allows you to withdraw certain amounts from your account while you are working for the Company. The minimum withdrawal amount is $500 or your full account balance, if less. You are not charged a fee to take a withdrawal.

| Your withdrawal options | | | | |
|---|---|---|---|---|
| **Withdrawal type** | **Amounts available for withdrawal (and hierarchy, if applicable)** | **Age** | **Reason** | **Federal income tax consequences** |
| **Non-taxable** | Pre-1987 after-tax contributions (but not earnings) | Any age | Any reason | No tax |
| **Rollover** | Rollover contributions (plus earnings) | Any age | Any reason | Ordinary income tax, plus 10% penalty tax if exceptions do not apply* (see **How Benefits Are Taxed**) |
| **In-service** | After-tax contributions, rollover contributions, and any vested profit-sharing contributions (and earnings on all these amounts) | Any age | Any reason | No tax on after-tax contributions; ordinary income tax on all income amounts, plus 10% penalty tax if exceptions do not apply* (see **How benefits are taxed**) |

citigroup

| Hardship (see Hardship withdrawals for more information) | After-tax contributions, rollover contributions, vested profit- sharing contributions, before-tax contributions and basic awards, Company contributions, vested employer matching contributions, and restricted contributions (and earnings on all these amounts, except earnings accrued after 1988 on before-tax contributions) | Before age 59½ | A "financial hardship" only | Ordinary income tax plus 10% penalty or excise tax if exceptions do not apply.* |
|---|---|---|---|---|
| Age 59½ | After-tax contributions, rollover contributions, vested profit- sharing contributions, before-tax contributions and basic awards, Company contributions, employer matching contributions, restricted contributions, Citibuilder Company Contributions, Associates Citibuilder Contribution, Company Matching Contributions, Associates Company Matching Contributions, and QMAC** contributions (and earnings on all of these amounts) | At age 59½ or later | Any reason | Ordinary income tax; no 10% penalty or excise tax |

citigroup〕

| | | | | |
|---|---|---|---|---|
| **Disability under age 55** | After-tax contributions, rollover contributions, vested profit-sharing contributions, before-tax contributions and basic awards, Company contributions, employer matching contributions, restricted contributions, vested Citibuilder Company Contributions, vested Associates Citibuilder Contribution, vested Company Matching Contributions, vested Associates Company Matching Contributions, Banamex MP Plan, Salomon PAYSOP and Salomon Guideline and QMAC** contributions (and earnings on all of these amounts) | Under age 55 | When you become permanently disabled as defined<br><br>Under the Company's Long-Term Disability Plan | Ordinary income tax; no 10% penalty or excise tax |
| **Disability at or over age 55** | After-tax contributions, rollover contributions, vested profit-sharing contributions, before-tax contributions and basic awards, Company contributions, employer matching contributions, restricted contributions, Citibuilder Company Contributions, Associates Citibuilder Contribution, vested Company Matching Contributions, vested Associates Company Matching Contributions, Banamex MP Plan, Salomon PAYSOP and Salomon Guideline and QMAC** contributions (and earnings on all of the above) | At or after age 55 | When you become permanently disabled as defined<br><br>Under the Company's Long-Term Disability Plan | Ordinary income tax; no 10% penalty or excise tax |

* Exceptions to the 10% excise tax rule include withdrawals after age 59½; distributions after separation from service after reaching age 55; distributions made because of certain medical hardships, death, or disability; distributions over your life expectancy or joint life expectancies of you and your designated beneficiary that begin after you separate from service; or rollovers.

** Qualified employer matching contributions.



Citigroup 401(k) Plan

## Hardship withdrawals

If you have a financial hardship as defined by the IRS, you may withdraw your before-tax contributions and the other permitted contributions described in this **chart**. Investment earnings on your post-1988 before-tax contributions are not available for a withdrawal under IRS hardship rules.

The IRS defines financial hardship as an "immediate and heavy financial need" that you cannot meet through other means, such as a Plan loan. The hardship withdrawal cannot be for more than the amount of the immediate and heavy financial need, although it can include additional amounts you may need to pay applicable taxes and penalties. According to IRS rules, a financial hardship includes:

- Purchase of a primary residence (excluding mortgage payments);
- Funds to prevent your eviction from or foreclosure on the mortgage of your primary residence;
- Post-secondary tuition expenses and related educational fees, including room and board, for you or your dependents for the next 12 months only; and
- Unreimbursed medical expenses for yourself, your spouse, or your dependents.

Other circumstances that may qualify as a financial hardship are:

- The next 12 months of primary or secondary education expenses at an accredited vocational, technical, or academic institution, including tuition and related fees and expenses, for you, your spouse, or your dependents;
- Legal expenses or court costs for yourself;
- Wage garnishment;
- Income tax due for prior tax years;
- Funeral expenses associated with the death of an immediate family member (including grandparents and grandchildren);
- Car repossession;
- Expenses associated with visiting or caring for an immediate family member (including grandparents and grandchildren) because of serious illness;
- Transforming your home to make it handicapped accessible;
- Repairs to your home as a result of a natural disaster not covered by insurance;
- Moving expenses in connection with the purchase of a principal residence; or
- Expenses necessary to maintain the habitability of a principal residence.

You will be required to document the existence of a financial hardship and the extent of the hardship.

The following rules apply to financial hardships:

- You must certify that your hardship cannot be relieved through other means — such as insurance reimbursement, liquidation of assets, Plan loans or other distributions, or bank loans — or by discontinuing your pretax contributions.
- You may not contribute to the Plan, any Citigroup Stock Purchase Program offering, or the Voluntary Capital Accumulation Program sponsored by Citigroup, its subsidiaries, or its affiliates for 12 months following a hardship withdrawal. When the suspension period is over, you must call the Plan or visit the Plan online to elect what percentage of your pretax pay you want to contribute to the Plan.

January 1, 2005



- In addition, the Code limit on the amount of before-tax contributions you make in the calendar year following the year of your withdrawal will be reduced by the amount you contributed in the previous year. This would include any catch-up contributions you elected to make. For example, the contribution limit for 2005 is $14,000. If you contributed $4,000 in 2004 before your hardship withdrawal, you will be limited to $10,000 in contributions when you resume contributions in 2005.

- You may not apply for a Plan loan for 12 months following a hardship withdrawal.

- If you have a balance in the Citigroup Common Stock Fund, you must elect to receive your dividends in cash. If you have not made a prior election, your election will be updated at the time your approved hardship is processed.

After the suspension of contributions, you must call or visit the Plan online to restart contributions.

## Loans

You may be able to borrow against your account while you are working at Citigroup by taking a loan from the Plan. You are required to repay any loan taken from the Plan. When you repay these loans, you repay your account with interest.

The minimum loan amount is $1,000; the maximum is the lesser of:

- 50% of your vested account balance or

- $50,000 reduced by the highest outstanding loan balance in the last 12 months.

The maximum amount available may be further reduced based on Plan and investment-related restrictions.

The Plan permits general and residential loans. General loans can be used for any purpose and can be repaid over a period of 12 to 60 months. Residential loans can be used to purchase your principal residence only and may be repaid over a period of 12 to 240 months.

You may have two loans outstanding at any time, and only one can be a residential loan. You may not apply for a loan for 12 months from the date of a hardship withdrawal.

You can request a loan by calling the Plan or by visiting the Plan's Web site. Documentation is required for a residential loan.

### Interest rates

The interest rate for all loans will equal the prime rate plus 1%, as reported in The Wall Street Journal on the first business day of the month in which the loan is made. The interest rate is fixed for the entire loan repayment period.

### Loan payments

You repay the loan through after-tax payroll deductions in equal amounts over a period of up to 60 months for general loans and 240 months for residential loans. Loan payments are returned to your account according to the investment election on file at the time the payment is credited to your account. For loans made on or after January 1, 2002, interest will continue to accrue on missed loan payments.

You can repay your general loan in a single cash payment at any time beginning six months from the date the loan was issued. You can repay your residential loan in a single cash payment at any time after the loan is issued. There is no penalty for repaying the loan balance early.

Partial lump-sum prepayments are not permitted.

You do not pay income taxes on any money borrowed from the Plan because it is repaid into your Plan account. The interest portion of your payments is not tax-deductible. You may wish to consult a tax adviser before borrowing from the Plan.

## Repaying your loan if you leave the Company

The Plan allows 90 days from your termination date for a full payment of the loan except for cases noted below. If full payment is not made within 90 days, the unpaid balance will be treated as a distribution and you will be taxed in the year of distribution and may be subject to a 10% penalty.

Participants who have been terminated involuntarily (except for gross misconduct or substantial failure to perform duties) or have retired or become disabled and have an outstanding loan can continue to make monthly payments on their loan after leaving the Company. Payments are due by the last business day of the month.

Interest will continue to accrue on missed loan payments for loans made on or after January 1, 2002.

If you die, the loan will become taxable to your estate.

## Defaulted loans

If you have defaulted on a loan from the Plan — or any plan merged into the Plan — the loan will be included when determining the number of loans available to you. The remaining principal of the defaulted loan also will be considered outstanding for purposes of determining the maximum amount available for any new loan.

You can always repay any previously defaulted loans in full. If you repay a defaulted loan, it will no longer be included in determining the maximum number of loans or maximum loan amount available to you. However, your defaulted loan will still be treated as a taxable distribution from the Plan even if you later repay it.

**Example:** If you defaulted on a loan in March 2004, beginning in 2005 the maximum number of loans you can take at any time is one. If you repay the defaulted loan, you can have a maximum of two loans outstanding at any time.

If you default on a loan taken on or after January 1, 2002, interest will continue to accrue on the defaulted loan. If you later decide to repay the loan, the loan payment amount will include interest from the time of your last payment.

## Check your pay statement

If you contribute to the Plan and/or have a Plan loan, check your pay statement — especially when you make a transaction that affects your pay — to be sure the correct amount is being deducted. Citigroup makes every effort to deduct the correct amounts, but it is your responsibility to review your pay statement. If you discover any error in your deduction or loan payment amount, call the Plan immediately.

# Distributions at termination of employment, disability, and death

You or your beneficiary can receive the vested value of your Plan account as a distribution when you:

- Leave the Company for any reason;
- Terminate employment as a result of a disability; or
- Die.

**citigroup**

You also may receive a portion of your vested account balance as a distribution when you:

- Have been disabled (as defined under the Company's Long-Term Disability Plan) and are still employed or
- Attain age 59½ before leaving the Company.

When you leave the Company:

- If the value of your Plan account is less than $1,000, your account automatically will be distributed to you as a lump sum with applicable taxes withheld.
- Effective March 28, 2005, if the value of your Plan account is between $1,000 and $5,000, and you do not make an election within 90 days after you receive a notice from the Plan, your account automatically will be rolled over into a Citibank IRA. Citigroup may select its own investment product for purposes of making the initial investment for your automatic rollover. Accordingly, when funds are automatically rolled over to a Citibank IRA, these funds will be initially invested in the Citibank IRA Insured Money Market Account, an investment insured by the Federal Deposit Insurance Corp. (FDIC) in accordance with applicable laws and regulations. Once rolled over, the Insured Money Market Account will earn interest compounded daily, and you will become a customer of Citibank with the same benefits and services available to other Citibank rollover IRA customers. You will pay any fees or expenses.
- If you are age 65 or older and your Plan account is $5,000 or less, your account automatically will be distributed to you as a lump sum with applicable taxes withheld. This distribution will not be eligible for an automatic rollover.
- If the value of your Plan account is greater than $5,000, you may request a distribution at any time or you can leave your money in the Plan. However, you must begin to receive your money by April 1 following the calendar year in which you reach age 70½. While your money remains in the Plan you can continue to direct the investment of your account. You may not borrow from your account.

### Required minimum distributions

If you remain employed by the Company after you reach age 70½, you may delay the distribution of your account until you retire. If you terminate employment before you reach age 70½, you must begin receiving distributions no later than April 1 following the calendar year in which you reach age 70½. For more information about your options, call the Plan.

### Forms of payment

You may elect to receive the value of your account in:

- A lump-sum payment (full or partial) of cash and/or stock or
- Monthly, quarterly, semiannual, or annual installments; installment payments may be made for any period that does not extend beyond the joint-and-last-survivor life expectancy of you and your beneficiary.

If you take a distribution while employed by the Company, generally you can receive this money in a lump-sum payment. Installments are not available for in-service withdrawals.

If you are a participant with a Copeland or Banamex Money Purchase Plan account, are married, and wish to elect a payment option other than a joint-and-survivor annuity option with your spouse as beneficiary, your spouse must consent to your election and the consent must be in writing and witnessed by a notary public.



If any portion of your account is invested in the Citigroup Common Stock Fund or the State Street Common Stock Fund and you elect the lump-sum or installment option, you may request that those funds be distributed to you in shares of stock with any fractional shares distributed in cash.

You also may convert any cash or investment funds in your account into the Citigroup Common Stock Fund and request a distribution of your entire account in whole shares of Citigroup common stock. A fractional share will be converted and distributed in cash.

If you take a distribution, the money will be taken from the contributions in your account on a pro-rata basis from all funds and sources of money.

For details about how taxes affect your benefits, see **How benefits are taxed**.

### *If you become disabled*

If you become disabled, you can take a disability withdrawal. For information about a disability withdrawal, see this **chart**.

### *If you die*

If you are married, your spouse will be your beneficiary unless you have designated someone else. Your spouse must consent to your naming another beneficiary, and the consent must be in writing and witnessed by a notary public.

At the time of your death, your beneficiary can leave the balance in the Plan, but it is subject to the IRS's required minimum distribution rules. Your beneficiary has the same rights to Plan participation as you except he or she cannot:

- Contribute to the Plan or receive Company contributions;
- Request an in-service withdrawal or loan; or
- Repay an outstanding loan.

If you have not named a beneficiary and are not married, or your beneficiary is not living at the time payment is made, your account balance will be paid to your estate.

### *Updating beneficiary information*

Keep your beneficiary designation up to date since, in the event of your death, your account will be paid in full to the beneficiary or beneficiaries you have named.

To designate your beneficiaries, visit the Your Benefits Resources™ Web site 24 hours a day at **http:// resources.hewitt.com/citigroup**. This site is available from the Citigroup intranet or through the Internet. Depending on the plan and the beneficiary information entered, an authorization may be mailed to your home. If so, you must sign and return the authorization within 60 days for your beneficiary information to take effect.

If you don't have access to Your Benefits Resources, call ConnectOne 1-800-881-3938. From the main menu, choose the "pension" option. For text telephone service, call 1-800-845-8531.

# How benefits are taxed

The following is a brief summary of certain federal income tax laws and their application to your benefits under the Plan as of the date of this prospectus. This summary is intended for U.S. employees only and does not address state or local income taxation. Regardless of your tax-paying status, you should consult your personal tax adviser to determine the applicability or interpretation of any federal, state, or local tax laws that may be relevant to your individual situation. Future changes in the law may affect the tax analysis described in this prospectus and other benefits-related communications.

The Plan enjoys certain tax advantages because it is intended to be a long-term savings program for retirement. For example, under current federal income tax law, money in your Plan account is not taxable while it is held in your Plan account. You or your beneficiary will owe income taxes on the taxable portion of your distribution (all amounts other than your after-tax contributions) when you receive the money.

In addition to ordinary income taxes, you may owe a 10% penalty tax on the taxable portion of any distribution you receive before you reach age 59½. The 10% penalty tax will not apply in the following situations:

- Your account is paid to you if you terminate employment with the Company at or after age 55;

- Your account is paid to you because you become disabled as defined by the IRS;

- Your account is paid to your beneficiary in the event of your death;

- You receive a distribution in a year in which you have deductible medical expenses in excess of 7.5% of your adjusted gross income (only the portion of the distribution in excess of 7.5% of your adjusted gross income is not subject to penalty);

- Payment is directed to another person by a Qualified Domestic Relations Order (QDRO) or payment is made to you as an alternate payee as a result of a QDRO;

- You roll over within 60 days or directly transfer the taxable amount of your account to an IRA (other than a Roth, Simple, or education IRA) or to another qualified employer-sponsored plan; or

- Payment is made in installments over your life expectancy or the joint life expectancies of you and your beneficiary.

## Special withholding

In general, for all distributions under the Plan (except for hardship withdrawals, annuities, or installments over your life expectancy or over 10 years, if less), you have the option of authorizing the Plan to make a direct rollover of your distribution into an IRA or another qualified plan that will accept the transferred amount. If you do not elect a direct rollover, federal income tax will be withheld.

As required by law, 20% of the taxable portion of the distribution must be withheld, unless you elect a direct rollover. You will receive information on the direct rollover option when you terminate employment and are ready to receive a distribution.

You are still permitted to roll over the distribution you receive into an IRA or another qualified plan that will accept the rollover if you do so within 60 days of the date you receive the distribution. However, if you elect this rollover option, 20% withholding will still apply. The only way to avoid federal income tax withholding at distribution is to elect the direct rollover option.

If your surviving spouse is entitled to receive an eligible distribution due to your death, he or she also can authorize a rollover of your Plan balance into an IRA or another qualified plan. A direct rollover is the only way to avoid the 20% federal income tax withholding.



Regardless of the amount of federal income tax withheld at distribution, if any, you will be responsible for payment of any taxes associated with the distribution.

## Withholding on installment payments

If you receive your account balance in installments for 10 years or more or in installments payable over your life expectancy (or the joint life expectancies of you and your designated beneficiary), you can elect to have federal income tax withheld from your payments by calling the Plan. If you do not make any election, federal income tax will be withheld automatically at a 10% rate. This withholding also applies to required minimum distributions.

Withholding is applied as if the payments were wages. If you elect not to have the withholding apply or even if you do elect the withholding, you still may owe taxes on the payments. You are responsible for payment of any taxes associated with installment payments.

## Withholding on hardship withdrawals

If you receive a financial hardship withdrawal, you can elect to have federal income tax withheld from your payment at 10% of the amount withdrawn or, if you choose, at a greater amount. If you do not make an election, 10% federal income tax will be withheld.

Regardless of your election, you still may owe taxes on the hardship withdrawal. You also may be subject to the 10% premature withdrawal penalty tax. See **How benefits are taxed**. You are responsible for payment of any taxes associated with the withdrawal.

## State tax withholding

If required by law, state income tax will be withheld on distributions from the Plan,.

### *Tax rules for common stock*

Upon certain events, if you choose to receive the value of your contributions and any vested Company Contributions invested in the Citigroup Common Stock Fund or State Street Common Stock Fund, any net unrealized appreciation in the value of such stock while held by the Plan's Trust is not taxable at the time of distribution but only at the time of disposition.

The net unrealized appreciation is the excess of the market value of the stock at the time of the distribution over the cost or other basis in the stock to the Trust. However, you may elect on your tax return for the taxable year of the distribution to account for such appreciation in current income.

Any appreciation on shares of common stock not taxed to you at the time of distribution generally will be taxed upon subsequent disposition of the stock as a long-term capital gain. For additional limitations and information regarding the taxability of State Street Stock, see **State Street stock**.

Any realized gain on a subsequent taxable disposition in excess of the net unrealized appreciation is taxable as either short-term or long-term capital gain, depending on the holding period.

If the value of a lump-sum distribution of common stock is less than your after-tax contributions (if any), no loss is recognized at the time of distribution, and the basis of such common stock would be the amount of your after-tax contributions.

The balance of the fair market value of your interest in excess of the aggregate of your contributions and the net unrealized appreciation will be taxed as ordinary income. All contributions other than after-tax and all investment growth on your account will be taxable when they are paid to you.



Tax laws change from time to time, and the tax impact of receiving payments from the Plan will vary with your individual situation and when you receive the distribution. Because the Company does not give tax advice or counsel, you should consult a professional tax adviser or financial expert for advice about your circumstances.

## Taxation of employer

For federal income tax purposes, the Company generally will be allowed a deduction for any before-tax and Company contributions made to the Plan.

## State Street stock

State Street Stock acquired before July 1, 2001, will have a basis of the lower of cost or market value when distributed for lump-sum distributions and after-tax withdrawals.

citigroup︎ᴶ

# Other important information

This section provides other important information about the Citigroup 401(k) Plan.

## Charges and expenses

The Plan currently pays all direct charges, expenses, and taxes that relate to purchases by the Citigroup Common Stock Fund. The other investment funds do not charge an initial investment fee to the Plan or its participants, but each fund invests in a portfolio that charges against the assets invested in that portfolio an annual management fee as well as the expenses of that portfolio's operations. The Company charges the administrative and recordkeeping costs of the Plan directly to participant accounts.

## Account statements

The value of your account is based on your contributions, Company contributions, if any, and the performance of the investment funds you have selected. Your account will be valued at the end of each business day. You can request a statement showing the current value of your account with:

- Your before-tax and/or rollover contributions;
- Any Company contributions made on your behalf;
- Any withdrawals, transfers, or loans; and
- Increases or decreases in the value of your investments.

At any time you may request an account balance summary with the market value of your accounts as of the previous business day. You may request this summary by calling the Plan or visiting the Plan's Web site.

## Top-heavy provisions

Under current tax laws, qualified retirement plans, including this Plan, are required to contain provisions that will become effective if they become "top-heavy." A plan is considered top-heavy only if the present value of the accumulated accrued benefits for certain highly paid employees is more than 60% of the accrued benefits of all employees.

It is unlikely that the Plan will ever become top-heavy. If it does, certain minimum benefits will have to be provided, and an overall limit on the compensation taken into account under the Plan will apply.

A more detailed explanation of these provisions will be provided if and when the Plan ever becomes top-heavy.

## Fiduciary liability

The Plan is intended to constitute a plan described by Section 404(c) of ERISA, and the fiduciaries of the Plan may be relieved of liability for any losses that are the direct result of investment instructions given by the Plan participant.



## Responsibility for investment allocations

This Plan is intended to constitute a plan described in Section 404(c) of ERISA and Title 29 of the Code of Federal Regulations Section 2550.404c-1. Records of transactions — including the purchase, sale, and voting of Citigroup common stock within the Plan — are kept confidential.

As such, the fiduciaries of the Plan may be relieved of liability for any losses incurred that are the direct and necessary result of investment instructions placed by a participant (or beneficiary, as the case may be).

## Plan confidentiality

The Plan has established procedures designed to ensure the confidentiality of your investment and voting decisions concerning the Citigroup Common Stock Fund. The confidentiality of your investment is maintained by the following procedures:

- Investment elections are received and processed by the Recordkeeper. All information relating to your investments is held by the Recordkeeper in strict confidence.

- When you exercise your voting rights on Citigroup common stock, the Trustee supervises and ensures confidentiality of your decision.

## Restrictions on alienation

Except as may be required under applicable law in the case of a QDRO (see the Glossary for the definition) under ERISA or as otherwise specifically permitted by U.S. Treasury regulations, your benefits under the Plan may not be assigned, transferred, sold, alienated, pledged, or encumbered.

## Future of the Plan

The Plan was adopted by Commercial Credit Co. effective January 1, 1987. Effective January 1, 1990, the Plan was amended and restated to substitute Primerica Corp. for Commercial Credit Co. as the Plan sponsor. Effective January 1, 1994, the Plan sponsor was changed to The Travelers Inc., and effective April 26, 1995, the Plan sponsor changed its name to Travelers Group Inc.

Effective October 8, 1998, Citicorp Inc. merged with and into a newly formed wholly owned subsidiary of Travelers Group Inc., and Travelers Group Inc. changed its name to Citigroup. In October 1998, the Plan sponsor changed its name to Citigroup.

Effective July 1, 2001, the Travelers Group 401(k) Savings Plan changed its name to the Citigroup 401(k) Plan, as amended and restated as of January 1, 2001. The Citibuilder 401(k) Plan was merged into the Citigroup 401(k) Plan July 1, 2001.

The Plan is subject to the continuing approval of the IRS. If changes are required for continued approval, you will be notified.

The Company expects to continue the benefits described here indefinitely but reserves the right to amend, modify, suspend, or terminate the Plan — in whole or in part — at any time without prior notice.

Citigroup's decision to change or terminate the Plan may be due to changes in federal or state laws governing retirement benefits, the requirements of the Code or ERISA, or for any other reason. Such change may transfer Plan assets to another plan or split this Plan into two or more parts.

In the event of a complete termination of the Plan, all participant accounts will be 100% vested. Trust assets then will be used to pay benefits to participants and beneficiaries.

# When benefits are not paid

This summary plan description describes how the Plan provides benefits to you or your beneficiary. It is important that you understand the conditions under which benefits could be less than expected or not paid at all.

- If you leave the Company before you have satisfied certain service requirements, in general, you will forfeit the value of certain Company contributions to your account. See **Vesting**.

- If, before you are vested, you terminate your employment as a result of disability and do not meet the conditions of a disability (as defined under the Company's Long-Term Disability Plan), you will forfeit the value of certain Company contributions to your account.

- You could lose your benefits if they are payable after you terminate employment and the Plan Administrator is unable to locate you at your last known address. Therefore, you must notify the Plan of any changes in your mailing address.

- If, as a result of a divorce, you are responsible for child support, alimony, or marital property rights payments, all or a portion of your benefits could be assigned to meet these payments if a court issues a QDRO. A QDRO is any judgment, decree, or order (including certain property settlement agreements) that provides for child support, alimony, and/or other marital property rights to a spouse, former spouse, child, or other dependent under state domestic relations law. The QDRO must comply with certain legal requirements, including review and approval by the Plan Administrator. For a detailed description of the procedures for a QDRO, participants and beneficiaries should contact the Plan. There is no charge for the procedures.

## Claims and appeals

### Claims procedure

If you do not receive benefits from the Plan to which you believe you are entitled, or if your application for benefits is denied in whole or in part, you may file a written claim with the Committee. Corporate Benefits or its delegate(s) will investigate your claim on behalf of the Committee, and you will receive its decision. Benefit claim determinations will be made in accordance with the Plan document, and the Plan provisions will be applied consistently to similarly situated participants.

If your claim is denied, you will receive a written explanation within 90 days after receipt of your claim (180 days if special circumstances apply and written notice is provided within the initial 90-day period indicating the special circumstances and the expected benefit determination date). Such explanation will include the following:

- The specific reasons for the denial;

- References in the Plan documentation that support these reasons;

- The additional information you must provide to improve your claim and the reasons why that information is necessary; and

- A description of the Plan's claims review procedures for filing an appeal with the Committee (including time limits) and a statement of your right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA) if the Committee's final decision is to deny the benefits requested in your appeal.

citigroupⰋ

### Appeals procedure

You have a right to appeal a denied claim by filing a written request for further review of your claim with the Committee within 60 days after your claim has been denied. The Committee will conduct a full and fair review of your appeal. You and your representative may review Plan documents and submit written comments with your appeal. You will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim.

The Committee's review will take into account all comments, documents, and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. The Committee, in its discretion, may grant to you the opportunity to present your case by telephone at a teleconference scheduled by the Committee.

A final decision on your claim will be made by the Committee no later than the first available meeting date of the Committee following the date on which you filed your appeal provided any request for review that is filed within 30 days preceding any such meeting date shall be decided at the second available meeting date.

The Committee will hold regularly scheduled meetings at least quarterly. If special circumstances require a further extension of time for processing, a decision will be made no later than the third available meeting date of the Committee following the date on which you filed your appeal.

In the case of an extension, you will receive written notice prior to the beginning of the extension that describes the special circumstances and the date as of which the benefit determination will be made. The Committee will notify you in writing of its decision no later than five days after the decision has been made. The reply will include:

- The specific reasons for the denial;
- References in the Plan documentation that support these reasons;
- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits; and
- A statement of your right to bring a civil action under Section 502(a) of ERISA.

### Other procedures

To file a claim or appeal to Committee, you must complete the form designated by the Committee in accordance with the Plan's procedures. By participating in the Plan, participants and beneficiaries are deemed to agree that they cannot begin a legal action against the Plan more than 12 months after the Committee's final decision on appeal.

No suit or action for benefits under the Plan shall be sustainable in any court of law or equity unless you complete the appeals procedure and unless such suit or action is begun within 12 months after the Committee's final decision on appeal.

## Plan type and funding

The Plan is a defined contribution plan, a portion of which is designated an employee stock ownership plan within the meaning of Section 4975 of the Code, with a cash or deferred arrangement under Section 401(k) of the Code. The Plan is intended to be qualified under Section 401(a) of the Code. The Plan is funded with contributions that Plan participants and the Company make to the Plan's trust fund and any investment earnings on those contributions. Participants can contribute on a before-tax basis.

The Plan is subject to ERISA, including the provisions relating to disclosure, reporting, participation, vesting, fiduciary responsibilities, administration, and enforcement. As the Plan is considered a "defined



contribution" type of pension plan, benefits are not insured by the Pension Benefit Guaranty Corp., and the Plan is not subject to the funding requirements of ERISA and the Code.

The Plan is intended to constitute a participant-directed individual account plan within the meaning of Section 404(c) of ERISA. Plan participants are "named fiduciaries" under ERISA to the extent that they exercise voting rights on Citigroup common stock.

## General information

| Plan name | **Citigroup 401(k) Plan** |
|---|---|
| Plan sponsor | **Citigroup Inc.**<br>75 Holly Hill Lane<br>Greenwich, CT 06830 |
| Employer identification number | 52-1568099 |
| Plan number | 004 |
| Plan year | January 1 through December 31 |
| Plan administrator | **Plans Administration Committee of Citigroup Inc.**<br>125 Broad St., 8th Floor<br>New York, NY 10004<br>212-291-4420 |
| Plan trustee | **Citibank, N.A.**<br>111 Wall St.<br>New York, NY 10043 |
| Agent for service of legal process<br><br>Service of legal process also may be made upon the Trustee or Plan Administrator | **Citigroup Inc.**<br>General Counsel<br>399 Park Ave., 3rd Floor<br>New York, NY 10043 |

A list of participating companies in the Plan is available from the Plan Administrator or your Human Resources representative.

## Administrative fees

Certain administrative fees, including trustee and recordkeeping fees, are charged to participant accounts on a pro-rata basis. Fees do not include investment management fees or other expenses that may be charged by mutual funds. See the fund prospectuses for details on fees charged by mutual funds.

## Information about Citigroup

Citigroup files annual, quarterly, and current reports; proxy statements; and other information with the Securities and Exchange Commission ("SEC"). These SEC filings are available to the public on the SEC's Web site at **www.sec.gov**. Citigroup's 2003 annual report, as well as certain of Citigroup's SEC filings, are available to the public on Citigroup's Web site at **www.citigroup.com**.

citigroup

## Incorporation of certain documents by reference

The SEC allows Citigroup to "incorporate by reference" the information it files with the SEC, which means that it can disclose important information to you by referring you to those documents.

The information incorporated by reference is considered to be part of this prospectus. Information that Citigroup files later with the SEC automatically will update information in this prospectus. In all cases, you should rely on the later information over different information included in this prospectus.

Citigroup incorporates by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Act prior to the filing of a post-effective amendment to the Registration Statement relating to the common stock issued under the Plan, which indicates that all Citigroup common stock offered has been sold or which deregisters all Citigroup common stock that has not been sold:

- Annual Report on Form 10-K, as amended, of Citigroup for the year ended December 31, 2003;

- The Quarterly Reports on Form 10-Q for the quarters ended March 31, 2004; June 30, 2004; and September 30, 2004;

- Periodic Reports on Form 8-K dated January 12, 2004; January 15, 2004; January 20, 2004; February 9, 2004; February 10, 2004; March 29, 2004; April 2, 2004; May 5, 2004; May 10, 2004; May 13, 2004; May 14, 2004; May 27, 2004; June 4, 2004; June 9, 2004; June 21, 2004; July 15, 2004; July 16, 2004; July 20, 2004; July 29, 2004; August 11, 2004; August 31, 2004; September 17, 2004; September 21, 2004; September 27, 2004; October 14, 2004; October 20, 2004; October 22, 2004; November 1, 2004; November 5, 2004; November 23, 2004; November 30, 2004; December 8, 2004; December 9, 2004; and

- Registration Statement on Form 8-B, dated May 10, 1988, as updated by the description of Citigroup common stock contained in the Company's Registration Statement on Form S-3, dated March 21, 2001, and any amendment or report filed to update such description.

Citigroup will provide its Annual Report on Form 10-K and its Proxy Statement for the most recent year to all Plan participants and will provide without charge to each person to whom this prospectus is delivered, on his or her request, a copy of any or all of the foregoing documents incorporated herein by reference (other than exhibits to such documents). Written or telephone requests should be directed to:

Plans Administration Committee of Citigroup Inc.
Corporate Benefits Department
125 Broad St., 8th Floor
New York, NY 10004
212-291-4420.

## Your rights under ERISA

As a participant in the Citigroup 401(k) Plan, you are entitled to certain rights and protections under ERISA.

### Receive information

You may examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites, all documents governing the Plan including insurance contracts and a copy of the latest annual report (Form 5500 Series) filed by the Plan Administrator with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

You may obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan including insurance contracts and copies of the latest annual report (Form 5500



Series) and an updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

You may receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of the summary annual report.

You may obtain a statement with your total account balance under the Plan. This statement must be requested in writing and is not required to be given more than once every 12 months.  The Plan must provide the statement free of charge. Even if you do not make this written request, you will receive statements automatically on a quarterly basis or as otherwise determined by the Plan Administrator.

## Prudent actions by Plan fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties on the people who are responsible for the operation of the Plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

## Enforce your rights

If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the Plan document or the latest annual report from the Plan and do not receive it within 30 days, you may file suit in federal court. In such a case, the court may require the Plan Administrator to provide the material and pay you up to $110 a day until you receive the material, unless the material was not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits, which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court.

If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## For more information

If you have any questions about the Plan, contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Ave., NW, Washington, DC 20210.

You also may obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.



# Glossary

The following definitions apply to the Plan unless clearly indicated otherwise.

**After-tax contributions:** The Plan allows you to contribute on a before-tax basis only. However, after-tax contributions were permitted in prior years for Travelers Property Casualty and Copeland (now Retirement Services Division of CitiStreet LLC) employees effective January 1, 1999). Other employees may have after-tax contributions from prior plans that were merged into the Citigroup 401(k) Plan. In addition, you may roll over after-tax amounts distributed to you from another employer's qualified plan, a 403(b) plan, or a 457(b) plan of a government entity.

**Basic Award contributions:** Pre-1999 contributions made to employees of the Savings Incentive Plan of Citibank, N.A. and Participating Companies (SIP).

**Before-tax contributions:** Contributions deducted from your pay before being subject to federal and, in some cases, state and local income taxes.

**Code:** Internal Revenue Code of 1986, as amended.

**Committee:** The Plans Administration Committee of Citigroup Inc.

**Company:** Citigroup Inc. and its participating subsidiaries and affiliates.

**Company contributions:** The following contributions made by the Company are considered Company Contributions:

- **Company Matching Contributions:** Contributions made by the Company for the Plan years on or after January 1, 2002.

- **Citibuilder Contributions:** Contributions for eligible employees of Citibank (1999-2001); Citigroup Corporate (excluding the Citigroup Investment Group) 2000-2001; Total Benefits Outsourcing (TBO) and Institutional Divisions (ID) of CitiStreet LLC (2001); and The Associates (2001).

- **State Street Match:** The employer matching contribution for State Street employees under the State Street Salary Savings Program prior to its merger into the Citigroup 401(k) Plan, effective July 1, 2001.

- **Wellspring match:** The employer matching contribution for Wellspring employees under the Savings and Investment Plan for the Associates of Wellspring Resources, LLC prior to its merger into the Citigroup 401(k) Plan, effective July 1, 2001.

- Other Company contributions

  - **Aetna Supplemental Savings-Post 1997:** Employer contributions for former Aetna employees.

  - **Company Match and Profit Sharing:** Employer matching and profit-sharing contributions made prior to 1996 for employees of Copeland (now Retirement Services Division of CitiStreet LLC).

  - **5% discount:** Post-1996 employer 5% discount on purchases of Citigroup common stock; 5% discount contributions are transfer-restricted for the remainder of the calendar year in which they were made. These contributions were available for 2001 and prior plan years only.

  - **Pre-Merger 5% Discount-December 1989:** Employer matching contributions for Travelers Group employees in the Primerica Holdings, Inc. Capital Accumulation Plan.

  - **Profit Sharing/Segregated Account:** Employer contributions made prior to 1992 for employees of Primerica Financial Services under the PFS Primerica Corporation Savings and Retirement Plan; employer contributions made under the American Express Incentive Savings



Plan, Shearson Lehman Brothers Holdings Inc. Employee Stock Ownership Plan, and the Retirement Plan of Phillip Brothers Inc. or the Phibro Energy Profit Sharing and Retirement Savings Plan.

- **Salomon 401(k) Match:** Employer matching contributions made in cash prior to 1999 for Salomon employees; the contributions are 100% vested immediately.

- **Special Company Contribution:** Employer contributions made for employees of Citigroup Investment Group, CitiFinancial, National Benefit Life Insurance Co., Primerica, Salomon Smith Barney Inc., CitiStreet LLC Retirement Services Division, Travelers Property Casualty, Phibro, Travelers Life & Annuity, and Travelers Insurance Co. who were eligible to participate in the Plan with one year of service, who were employed on the last day of the Plan year, and whose eligible pay was not in excess of $40,000 for full-time employees ($20 per hour for part-time employees). The contribution was 100% vested immediately.

- **Supplemental Awards:** Pre-1999 Matching Contributions made to employees of the Savings Incentive Plan of Citibank, N.A. and Participating Companies (SIP).

▫ Employer match

- **Employer Match:** Employer matching contributions for Travelers Property Casualty, Travelers Life & Annuity, Travelers Insurance Co., and Copeland (now Retirement Services Division of CitiStreet LLC) employees (made prior to 1997 except for Travelers Property Casualty Transitional Benefit employees who received employer matching contributions through December 31, 1998).

- **Employer Pre-Merger Match:** Employer matching contributions for Travelers Group and Smith Barney employees made prior to 1997. Pre-merger match contributions were made by the employer for Travelers Group and Smith Barney employees prior to the merger of the Primerica Holdings, Inc. Capital Accumulation Plan and the Smith Barney 401(k) Employee Savings Plan into the Travelers Group 401(k) Savings Plan.

- **Money Purchase Contributions:** Contributions made for employees of the Retirement Services Division of CitiStreet LLC.

- **Profit-Sharing Contributions:** Profit-sharing contributions made before 1980 for employees in the Savings Incentive Plan of Citibank, N.A. and Participating Companies (SIP); Associates post-1991 profit-sharing and match; and Wellspring plan employer non-elective contributions (profit-sharing).

▫ Restricted contributions

- **Aetna Employer Match:** 1996 employer matching contributions made for former Aetna employees; the contributions are 100% vested immediately.

- **5% discount-restricted:** Pre-1997 employer 5% discount on purchases of Company common stock restricted from transfer out of any common stock fund until age 55.

- **Salomon Guideline Benefit Contributions:** Employer contributions made prior to 1999 for Salomon employees based on years of service; the contributions are 100% vested after seven years.

- **Salomon PAYSOP Contributions:** Employer contributions under the prior Payroll Based Stock Ownership Plan or additional employer matching contributions made in stock prior to 1999 for Salomon employees; the contributions are 100% vested immediately.

**Disabled:** As defined in the Company's Long-Term Disability Plan.



**ERISA:** Employee Retirement Income Security Act of 1974, as amended.

**Hours of service:** Each hour you are paid or entitled to payment for the performance of duties for a Participating Company. You also earn hours of service for vacation, holidays, illness, disability, and jury duty for which you are entitled to pay or hours for which back-pay awards are applicable. However, you may not receive more than 501 hours of service for any single, continuous period during which you perform no duties.

**The Plan or this Plan:** The Citigroup 401(k) Plan.

**Plan Administrator:** The Plans Administration Committee of Citigroup Inc.

**Plan Year:** January 1 through December 31.

**QDRO:** A QDRO or "qualified domestic relations order" is a judgment, decree, or order (including certain property settlement agreements) that provides for child support, alimony, and/or other marital property rights to a spouse, former spouse, child, or other dependent under state domestic relations law. The QDRO must comply with certain legal requirements, including review and approval by the Plan Administrator.

**QMAC contributions:** 1990 and 1991 employer-qualified matching contributions for Travelers Group employees subject to transfer and withdrawal restrictions.

**QVEC contributions:** Pre-1987 qualified voluntary employee contributions for employees of the Savings Incentive Plan of Citibank, N.A. and Participating Companies (SIP). In addition, Travelers Property Casualty Co. and Travelers Life & Annuity Co. had QVEC contributions. See Appendix C for more information.

**Rollover contributions:** Amounts contributed to the Plan from an IRA or another employer's qualified plan.

**Trust:** The trust established under the Plan for purposes of investing and holding the assets of the Plan.



# Appendix A: Information for participants in the former Salomon Inc Retirement Plan

This section applies to participants in the former Salomon Inc Retirement Plan, which, as of December 1, 1997, was merged into the Travelers Group 401(k) Savings Plan (later renamed the Citigroup 401[k] Plan).

## Distributions

In addition to any features of the Plan described in this summary plan description, your account balances (and the earnings thereon) in the Plan that have been transferred from the Salomon Retirement Plan will have the additional feature described below.

The following seven-year graded vesting schedule will apply to prior plan Salomon Guideline Benefit balances:

| | |
|---|---|
| Less than 1 year | 0% |
| Greater than or equal to 1 year and less than 2 years | 10% |
| Greater than or equal to 2 years and less than 3 years | 20% |
| Greater than or equal to 3 years and less than 4 years | 30% |
| Greater than or equal to 4 years and less than 5 years | 40% |
| Greater than or equal to 5 years and less than 6 years | 60% |
| Greater than or equal to 6 years and less than 7 years | 80% |
| Greater than 7 years | 100% |

citigroupJ

# Appendix B: Information for employees of the Retirement Services Division (RSD) of CitiStreet LLC

### *Spousal consent for distributions*

Under the Money Purchase Plan 401(k) Savings Plan (a prior plan), spousal consent is required for all distributions of these funds. Federal law requires that benefits to a married participant be paid as an annuity for life and thereafter for the spouse's lifetime, unless this form of benefit is waived. If you are married, you and your spouse must waive this form of benefit to receive a distribution in any other form. Your spouse's signature must be witnessed by a notary public.



# Appendix C: Information for employees of Travelers Property Casualty Co. and Travelers Life & Annuity Co.

### Loans

Beginning January 1, 1999, all prior loans previously repaid only to the Fixed-Income Securities Fund will be repaid according to current investment elections.

### Qualified voluntary employee contributions (QVEC)

Prior to 1987, you could contribute to the Plan on a before-tax basis, but there were no Company Matching Contributions on these deposits. These contributions are known as qualified voluntary employee contributions (QVEC).

Special rules govern these contributions. They automatically are invested in the Fixed-Income Securities Fund under a group annuity contract. The contract provides a guarantee of the principal amount of the fund and interest accumulation for five years. After the five-year period expires, contributions mature and are reinvested — along with interest accumulated — for another five years at the interest rate in effect at that time.

Your QVEC account is payable when you retire, become disabled, or die. The account will be paid to you in a lump sum, in installments, as an annuity, or in a combination. You may withdraw money from your QVEC account at any time. If you make a partial withdrawal as an active employee, the last contributions you made will be the first paid to you. Partial withdrawals are not allowed for disabled employees, retired employees, terminated employees, or beneficiaries of deceased employees, except for maturity of a class-year account.

Because these contributions were not taxed when they were deposited into the Plan, they will be subject to income taxes when paid to you. The 10% excise tax applies as it would to early withdrawals. The rules regarding rollovers and mandatory 20% withholding and minimum distribution requirements at age 70½ also apply. In addition, there may be federal and state tax implications. Consult your tax adviser before requesting a distribution. QVECs are no longer permitted.



# Appendix D: Information for employees of The Associates Savings and Profit Sharing Plan

### *Withdrawals during employment*

In addition to other withdrawal rights under the Plan described in this prospectus and summary plan description, your account balances (and earnings thereon) in the Plan that have been transferred from the Associates Savings and Profit Sharing Plan will have the additional features described below:

- You may withdraw from your account in one or more withdrawals from the post-tax contribution account.

- You may withdraw part or all of such interest in the Plan attributable to profit-sharing contributions.

The following vesting schedule will apply to prior Associates employees who were employed December 31, 1991, and the portion of their Associates accounts attributable to matching and profit-sharing accounts:

| Less than 1 year | 0% |
|---|---|
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 60% |
| 4 years | 80% |
| 5 or more years | 100% |

If you were hired or rehired on or after January 1, 1992, you will have a 100% vested interest in that portion of your Associates account attributable to your profit-sharing account upon attaining five years of vesting service and will have a 0% vested interest prior to that time.



# Appendix E: Information for participants in the former Geneva Group, Inc. Employee Stock Ownership Plan (ESOP)

This information applies to participants in the former Geneva ESOP at the time of the acquisition of Geneva Group, Inc. by Citigroup January 31, 2001.

You will be credited with vesting service for:

- Any vesting computation period (determined on a November 1 to October 31 basis), which ended prior to January 1, 2002, for which you were credited with a year of vesting service under the terms of the Geneva Group, Inc. ESOP.

- Any such vesting computation period that overlaps with the plan year beginning January 1, 2002.

- Any plan year beginning on or after January 1, 2002, in which you are deemed to perform 1,000 hours of service.

The following vesting schedule applies to your portion of your Geneva ESOP account:

| Less than one year | 0% |
| --- | --- |
| 1 year | 10% |
| 2 years | 20% |
| 3 years | 30% |
| 4 years | 40% |
| 5 years | 60% |
| 6 years | 80% |
| 7 or more years | 100% |

You may elect to receive any cash dividends paid from the portion of your Geneva ESOP account invested in the Citigroup Common Stock Fund under the Plan.



# Appendix F: Information for participants in the former California Federal Employees' Investment Plan (the "Cal Fed Plan")

If you were actively employed by Citigroup as of January 1, 2003, you will be credited with vesting service under the Plan as follows:

- Each whole year of vesting service that would have been credited prior to January 1, 2003, under the terms of the Cal Fed Plan will be counted as a year of vesting service under the Plan;

- Any partial year of vesting service credited as of December 31, 2002, under the terms of the Cal Fed Plan will be rounded up and counted as a whole year of vesting service under the Plan; and

- Each calendar year beginning on or after January 1, 2003, in which you are deemed to perform 1,000 hours of service will be counted as a year of vesting service under the Plan.

If you were actively employed by Cal Fed on or after January 1, 2000, you are 100% vested in any profit-sharing and matching contributions made under the terms of the Cal Fed Plan prior to December 31, 2002.



# Appendix G: Information for participants in the former Banamex USA Bancorp 401(k) Plan (the "Banamex 401[k] Plan") and the former Banamex USA Bancorp Money Purchase Pension Plan (the "Banamex MP Plan")

Former participants of the Banamex 401(k) Plan and the Banamex MP Plan who were actively employed by Citigroup as of June 30, 2004, will be credited with vesting service under the Citigroup 401(k) Plan as follows:

- Each whole year of vesting service that would have been credited prior to January 1, 2004, under the terms of the Banamex MP Plan;

- Any fractional part of a year of vesting service as of June 30, 2004, under the terms of the Banamex 401(k) Plan, will be rounded up and counted as a whole year of vesting service under the Plan; and

- Each calendar year beginning on or after January 1, 2005, in which you are deemed to perform 1,000 hours of service will be counted as a year of vesting service under the Plan

You will be 100% vested in the portion of your Plan account attributable to contributions made prior to July 1, 2004, under the Banamex 401(k) Plan and the Banamex MP Plan.

### Spousal consent for Banamex MP Plan distributions

Spousal consent is required for any distribution from the portion of a your Plan account attributable to contributions made prior to July 1, 2004 under the Banamex MP Plan. Federal law requires that benefits to a married participant be paid as an annuity for life and thereafter for the surviving spouse's lifetime in an amount equal to 50% of the benefit amount that would have been payable to the participant if he or she had lived, unless this form of benefit is waived.

If you are married, you and your spouse must waive this form of benefit to receive a distribution in any other form. Your spouse's signature must be witnessed by a notary public. Optional forms of payment include a single life annuity, a joint and 50% survivor annuity for a non-spouse beneficiary, and a term certain annuity with guaranteed payments for five, 10, 15, or 20 years.



**Citigroup 401(k) Plan**

# Appendix H: Information for participants in the former Forum Financial Group Savings Plan (the "Forum Plan")

If you became eligible to participate in the Plan as of May 1, 2004, your prior service will count toward vesting in the Plan.

citigroup

# Appendix I: Information for participants in the former Sears 401(k) Savings Plan (the "Sears Plan")

If you became eligible to participate in the Plan as of January 1, 2004, your prior service will count toward vesting in the Plan.

citigroup⌐

# Appendix J: Information for participants in the former Principal Select Savings Plan (the "Principal Plan")

If you became eligible to participate in the Plan as of July 1, 2004, your prior service will count toward vesting in the Plan.

citigroup

# Appendix K: Information for participants in the former Washington Mutual Savings Plan (the "WaMu  Plan")

If you became eligible to participate in Plan as of March 1, 2004, your prior service will count toward vesting in the Plan.